ACCEPTED
15-24-00132-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
5/22/2025 5:10 PM
CHRISTOPHER A. PRINE
CLERK

No. 15–24–00132–CV

# In the Court of Appeals
# for the Fifteenth Judicial District
# Austin, Texas

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
5/22/2025 5:00:00 PM
CHRISTOPHER A. PRINE
Clerk

---

AIRW 2017-7, L.P. ET AL,

*Appellants,*

*v.*

CITY OF GEORGETOWN, TEXAS,

*Appellee.*

---

## BRIEF OF APPELLANTS AIRW 2017-7, L.P.; 600 WESTINGHOUSE INVESTMENTS, LLC; 800 WESTINGHOUSE INVESTMENTS, LLC

---

Andrew B. Davis
State Bar No. 24082898
andrew@lkcfirm.com
William T. Thompson
Texas Bar. No. 24088531
will@lkcfirm.com
Todd Disher
Texas Bar. No. 24081854
todd@lkcfirm.com

LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
T: (512) 693–8350
F: (512) 727–4755

*Counsel for Appellants AIRW 2017-7, L.P.; 600 Westinghouse Investments, LLC; 800 Westinghouse Investments, LLC*

**Oral Argument Requested**

## IDENTITY OF PARTIES AND COUNSEL

**Intervenor-Defendants / Appellants:**
AIRW 2017-7, L.P.; 600 Westinghouse Investments, LLC; and 800 Westinghouse Investments, LLC

**Counsel for Intervenor-Defendants / Appellants:**
Andrew B. Davis
Texas Bar. No. 24082898
andrew@lkcfirm.com
William T. Thompson
Texas Bar. No. 24088531
will@lkcfirm.com
Todd Disher
Texas Bar. No. 24081854
todd@lkcfirm.com
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701

Helen S. Gilbert
Texas Bar No. 00786263
hgilbert@bartonbensonjones.com
Barton Benson Jones, PLLC
7000 N. MoPac Expwy, Suite 200
Austin, TX 78731

Edmond McCarthy
Texas Bar No. 13367200
Ed@ermlawfirm.com

**Plaintiff / Appellee:**
City of Georgetown, Texas

**Counsel for Plaintiff / Appellee:**
William A. Faulk, III
Texas Bar No. 24075674
CFaulk@spencerfane.com
Carlota Hopinks-Baul
Texas Bar No. 24094039
CHBaul@spencerfane.com
Spencer Fane, LLP
816 Congress Ave., Ste. 1200
Austin, TX 78701

**Intervenor-Defendant / Appellant:**
Jonah Water Special Utility District

**Counsel for Defendant-Appellant:**
John J. Carlton
Texas Bar No. 03817600
john@carltonlawaustin.com
Kelli A. N. Carlton
Texas Bar No. 15091175
kelli@carltonlawaustin.com
Erin R. Selvera
Texas Bar No. 24043385
erin@carltonlawaustin.com
The Carlton Law Firm, P.L.L.C.
4301 Westbank Drive, Ste. B-130
Austin, TX 78746

McCarthy & McCarthy, LLP
1122 Colorado St., Suite 2399
Austin, TX 78701

**Defendant-Appellant:**
Texas Commission on
Environmental Quality

**Counsel for Defendant-Appellant:**
Sara J. Ferris
Assistant Attorney General
Texas Bar No. 50511915
Sara.Ferris@oag.texas.gov
Environmental Protection Division
Office of the Attorney General
P.O. Box 12548, MC-066
Austin, TX 78711-2548

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ........................................................................ ii

TABLE OF CONTENTS ............................................................................................... iv

INDEX OF AUTHORITIES ........................................................................................... vi

RECORD REFERENCES AND CITATIONS ..................................................................... ix

STATEMENT OF THE CASE ...........................................................................................x

ISSUES PRESENTED ................................................................................................... xii

STATEMENT REGARDING ORAL ARGUMENT ........................................................... xiii

INTRODUCTION ..........................................................................................................1

STATEMENT OF THE FACTS .........................................................................................3

    A.  The Developers decide to develop 128 acres in the City's extraterritorial jurisdiction as a residential community. ..............................................................................3

    B.  The Developers ask the City of Georgetown to use their wastewater treatment facilities but are told that this requires annexation. .........................................................5

    C.  AIRW applies for a TPDES wastewater permit. ...........................7

    D.  The Commission grants the wastewater permit after a contested case hearing. .................................................................8

    E.  The trial court reverses the Commission's order as inconsistent with Texas's regionalization policy. ........................10

SUMMARY OF THE ARGUMENT ................................................................................11

STANDARD OF REVIEW ...........................................................................................15

ARGUMENT ..............................................................................................................16

    I.  The trial court erred in concluding that the Commission's order violated Texas's regionalization policy. ....................................16

A.  The Texas Water Code gives the Commission broad discretion whether to grant a wastewater permit when there is a nearby "available" wastewater system. ........................17

B.  The Commission's informal guidance states that it will approve a permit for a new wastewater facility where an existing system denies connection or where connection is costly. ...................................................................19

C.  The Commission reasonably exercised its discretion to grant AIRW's permit application because it found that the City denied service and that connection was costly. .............21

D.  There was no basis for the trial court to second guess the Commission's findings on denial of service and cost of connection. .................................................................25

E.  The City's inability to provide service to the Development is an independent basis to reverse. ........................33

II.  There is no alternative ground on which to affirm. ...........................34

A.  There is substantial evidence that AIRW's application was complete and accurate, with the Commission having all the information it needed to make a reasoned decision. ..................................................................34

B.  Substantial evidence supports the Commission's determinations that the permit protects water quality. ...............36

C.  Substantial evidence supports the Commission's other determinations. .................................................................39

PRAYER .................................................................................................40

CERTIFICATE OF SERVICE ......................................................................42

CERTIFICATE OF COMPLIANCE ...............................................................42

## INDEX OF AUTHORITIES

**Page(s)**

**Cases**

*Andrade v. Venable*,
372 S.W.3d 134 (Tex. 2012)................................................................38

*City of El Paso v. Public Util. Comm'n of Tex.*,
883 S.W.2d 179 (Tex. 1994)...........................................................18, 19

*Collins v. Yellen*,
594 U.S. 220 (2021)...........................................................................31

*Commons of Lake Hous., Ltd. v. City of Hous.*,
__ S.W.3d __, No. 23-0474, 2025 WL 876710 (Tex. Mar. 21, 2025).............32

*Elliott v. City of Coll. Station*,
__ S.W.3d __, No. 23-0767, 2025 WL 1350002 (Tex. May 9, 2025) ...............4

*Jenkins v. Crosby Indep. Sch. Dist.*,
537 S.W.3d 142 (Tex. App.—Austin 2017, no pet.) ....................................15

*Lazarides v. Farris*,
367 S.W.3d 788 (Tex. App.—Houston [14th Dist] 2012, no pet.) ..............29

*Norhill Energy, LLC. v. City of McKinney*,
05-23-00706-CV, 2024 WL 4970952 (Tex. App.—Dall. 2024,
pet. denied) ....................................................................................29

*Reliant Energy, Inc. v. Pub. Util. Comm'n of Tex.*,
153 S.W.3d 174 (Tex. App.—Austin 2004, pet. denied)............................28

*Ross v. Blake*,
578 U.S. 632 (2016)........................................................................17, 18

*Save Our Springs All., Inc. v. Texas Comm'n on Env't Quality*,
__ S.W.3d __, No. 23-0282, 2025 WL 1085176 (Tex. Apr. 11,
2025) ....................................................................................................16

*Slay v. Texas Comm'n on Env't Quality*,
351 S.W.3d 532 (Tex. App.—Austin 2011, pet. denied)............................32

*Suburban Util. Corp. v. Pub. Util. Comm'n*,
652 S.W.2d 358 (Tex. 1983).....................................................................15

*Tex. Comm'n on Env't Quality v. Maverick County*,
642 S.W.3d 537 (Tex. 2022)..............................................................15, 27

*Tex. Health Facilities Comm'n et al. v. Charter Med.-Dall., Inc.*,
665 S.W.2d 446 (Tex. 1984)..............................................................15, 33

*Texas Indus. Energy Consumers v. CenterPoint Energy Hous. Elec.,
LLC*,
324 S.W.3d 95 (Tex. 2010)........................................................................26

*USA Waste Servs. of Hous., Inc. v. Strayhorn*,
150 S.W.3d 491 (Tex. App.—Austin 2004, pet. denied)...........................29

**Statutes**

Tex. Gov't Code § 311.016(1) ...............................................................................18

Tex. Gov't Code § 2001.146(c) .............................................................................10

Tex. Gov't Code § 2001.171....................................................................................29

Tex. Gov't Code § 2001.174............................................................................15, 16

Tex. Gov't Code § 2003.047(i-1)...........................................................................36

Tex. Water Code § 5.351 .......................................................................................15

Tex. Water Code § 13.244(c).................................................................................33

Tex. Water Code § 26.003 ................................................. 2, 10, 12, 16, 17, 28, 29

Tex. Water Code § 26.027(b) ............................................................................34

Tex. Water Code § 26.0282 .........................................................12, 17, 18, 28, 34

**Other Authorities**

16 Tex. Admin. Code § 24.225(c) ......................................................................33

30 Tex. Admin. Code § 60.1 ..............................................................................40

30 Tex. Admin. Code § 305.64 ..........................................................................35

30 Tex. Admin. Code § 307.5(b) ...................................................................37, 38

30 Tex. Admin. Code § 309.13(e) ......................................................................39

*Black's Law Dictionary* (12th ed. 2024) .............................................................38

City of Georgetown Home Rule Charter § 5.01 ..................................................31

City of Georgetown Ordinance No. 2003-16 (Mar. 11, 2003) ...........................25

Georgetown Unified Dev. Code § 13.05 ...............................................1, 5, 25, 26

*Hearing on S.B. 1586 Before the S. Comm. on Water, Agric., and
    Rural Affs.*, 89th Reg. Session (Tex. 2025),
    https://perma.cc/5KT4-MRCB .....................................................................27

# RECORD REFERENCES AND CITATIONS

The Reporter's Record is cited as "RR [page number] [line number]."

The Clerk's Record is cited as "CR [page number]."

The complete Administrative Record from the administrative proceeding is included in the Supplemental Clerk's Record and was admitted at the trial court as Exhibit 1 to the Reporter's Record. The Administrative Record is cited directly herein as "[volume number].AR.[item no.]" and "at [page number]" where applicable. For items in volumes 1-3, the page number corresponds to the page of the pdf document rather than any page number that may be marked on the page. This is because the underlying documents often have different and inconsistent page numbering conventions. For items in volume 4, which is the contested case transcript, page numbers correspond to the transcript page numbering.

In citations to the Commission's Final Order, "Finding(s) of Fact" is abbreviated as "FOF" and "Conclusion(s) of Law" is abbreviated as "COL."

## STATEMENT OF THE CASE

*Nature of the Case:*

This is an appeal of the reversal of the Texas Commission on Environmental Quality's (the "Commission" or "TCEQ") order granting Appellant AIRW 2017-7, L.P.'s application for a Texas Pollutant Discharge Elimination System ("TPDES") wastewater permit.

*Trial Court:*

Hon. Laurie Eiserloh, 261st District Court of Travis County, Texas.

*Course of Proceedings:*

The Commission granted AIRW's application for a TPDES wastewater permit to serve a new residential community development in the extraterritorial jurisdiction of the City of Georgetown (the "City"). The Commission concluded that granting the permit was appropriate because the City of Georgetown refused to provide wastewater service to the development unless the development agreed to annexation—a condition that would cost $20 million and result in the imposition of development restrictions. The City appealed to Travis County district court, arguing, among other things, that Texas's regionalization policy required the Commission to deny the permit and instead force the development to agree to the City's restrictions for service.

After considering briefing on all issues and holding a hearing, the trial court entered an order reversing and remanding to the Commission on regionalization. The trial court reasoned that, even though the City's law requires annexation for service and city staff repeatedly told AIRW that annexation was required for service, the Commission could not grant the permit consistent with regionalization unless and until AIRW asked the

x

Georgetown city council to waive the annexation requirement and the city council denied relief.

*Trial Court's*
*Disposition:*     The trial court reversed the Commission's order and remanded for further proceedings.

## ISSUES PRESENTED

**Issue 1:**

Did the Commission reasonably exercise its discretion to grant a wastewater permit to a residential development in the City of Georgetown's extraterritorial jurisdiction where: (a) a City ordinance required the development to agree to annexation for it to instead receive wastewater service from the City, (b) city staff repeatedly said that the development would have to agree to annexation in order to receive service from the City, and (c) annexation would both cost $20 million and alter the residential character of the development?

**Issue 2:**

Do any of the City of Georgetown's other arguments, including arguments about water quality and the completeness of AIRW's application, provide an alternative ground for affirmance?

## STATEMENT REGARDING ORAL ARGUMENT

Appellant AIRW 2017-7, L.P. respectfully requests oral argument. The Legislature instructed the Commission to use "reasonable methods" to encourage the use of regional and areawide wastewater collection and treatment systems. It gave the Commission wide discretion whether to "deny or alter" a proposed wastewater permit when connection to an existing system is "available." The decision below destabilizes that regime by changing regionalization from a policy goal the Commission considers into a weapon that cities can use to delay disfavored development.

Under the trial court's order, developers must first formally request any nearby city council to waive annexation requirements for wastewater service—a common municipal ordinance—and be denied before the Commission can issue a new wastewater permit. That holding, if left undisturbed, would incentivize cities that oppose development in their extraterritorial jurisdiction to string-along developers with the prospect of waiving an annexation requirement until the developers either cave to annexation or the development dies from delay years later. It would also create an administrative application and appeal process external to the legislatively-established TPDES application process at the Commission.

Oral argument is likely to aid the Court's consideration of these weighty issues that present questions of first impression for this Court.

The Legislature vested the Texas Commission on Environmental Quality—not a Travis County trial court—with discretion over new wastewater permits. The Commission rightly granted Appellant AIRW's application for a new wastewater permit when the City of Georgetown held its own wastewater services hostage to annexation demands that would cost AIRW's new residential development tens of millions of dollars and gut its residential character. That was an eminently reasonable exercise of the Commission's discretion that is supported by substantial evidence. The trial court's decision second-guessing that judgment was in error and should be reversed.

AIRW and its partner entities, 600 Westinghouse Investments, LLC; and 800 Westinghouse Investments, LLC (together, "the Developers") are developing approximately 128 acres in the extraterritorial jurisdiction (the "ETJ") of the City. They want to build an affordable, high-quality residential community with over 800 housing units ("the Development").

The Developers requested wastewater service for the Development from the City. The City, however, unequivocally refused to provide service unless the Developers agreed to annexation. This was consistent with the City's Unified Development Code, which *requires* annexation as a condition of wastewater service. Georgetown Unified Dev. Code § 13.05. But annexation is not a realistic option for the Developers. It would lower the

1

Development's value by $20 million and require switching from a residential development to a primarily commercial development.

Because the City refused to provide wastewater service without annexation, AIRW applied for a permit to treat and discharge the Development's wastewater using a new wastewater facility (the "Facility") to be constructed next to the Development. But the City opposed this wastewater solution as well. Its objections to the permit at the contested case hearing before the State Office of Administrative Hearing were varied in form, ranging from baseless environmental concerns to made-up procedural shortcomings. Yet the City's fundamental complaint has never been about the permit or the process: the City wants control of the Development, but does not have it because the Development is outside its corporate boundaries.

The Commission rightly rejected all the City's objections and granted AIRW's application. Most relevant for this appeal, the Commission rejected the City's attempt to use Texas's regionalization policy "encourag[ing]" the use of existing wastewater systems, Texas Water Code § 26.003, as a weapon to force connection and annexation. The Commission has wide discretion with respect to regionalization. And here, it exercised that discretion to grant the permit because substantial evidence establishes that (a) the City's ordinance requires annexation as a condition of wastewater service, (b) the City manager's office through multiple staffers repeatedly and unequivocally said annexation was required, and (c) "[t]here was no

2

indication that the City was willing to waive" this requirement. 1.AR.66 at 10 (FOF 41).

The trial court's decision to reverse the Commission's permitting decision was in error. According to the trial court, it was unreasonable for the Commission to issue the permit unless and until AIRW requested and was denied a waiver of Georgetown's annexation requirement by its city council. That holding cannot be squared with the substantial evidence standard of review or the Legislature's decision to grant *the Commission* discretion to decide when and how to implement regionalization. The Commission rightly concluded that an applicant can take "no" for an answer, and there was no basis for the trial court to disturb that conclusion.

This Court should reverse the judgment below and render judgment for the Commission, AIRW, and the other intervening defendants.

## STATEMENT OF THE FACTS

### A. The Developers decide to develop 128 acres in the City's extraterritorial jurisdiction as a residential community.

AIRW and its fellow developers saw a need for more high-quality, affordable housing north of Austin. To serve this need, they are developing a roughly 128-acre property in Georgetown's extraterritorial jurisdiction. 2.AR.167 at 2-3. The plan is to build over 800 housing units on the property: a 424-unit duplex development known as "Luxe of Georgetown," and a

separate 440-unit duplex project known as "Mansions of Georgetown III." 2.AR.167 at 2-3.[1]

The City has a different vision for this same land. The City's "2030 Future Land Use Plan" says the land being used for the Luxe and Mansions developments should instead be developed as a "Community Center." 2.AR.122 at 2; *see* 2.AR.105. This means that its primary use should be "[s]mall to mid-size retailers" with a target ratio for usage of "80% nonresidential, 20% residential." 2.AR.122 at 2.

Accordingly, were the property to become part of the City through annexation, the Developers would have to "substantially change the character of this development"—something they are not in the business to do because they are not commercial real estate developers. 4.AR.181 at 607-08. But so long as the property remains in the City's extraterritorial jurisdiction, the City's has no legal authority to prevent the Developers from developing the property for residential purposes as intended. *See Elliott v. City of Coll. Station*, __ S.W.3d __, No. 23-0767, 2025 WL 1350002, at *1 (Tex. May 9, 2025) (recognizing limited authority of a municipality in its extraterritorial jurisdiction).

---

[1] Appellant 600 Westinghouse Investments, LLC is developing Luxe of Georgetown and Appellant 800 Westinghouse Investments, LLC is developing Mansions of Georgetown. 2.AR.167 at 2-3.

**B. The Developers ask the City of Georgetown to use their wastewater treatment facilities but are told that this requires annexation.**

The Developers set out in June 2019 to find wastewater service for their planned residential developments. As the Commission requires, the Developers coordinated with several wastewater entities in the area, including the City. 2.AR.74 at 77-80. They emailed the city manager's office asking if the City's "sewer system has the available capacity for our development" and whether it would "be feasible for us to extend a sewer main to our property[.]" 2.AR.100 at 1. The City responded: "using our [wastewater] will require voluntary annexation." 2.AR.100 at 1. This was in line the City's Unified Development Code, which provides that "[p]roperties in the ETJ that desire or require wastewater service from the City of Georgetown *shall* first submit a petition for voluntary annexation." Georgetown Unified Dev. Code § 13.05 (emphasis added).

Based on that response, the Developers began seriously considering whether to build their own wastewater treatment plant for Luxe and Mansions. 2.AR.107. Still, they approached the City again, asking about opportunities to secure wastewater service without annexation, or with delayed annexation that would still allow them to build their planned residential communities. As a proposed incentive to the City for it to provide service without annexation, for example, they developed a plan to create "a 5 acre Park in place of the wastewater treatment plant." 2.AR.107 at 3. But

5

the City's planning director, Sofia Nelson, replied: "Should you desire to connect to the City wastewater system annexation will be required. We do not support a delayed annexation approach at this point." 2.AR.107 at 3. To the City, the park proposal, like delayed annexation, was simply a "non-starter." 2.AR.131 at 12-13.

By this point, the Developers understood well that their residential developments would not receive wastewater service from the City without annexation. The City was not interested in fashioning any deal. But were there any doubt, the City quickly dispelled it. When the Developers told the City in February 2020 that they would seek to develop their own private water treatment facility, Assistant City Manager Wayne Reed said: "Both in our meeting and in Sofia's e-mail communication with you, we have been clear that should you desire or need to connect to the City's wastewater system, you would have [to] annex[.] . . . Also, Sofia confirmed that we do not support a delayed annexation approach." 2.AR.103. He then wrote, "[Y]ou can develop in the ETJ with a private water treatment facility." 2.AR.103.

A few months later, in May 2020, the Developers thought there may have been an opening to revisit the issue based on a call with the City's Systems Engineering Director. The Developers accordingly wrote to Assistant City Manager Reed:

> [W]e would like for the City to agree to work with us on . . . a Development Agreement that would result in the City providing

6

sewer service. The agreement could not require annexation or limit land use but other options would be on the table and it would be site plan specific. As mentioned previously this agreement would include substantial financial contribution by the Developer to help the City with road or utility projects.

2.AR.101 at 2.

But Reed immediately shut down any idea of reconsidering the City's position. He responded:

[N]othing . . . said on our call yesterday should have been construed as the City entertaining providing wastewater service to this project in the ETJ. We have had multiple meetings and communications with [a representative from the Developers] on this topic, have explained our position in detail, and there is no need to revisit this request as the City's position remains the same; annexation will be required in order to receive wastewater service from the City.

2.AR.101 at 1.

## C. AIRW applies for a TPDES wastewater permit.

Given the City's steadfast position that wastewater service requires annexation, AIRW—the entity that owns the land on which the Facility is to be built—submitted an application for a TPDES wastewater permit to the TCEQ on April 6, 2020 (the "Application"). *See* 1.AR.66 at 5 (FOF 1); 1.AR.1. The Application requested authorization to discharge a small volume of treated domestic wastewater from a wastewater treatment plant or water resource reclamation facility on AIRW's property. 1.AR.66 at 5 (FOF 2). The

7

Application stated that "treated effluent [would] be discharged via pipe," then "through a culvert," "to an unnamed tributary," "to Mankins Branch," and finally "to the San Gabriel/North Fork San Gabriel River in Segment No. 1248 of the Brazos River Basin." 1.AR.66 at 6 (FOF 3). For much of the year, however, the Facility does not expect to discharge much, if any, wastewater because it plans, subject to the Commission's approval, to beneficially reuse wastewater via irrigation. 1.AR.1 at 43-44.

### D. The Commission grants the wastewater permit after a contested case hearing.

TCEQ's Executive Director reviewed AIRW's Application, concluded that it "meets the requirements of applicable law," and issued a draft permit (the "Draft Permit") to be considered by the full Commission. 1.AR.12 at 1. In response, the City and Jonah Water Special Utility District ("Jonah Water") separately objected to the Executive Director's decision, and each requested a contested case hearing. *See* 1.AR.15. The Commission concluded that the City met the qualifications for an "affected person" and issued an interim order referring the matter to the State Office for Administrative Hearings ("SOAH") for a contested case hearing on eight separate issues. 1.AR.19 at 4-5. One of these eight issues was "[w]hether the draft permit is consistent with the state's regionalization policy," 1.AR.19 at 5—a policy that encourages the "combination of two or more community wastewater systems for improved planning operation or management." 2.AR.98 at 1.

8

Over three days in May 2022, SOAH held a contested case hearing before two ALJs.[2] 4.AR.179; 4.AR.180; 4.AR.181. The ALJs heard testimony from eleven live witnesses, admitted approximately 101 exhibits, and received written briefing. 4.AR.181 at i-xv. With respect to regionalization, evidence at the hearing included multiple witnesses and multiple exhibits, including emails stating that, although the Developers sought to connect to the City's existing wastewater facilities rather than build a new treatment plant, the City repeatedly told the Developers that annexation was a precondition to service. *See, e.g.*, 2.AR.100 at 1; 2.AR.101 at 1; 2.AR.107 at 3. The evidence also included testimony from witnesses and documents showing that annexation would both lower the value of Luxe and Mansions by approximately $20 million and require substantial changes in the character of the development in order to make it consistent with the City's land use plans. *E.g.*, 2.AR.93 at 2; 2.AR.107 at 1; 2.AR.131 at 12; 4.AR.181 at 607-08.

---

[2] Following the Commission's interim order, but before the contested case hearing began, both 600 Westinghouse and 800 Westinghouse entered into Non-Standard Service Agreements with Jonah Water for the provision of sewer service to the Development (the "NSSAs"). 2.AR.113. Jonah Water had already committed to be the water provider to the Development. But before entering these NSSAs, Jonah Water had been concerned that the permit would allow another entity to operate a wastewater facility within its jurisdictional territory. *See generally* 2.AR.176. The NSSAs, however, resolved those concerns because the parties agreed that Jonah Water would own and operate the Facility, including the wastewater collection system, after the TPDES permit was issued and then transferred to Jonah Water in accordance with the Commission's rules in a separate approval process. 2.AR.113. Based upon the NSSAs, Jonah Water changed its position and supported the issuance of the Draft Permit in the contested case hearing.

Based on this evidence, other evidence, and the ALJs' recommendation, the Commission issued a final order granting the permit. 1.AR.66. To support its decision, the Commission issued findings of fact and conclusions of law, including on regionalization. The Commission found that "[t]here was no indication that the City was willing to waive the annexation and land use requirements," and that "[c]osts weigh in favor of granting AIRW's application." 1.AR.66 at 10-11 (FOF 41, 46). The Commission then concluded that "[t]he Application demonstrates compliance with TCEQ's regionalization policy. Tex. Water Code §§ 26.003, 26.081(a)-(b), (d); 26.0282." 1.AR.66 at 15 (COL 10).

The City moved for rehearing on all eight issues referred to SOAH for decision. 1.AR.67. That motion was overruled by operation of law. Tex. Gov't Code § 2001.146(c).

### E. The trial court reverses the Commission's order as inconsistent with Texas's regionalization policy.

The City filed a petition for judicial review of the Commission's order in Travis County District Court. CR 5 (petition for review). Both the Developers and Jonah Water then intervened as defendants given their uncontested stake in the permitting decision. CR 145 (AIRW intervention); CR 155 (Jonah Water intervention). The City raised and briefed all eight issues that had been referred to SOAH for decision. CR 5 (petition); CR 205 (City opening brief). The Commission, the Developers, and Jonah Water filed briefs opposing the City on all issues. CR 412 (TCEQ brief); CR 495

10

(AIRW intervenor brief); CR 650 (Jonah Water intervenor brief). The trial court held a hearing on the merits on October 31, 2024. RR 1.

On December 2, 2024, the trial court issued a final judgment reversing and remanding to the Commission for further proceedings. CR 730. The court explained that after reviewing the "pleadings, administrative record, briefing, and argument of counsel," reversal was required "for the following reasons":

1. Defendant erred by determining that the Permit complies with Texas's regionalization policy.

2. Because Intervenor AIRW failed to seek a waiver from Plaintiff's city council, there is no way to know whether the city council would be willing to waive the annexation requirement. It is unreasonable to assume that City staff—who are bound by the city council—speak for the city council, which is not bound and has both the power to waive requirements and the ability to act under political considerations. This means that Defendant should not have determined both that (1) Plaintiff denied Intervenor AIRW service; and (2) connection to Plaintiff's system would cost Intervenor AIRW $20 million.

CR 730-31.

The Developers timely appealed. CR 743.

## SUMMARY OF THE ARGUMENT

The trial court erred when it held that the Commission's final order granting AIRW's application violated Texas's regionalization policy. Regionalization policy directs the Commission to use *reasonable* methods to

11

*encourage* connection to existing wastewater facilities. The trial court fundamentally misunderstood it as a mandate to deny new wastewater permit applications unless an applicant has turned over every stone and exhausted every political avenue, no matter how futile, to prove that connecting to an existing facility is impossible. That is a novel interpretation of regionalization that both usurps the Commission's legislatively granted discretion and, if allowed to stand, would empower cities to hold disfavored development hostage.

Texas's regionalization policy is straightforward. It directs the Commission to use "reasonable methods" to encourage the use of existing wastewater facilities. Tex. Water Code § 26.003. These reasonable methods include the discretion to deny (or grant) a wastewater permit application *if* connection to a nearby facility is "availabl[e]." *Id.* § 26.0282. Given this wide berth of discretion granted by the Legislature, the Commission established informal guidelines identifying four non-exclusive circumstances where it would approve new wastewater permits as consistent with regionalization. Two circumstances are relevant here: (1) where the request for service from the nearby facility "was denied," and (2) where "[t]he applicant can successfully demonstrate that an exception to regionalization should be granted based on costs, affordable rates, and/or other relevant factors." 2.AR.98 at 1-2.

The Commission determined that both these situations applied to AIRW. The City "denied AIRW's request for service unless AIRW agreed to

12

annexation and land use restrictions." 1.AR.66 at 10 (FOF 42). And "[c]osts weigh in favor of granting AIRW's application" because annexation "carries with it an approximately $20 million cost due to diminution in property value." 1.AR.66 at 11 (FOF 45, 46). The evidence supporting both conclusions is robust and uncontradicted. Not only does the City have an ordinance mandating annexation as a condition of service, but City staff from the City manager's office repeatedly took the "position" in writing that the City requires annexation for service. *E.g.*, 2.AR.101 at 1. Similarly, AIRW produced unrebutted financial evidence establishing the enormous financial impact that annexation would have on the Development. 2.AR.93 at 2, 16-17.

The trial court nonetheless concluded that granting the permit violated regionalization because AIRW did not ask Georgetown's city council to waive the annexation requirement through its political process. But the City's Unified Development Code does not appear to set out any specific waiver process for the annexation mandate. And no law, including Texas's regionalization policy, requires an applicant to petition a city council.

The law instead empowers the Commission in its discretion to decide when granting a permit is consistent with regionalization. And it was more than reasonable for the Commission to conclude that forcing AIRW to go through the city council's political process—a separate process that could take years on top of the significant amount of time the Developers had already spent requesting service from the City—does not serve regionalization when the city council has never even suggested that it would

13

consider waiving annexation. Moreover, the trial court's holding is built on the false premise that "there is no way to know whether the city council would be willing to waive the annexation requirement." CR 730. In fact, the city staff's repeated statements that waiver is required for connection easily support the finding that "[t]here was no indication that the City was willing to waive the annexation" requirement. 1.AR.66 at 10 (FOF 41). There was simply no basis in law or fact for the trial court to reject the Commission's conclusion that the permit complies with regionalization.

If this Court concludes that the permit is consistent with regionalization, it should reverse the trial court and render judgment for AIRW because none of the other arguments the City made below—and may raise again here—are alternative bases to affirm. The City's arguments that AIRW's application was incomplete lacks merit because the City never identifies any information required by law that was omitted from the application. Its arguments about water quality are no better. The City argues that the permit does not protect water quality in various ways, but it failed entirely to present any evidence supporting these arguments to the Commission. Finally, the City's arguments about needing nuisance odors and additional permit conditions misunderstand governing law and the underlying facts of AIRW's application.

14

## STANDARD OF REVIEW

The Commission's decision granting a wastewater permit is reviewed for substantial evidence, including whether substantial evidence supports the decision, whether the Commission abused its discretion, and whether the decision violates any statutory provision. *See* Tex. Water Code § 5.351; Tex. Gov't Code § 2001.174. In conducting this review, courts "may not substitute [their] judgment for the judgment of the state agency on the weight of the evidence." Tex. Gov't Code § 2001.174. This Court must uphold the agency's ultimate decision "if the evidence is such that reasonable minds could have reached the conclusion that the agency must have reached in order to justify its action." *Tex. Health Facilities Comm'n et al. v. Charter Med.-Dall., Inc.*, 665 S.W.2d 446, 453 (Tex. 1984) (citing *Suburban Util. Corp. v. Pub. Util. Comm'n*, 652 S.W.2d 358, 364 (Tex. 1983)).

This level of review is best understood as a "rational-basis test" asking only whether a "reasonable basis exists in the record for the agency's action." *Jenkins v. Crosby Indep. Sch. Dist.*, 537 S.W.3d 142, 149 (Tex. App.—Austin 2017, no pet.) (citation and quotation omitted). The agency's decision, moreover, is "presumed to be supported by substantial evidence." *Tex. Comm'n on Env't Quality v. Maverick County*, 642 S.W.3d 537, 547 (Tex. 2022) (quoting *Charter Med.-Dall., Inc.*, 665 S.W.2d at 453). The "burden" is therefore "on the contestant to prove otherwise." *Id.* (quoting *Charter Med.-Dall., Inc.*, 665 S.W.2d at 453).

Ultimately, whether the Commission's order complies with the requirements set forth in Texas Government Code § 2001.174, including the substantial-evidence requirement, "is a question of law subject to de novo review." *Save Our Springs All., Inc. v. Texas Comm'n on Env't Quality*, __ S.W.3d __, No. 23-0282, 2025 WL 1085176, at *7 (Tex. Apr. 11, 2025).

## ARGUMENT

### I. The trial court erred in concluding that the Commission's order violated Texas's regionalization policy.

Regionalization is not a one-size-fits-all rule. It is a permissive policy encouraging the use of existing wastewater facilities through "reasonable methods." Tex. Water Code § 26.003. Regionalization is meant to ensure that applicants for a wastewater permit explore and give serious consideration to connecting to nearby utilities. It is not a weapon for cities to use to hold-up development or exact concessions from developers. That is why the Texas Water Code leaves it to the Commission's discretion whether to deny or alter a permit application based on regionalization.

The Commission's decision here to grant AIRW's permit application was well within that discretion and was supported by substantial evidence. It was reasonable to grant the permit given the City's insistence on exceedingly costly and development-altering annexation as a condition for service. It was also reasonable to grant the permit without requiring the Developers to spend additional precious time and resources lobbying the city council through the political process to waive the annexation

16

requirement. The trial court's contrary conclusion improperly substitutes its judgment for the Commission's, second-guesses factual findings that are plainly supported by substantial evidence, and requires reversal.

## A. The Texas Water Code gives the Commission broad discretion whether to grant a wastewater permit when there is a nearby "available" wastewater system.

Texas's regionalization policy comes from the Texas Water Code. Section 26.003 establishes that "[i]t is the policy of this state . . . to encourage and promote the development and use of regional and areawide waste collection, treatment, and disposal systems to serve the waste disposal needs of the citizens of the state." Tex. Water Code § 26.003. It then instructs the Commission to employ "all *reasonable* methods to implement this policy." *Id.* (emphasis added). But it provides no details on what it means to "encourage and promote" existing systems or what methods are considered "reasonable."

That is where Section 26.0282 steps in. Section 26.0282 provides that the Commission "*may* deny or alter the terms and conditions of [a] proposed permit" based on the "availability of existing or proposed areawide or regional . . . systems." *Id.* § 26.0282 (emphasis added). The word "availability" here is key: it instructs that the Commission is authorized to exercise its discretionary authority to deny a permit application *only* if connection to an existing wastewater system is in fact available. This is a practical inquiry. As the United States Supreme Court explained in *Ross v.*

*Blake*, "the ordinary meaning of the word 'available' is capable of use for the accomplishment of a purpose, and that which is accessible or may be obtained." 578 U.S. 632, 642 (2016) (cleaned up). In the context of the Water Code, then, service from an existing wastewater system must be reasonably accessible to the applicant in the "real world," *id.*,[3] before the Commission has any authority to alter or deny a permit based on regionalization.

Even where an existing regional system is "available," the Commission is not *required* to deny or alter a permit in favor of connecting to that system. Rather, Section 26.0282 states that the Commission "*may*" alter or deny the permit application. The word "may" "creates discretionary authority or grants permission or a power." Tex. Gov't Code § 311.016(1). This means that where connection to an existing regional system is available, the Commission still has discretion whether to grant a permit for a new wastewater facility, deny the permit in favor of connection to an existing system, or alter the conditions of the permit in some other manner.

The only constraint on that discretion is that the Commission act "reasonably"—a constraint that this Court reviews deferentially, asking whether the agency reached such "a completely unreasonably result" that it abused its discretion. *See City of El Paso v. Public Util. Comm'n of Tex.*, 883

---

[3] That could mean, for example, that the neighboring facility had the capacity to serve, there was a means to transport the untreated wastewater (via sewer lines, easements, etc.) to the neighboring facility, the provider was legally authorized to accept the wastewater at the location where it was generated, and the provider was willing to accept the wastewater.

S.W.2d 179, 184 (Tex. 1994) (explaining that an agency abuses its discretion if it reaches an unreasonable result even after it "weighs . . . relevant factors that the legislature directs it to consider").

**B. The Commission's informal guidance states that it will approve a permit for a new wastewater facility where an existing system denies connection or where connection is costly.**

To help regulated entities and the public understand how the Commission exercises this broad discretion, the Commission issued regulatory guidance entitled "TCEQ Regionalization Policy for Wastewater Treatment." 2.AR.98; *see also* 2.AR.116 at 1 (Commission referring to document as "[e]stablished guidance"). This guidance makes clear that the Commission will exercise its discretion with respect to regionalization even when there is a nearby wastewater treatment facility. It states: "[t]he presence of a wastewater treatment facility . . . within three miles of a proposed new wastewater treatment facility . . . is *not* an automatic basis to deny an application or to compel an applicant to connect to an existing facility." 2.AR.98 at 1 (emphasis in original). Indeed, it could not be any other way. If the mere existence of another facility required denial of an application, then the Commission would be ignoring both the requirement that connection be "available," and the requirement that it exercise discretion when deciding whether to deny or alter a permit.

The informal guidance then sets forth four "situations" in which the Commission "may approve" a new wastewater permit.[4] Two of these situations are relevant here because they apply when an existing wastewater service is not "available" to the applicant in the real world. 2.AR.98 at 1-2. *First*, the Commission may approve an application where the request for service from the nearby facility "was denied." 2.AR.98 at 2. *Second*, it may approve an application where "[t]he applicant can successfully demonstrate that an exception to regionalization should be granted based on costs, affordable rates, and/or other relevant factors." 2.AR.98 at 2.

Nothing in the guidance suggests that these four situations are the only situations in which the Commission may approve an application consistent with regionalization. Moreover, there is no suggestion that the guidance is intended to be rigid, requiring, for example, formal denials of service before the Commission exercises its discretion to grant a permit. Indeed, the guidance was drafted following a Commission decision adopting an ALJ's proposal for decision explaining that "the purpose of the regionalization review is to encourage Applicants to explore and give serious consideration to connection to such utilities—not to provide neighboring utilities leverage and means to require such connection." 2.AR.94 at 11.

---

[4] The guidance uses the word "may" in part because the Commission may of course still deny (and may be required to deny) a regionalization-consistent permit application for reasons having nothing to do with regionalization.

20

### C. The Commission reasonably exercised its discretion to grant AIRW's permit application because it found that the City denied service and that connection was costly.

The Commission concluded that AIRW's permit application complies with regionalization for two reasons: (1) the City denied service as a practical matter and (2) connecting to the City would impose exorbitant costs. Both conclusions were reasonable exercises of the Commission's discretion and are supported by substantial evidence.

### 1. The Commission reasonably decided to grant the permit application because the City denied service.

The Commission reasonably exercised its discretion to grant the permit consistent with regionalization because it found that the City "*denied* AIRW's request for service unless AIRW agreed to annexation and land use restrictions." 1.AR.66 at 10 (FOF 42) (emphasis added).

As far back as June 2019, the City manager's office unequivocally told the Developers that "using our [wastewater] will require voluntary annexation" and that they "had better look at the land use map to determine if the proper zoning is possible." 2.AR.100 at 1. This unflinching insistence on annexation was reiterated time and again by multiple city officials. The City's planning director wrote in January 2020: "Should you desire to connect to the City wastewater system annexation will be required." 2.AR.107 at 3. Assistant City Manager Reed then followed up the next month, writing, "we have been clear that should you desire or need to connect to the City's wastewater system you would have . . . [to] submit a

21

petition for voluntary annexation." 2.AR.103 at 1 (brackets omitted). Reed later wrote that the City's position would not change and was not even up for discussion. 2.AR.101 at 1 (explaining there was "no need to revisit" the request for service without annexation).

The Developers did their best to try to find a solution to allow connection without annexation. They proposed to build a public park instead of a private wastewater treatment facility. 2.AR.131 at 12-13. But the City saw that as a "non-starter." 2.AR.131 at 12-13. They also proposed delayed annexation so that they could first build Luxe and Mansions outside of the City's land use planning scheme and then later come within City limits as an existing use. 2.AR.107 at 3. But the City shot that idea down too. 2.AR.107 at 3. At no time did the City so much as hint at any openness to working with the Developers to avoid annexation.

Based on this evidence, the Commission reasonably found that "[t]here was no indication that the City was willing to waive the annexation" requirement. 1.AR.66 at 10 (FOF 41). The City thus, in effect, "denied AIRW's request for service," 1.AR.66 at 11 (FOF 43), by imposing a condition precedent that made service not "available" in the real world. This is precisely the situation identified in the guidance where the Commission said it would approve a permit application. 2.AR.98 at 2. But even if the Commission had not included this exact situation in its regionalization guidance, the Texas Water Code plainly affords the Commission discretion

22

to grant a permit, including when a city demands annexation as a condition for connection.

### 2. The Commission also reasonably decided to grant the permit application because connecting to the City would impose exorbitant costs.

The Commission separately exercised its discretion to grant the permit consistent with regionalization because it would cost $20 million more to connect to the City than to build the Facilty. As the Commission explained, "[c]osts weigh in favor of granting AIRW's application" because connecting to the City's wastewater "carries with it an approximately $20 million cost due to diminution in property value" due to annexation. 1.AR.66 at 11 (FOF 45, 46). Given this finding, it was not only reasonable for the Commission to grant the permit, but the Commission lacked discretion on these facts to deny the permit based on regionalization. That is because, when connection to an existing wastewater system will cost $20 million more than building a new facility, that existing system is anything but "available" in the real world.

The Commission's finding that annexation would cost approximately $20 million is well supported by the evidence—and the City does not deny this.

The Developers submitted a letter to the Commission in 2021 explaining that "[t]he costs associated with annexation . . . have been estimated to reduce the value of the applicant's developed project by over

23

$20 million. . . . based on lost value of the property when sold, payment of additional City taxes and fees, and costs to comply with the City's zoning requirements." 2.AR.107 at 1. That letter, moreover, explained the basis for the calculation. It explained that annexation would require "significant change to the planned development" because the City was demanding "uses other than residential." 2.AR.107 at 1. And it walked through the tax analysis, providing a bottom line that "the lost value of the property attributable to City taxes alone are estimated to be between $13,000,000 and $18,000,000." 2.AR.107 at 1. The Developers then separately introduced into evidence at the contested case hearing a 105-page independent appraisal report showing that the property's "As-Is Unincorporated" value was $20 million greater than the "As-Is Incorporated" value. 2.AR.93 at 2, 16-17.[5]

This is more than substantial evidence for the Commission's finding that the costs analysis favored granting the permit. The Commission's decision to grant the permit was reasonable and lawful.

---

[5] The costs to physically construct the Facility and the costs to physically connect to the City's wastewater are very similar. *See* 1.66.AR at 11 (FOF 44) ("Constructing a new plant will cost approximately $300,000 more than connecting to the City's system."). They therefore largely cancel out and do not play a material role in assessing the cost difference between the Facility and connecting to the City's system.

**D. There was no basis for the trial court to second guess the Commission's findings on denial of service and cost of connection.**

Despite all this evidence supporting the Commission's exercise of its discretion to grant the permit, the trial court held that the Commission failed to follow Texas' regionalization policy. CR 730. The trial court held that substantial evidence does not support the Commission's determinations about denial of service and cost of connection because those determinations are based on the annexation requirement and "there is no way to know whether the city council would be willing to waive" that requirement. CR. 730.

That was error for multiple reasons, each of which independently requires reversal.

**1. It was *per se* reasonable for the Commission to hold the City to the terms of its own law.**

The City's Unified Development Code—adopted by its city council through a municipal ordinance, *see* City of Georgetown Ordinance No. 2003-16 (Mar. 11, 2003)—unambiguously requires annexation as a condition of service. It states: "Properties in the ETJ that desire or require wastewater service from the City of Georgetown *shall* first submit a petition for voluntary annexation." Georgetown Unified Dev. Code § 13.05 (emphasis added). The City's Code contains no provision indicating "unless waived," or a process to pursue a "waiver." The trial court nevertheless held that it was unreasonable for the Commission to conclude that connecting to the

City's wastewater system requires annexation. That is remarkable. Where a city's law requires annexation as a condition of service, it must be *per se* reasonable for the Commission to conclude that annexation is a condition of service. After all, just as "an agency cannot be said to err or act arbitrarily or capriciously by complying with the mandate of its own rule," *Texas Indus. Energy Consumers v. CenterPoint Energy Hous. Elec., LLC*, 324 S.W.3d 95, 104 (Tex. 2010) (citation and quotation omitted), it also does not act unlawfully when it follows the mandate of a city's law.

Perhaps there are circumstances where the Commission, in its discretion, *could* reasonably conclude that a city's law will not apply to an applicant. For instance, where a city has already started taking steps to waive an annexation requirement for a wastewater applicant, or has a history of waiving annexation for similarly situated applicants, then it may be reasonable for the Commission to conclude that the City may be willing to provide service without annexation. But that is not this case. Nothing in the record remotely suggests that Georgetown's city council was willing to waive Section 13.05's annexation requirement. Nor is there anything in the record establishing that Georgetown's city council has ever waived its annexation requirement for anyone.

If the City were in fact open to providing service to the Development without annexation, then it certainly would have put that evidence in the record before the Commission. It did not do so because no such evidence exists. The City has never shown the slightest willingness to waive Section

26

13.05 and provide service to the Development or any other development without annexation.[6] And the City's attempt to kick up dust at the trial court by saying, in effect, "who knows what we would do," is no answer because it was the City's "burden" to prove that the Commission's decision was unlawful. *Maverick County*, 642 S.W.3d at 547. Without *some* evidence that the City was willing to set its own law aside, the *only* reasonable conclusion on this record was the Commission's conclusion that the City's own law requiring annexation as a condition of service controls.

### 2. The trial court's order usurps the Commission's discretion to determine when applicants can take "no" for an answer.

The trial court's order also robs the Commission of its discretion to decide what steps are necessary to appropriately encourage and promote regionalization. The Commission determined that AIRW did not need to seek relief from the city council—a potentially long and costly political process that a city could use to delay and kill disfavored development. The fact that the City's ordinance required annexation and city staff confirmed

---

[6] In fact, the City of Georgetown continues to make clear in practically every forum that it will *not* provide service without annexation. On April 28, 2025, for example, the mayor pro tem of the City of Georgetown testified in support of a bill that would prohibit building wastewater treatment facilities like the one at issue here within 1,000 feet of a municipal water line, essentially forcing annexation under the City's ordinance because developers would have no option but to connect to an existing system. *Hearing on S.B. 1586 Before the S. Comm. on Water, Agric., and Rural Affs.*, 89th Reg. Session (Tex. 2025), https://perma.cc/5KT4-MRCB (statement of Kevin Pitts at 48:10). Mayor Pitts further explained that the bill is necessary because developments are occurring in "pockets [of the ETJ that] have not been annexed." *Id.* at 50:05.

this requirement was sufficient to conclude that the city denied service. This practical, enough-is-enough approach to implementing regionalization is reasonable. The trial court had no legal basis to override it.

As explained above, the Texas Water Code requires the Commission to use "reasonable methods" to promote regionalization, including exercising broad discretion to grant or deny a wastewater permit after considering whether connection to an existing service is "availabl[e]." Tex. Water Code §§ 26.003, 26.0282. The Water Code says nothing about whether an applicant must pursue political solutions before the Commission can determine that connection to an existing service is not "availabl[e]." *Id*. And no wastewater permitting rules under the Commission's jurisdiction require an applicant to proceed in what is tantamount to a separate or parallel proceeding before a different tribunal on the issue of wastewater treatment and disposal. "The legislature thus left [the] decision to the Commission's discretion." *Reliant Energy, Inc. v. Pub. Util. Comm'n of Tex.*, 153 S.W.3d 174, 189 (Tex. App.—Austin 2004, pet. denied). Likewise, the legislature granted the Commission broad discretion to determine when to "deny or alter the terms and conditions of [a] proposed permit," even when existing service is available. Tex. Water Code § 26.0282.

Exercising this discretion granted by the Legislature, the Commission determined that, because there is "no indication that the City was willing to waive the annexation" requirement, 1.AR.66 at 10 (FOF 41), AIRW did not need to go to the city council asking for a waiver.

28

The trial court's judgment, by contrast, holds that AIRW was required to seek political relief from the city council. The trial court, however, did not provide any legal basis for creating this external process requirement. That is because there is none. The trial court's requirement to seek political relief does not come from Texas Water Code § 26.003's instruction to implement regionalization through "reasonable methods." Nor does it come from the Commission's guidance, which takes a functional approach to when service is "denied." *Cf. USA Waste Servs. of Hous., Inc. v. Strayhorn*, 150 S.W.3d 491, 495 (Tex. App.—Austin 2004, pet. denied) ("[A]n administrative agency has the power to interpret its own rules, and its interpretation is entitled to great weight and deference.").[7]

Indeed, the trial court's demand that applicants like AIRW press for a political solution from the city council is patently unreasonable in many situations. Take here, for example. AIRW inquired about service not only

---

[7] During the administrative process, the City argued that pursing relief from the city council was part of a requirement to "exhaust[] . . . local administrative remedies." 1.AR.51 at 20. The City, however, dropped that nomenclature even in the trial court, perhaps recognizing that no such requirement exists, and that even if it did, exhaustion applies to *administrative* remedies, not political ones like waiver from a city council. *See* Tex. Gov't Code § 2001.171 ("A person who has exhausted all administrative remedies available *within a state agency* and who is aggrieved by a final decision in a contested case is entitled to judicial review under this chapter." (emphasis added)); *Norhill Energy, LLC. v. City of McKinney*, 05-23-00706-CV, 2024 WL 4970952, at *4 (Tex. App.—Dall. 2024, pet. denied) ("The requirement of administrative exhaustion compels a party to 'pursue all available remedies *within the administrative process* before seeking judicial relief.'" (quoting *Lazarides v. Farris*, 367 S.W.3d 788, 798 (Tex. App.—Houston [14th Dist] 2012, no pet.) (emphasis added)).

29

from the City of Georgetown but also from the City of Round Rock. 2.AR.74 at 79. Round Rock responded that it could not provide service at present, but "[i]f the development is able to be released from the City of Georgetown's ETJ and is able to get contiguous and annexed into the City of Round Rock City Limits, we could further evaluate the possibility of serving this development with wastewater." 2.AR.74 at 78. Was AIRW required to ask the City to be removed from its ETJ and then ask Round Rock about annexation? Or, what if a city were to respond to a request for service by saying that its existing system lacks capacity: does the applicant have to ask the city council to build out more capacity for it to use? Of course not. Regionalization requires the Commission to employ reasonable methods. Imposing burdensome requirements that would substantially delay, if not stop, development is anything but reasonable.

The Commission's decision allowing AIRW to accept "no" for an answer was well within its discretion to examine regionalization practically and not allow a city to leverage regionalization to achieve other ends.[8] The trial court's decision to instead impose its own view requiring applicants to pursue political remedies was error.

---

[8] *See* 2.AR.94 at 7 (Commission adopting ALJ's proposal for decision that explained that "the purpose of regionalization review is to encourage Applicants to explore and give serious consideration to connection to such utilities—not to provide neighboring utilities leverage and means to require such connection." (alteration adopted)).

**3. The Commission reasonably inferred the city council's position from city staff.**

The trial court's judgment is also built on the false premise that it is "unreasonable" to infer anything about the city council's position based on statements by city staff. *See* CR 730-31 (explaining that "there is no way to know whether the city council would be willing to waive its annexation requirement" because "[i]t is unreasonable to assume that City staff . . . speak for the city council"). In fact, it was reasonable for the Commission to infer from the city staff's consistent and emphatic statements in this case that the city council was not willing to waive the annexation requirement. *See* 1.AR.66 at 10 (FOF 37, 41) (recognizing that the city council can waive the annexation requirement but that there was "no indication" that the city council was willing to do so).

The City provides no reason to assume its staff were acting contrary to the wishes of its Council. The city manager is appointed by, and serves at the pleasure of, the city council. *See* City of Georgetown Home Rule Charter § 5.01. The city departmental staff's views, especially on major issues for the City—such as the wastewater treatment facility at issue in this appeal—are thus very likely to reflect the city council's views. *Cf. Collins v. Yellen*, 594 U.S. 220, 252 (2021) ("The removal power helps the President maintain a degree of control over the subordinates" and helps ensure that these individuals act "in accordance with the policies that the people presumably elected the President to promote."). And notably here, City staff did not say

31

something to the effect of: "Unfortunately, we are bound by our Unified Development Code to require annexation, and the city council is the only one who can waive that requirement." To the contrary, City staff said that it was "the City's position" that annexation would be required for service. 2.AR.101 at 1.

It was therefore perfectly reasonable for the Commission to conclude based on the city staff's repeated statements demanding annexation that (a) there was "no indication" the city would waive the annexation requirement, and that (b) the city was in effect denying service. Indeed, requiring AIRW to go to the city council despite unequivocal statements from the city manager's office runs headlong into the Texas Supreme Court's recent admonition in the takings context that "futile . . . requests . . . are not required." *Commons of Lake Hous., Ltd. v. City of Hous.*, __ S.W.3d __, No. 23-0474, 2025 WL 876710, at *10 (Tex. Mar. 21, 2025) (citation and quotation omitted) (recognizing that "[t]he government may demonstrate . . . through its interactions and communications with the owner . . . or even through its briefs and arguments in the appellate court" that it has "committed to a position" (citation and quotation omitted)).

At the very least, the city staff's communications satisfy the substantial evidence standard, which asks only whether there is evidence that "a reasonable mind might accept as adequate to support a conclusion of fact." *Slay v. Texas Comm'n on Env't Quality*, 351 S.W.3d 532, 549 (Tex. App.—

Austin 2011, pet. denied). And that is all that is needed to reverse the trial court's judgment and reinstate the Commission's order.

### E. The City's inability to provide service to the Development is an independent basis to reverse.

For all the above reasons, the Commission's decision to grant the permit without requiring AIRW to seek a waiver from Georgetown's city council is reasonable and supported by substantial evidence. But even if it were not, this Court should still reverse the trial court and affirm the Commission's order because it would be *unlawful* for the City to provide service to the Development. *See Charter Med.-Dallas*, 665 S.W.2d at 452 (court may affirm based on any "valid basis [in the record] for the action taken by the agency").

A city may not provide utility service within the jurisdictional boundaries of another retail public utility without its consent. *See* Tex. Water Code § 13.244(c); 16 Tex. Admin. Code § 24.225(c) ("[A] retail public utility may not provide retail water or sewer utility service within the boundaries of a district that provides the same type of retail water or sewer utility service without the district's consent . . . "). It was uncontroverted that the Development was located within Jonah Water's jurisdictional boundaries. But the City never sought, and Jonah Water never gave, consent for the City to provide sewer services within its jurisdictional boundaries. 1.AR.66 at 11 (FOF 52); 4.AR.179 at 43-44. Without the legal authority to serve, service from

33

the City was not "available" under Section 26.0282, and the Commission lacked discretion under that Section to deny the permit. 2.AR.94 at 32.

## II. There is no alternative ground on which to affirm.

The City's opposition to AIRW's wastewater permit application has always, at its core, been about regionalization: the City believes that the Development should be required to connect to the City's wastewater system (which, conveniently for the City, would allow it to force annexation). But in its effort to halt the permit and the Development, the City has argued that the Commission's decision was in error for multiple additional reasons having nothing to do with regionalization. These arguments do not have any merit. They are simply sand in the gears. If the City raises them again as alternative grounds for affirmance, this Court should reject them.

### A. There is substantial evidence that AIRW's application was complete and accurate, with the Commission having all the information it needed to make a reasoned decision.

The City argued below that AIRW's application failed to contain "all information reasonably required by the commission." Tex. Water Code § 26.027(b). But the Commission found the opposite: it found that "[t]he Application included all required information and was substantially complete and accurate." 1.AR.66 at 12 (FOF 64); *see* 1.AR.66 (FOF 62). And those findings are well-supported by the record, including by testimony that the Application "went through both an administrative and a technical review" that "provided [Executive Director] staff an opportunity to

34

determine whether the administrative and technical portions of the application were missing any information." 2.AR.124 at 10-11; *see also* 2.AR.78 at 8 (testimony that the Application was in "compliance with the applicable rules, including all rules relating to the submission of supporting materials").

As part of its argument that AIRW's application was incomplete, the City argued that 600 Westinghouse Investments should have been listed on the application because it co-owns the Facility. Not so. AIRW was the proper party to submit the Application because it "currently owns the site at which the proposed Facility will be located," 2.AR.66 at 6 (FOF 6), having purchased the property from 600 Westinghouse, 2.AR.167 at 2-3. The City also argued that Jonah Water was required to be on the application as an operator of the Facility. But Jonah Water is not responsible for any operation of the Facility until *after* the permit issues, and even then, Jonah Water is only responsible *if* the issued permit is transferred to Jonah Water in a wholly separate proceeding subject to the Commission's review and approval. 2.AR.113 at 3 (2.A); 30 Tex. Admin. Code § 305.64.

Finally, the City raised a grab-bag of arguments about supposedly missing information. But the City never identified a single piece of legally required information that was either incorrect or missing from the Application. Moreover, had TCEQ's Executive Director wanted additional information in the application review process, she would have requested it through the "notice of deficiency" process. But both the Executive Director,

35

and then, later, the Commission, concluded that the Application was substantially complete and accurate. 1.AR.66 at 12 (FOF 64); *see* 1.AR.66 (FOF 62). There was simply no missing information requiring reversal.

**B. Substantial evidence supports the Commission's determinations that the permit protects water quality.**

Substantial evidence supports the Commission's determination that the permit protects water quality. The City argued below that this determination was error for four different reasons: the permit (1) does not protect existing uses of receiving waters, (2) does not protect the health of nearby residents, (3) is inconsistent with the Commission's antidegradation policy and procedures, and (4) does not include sufficient operational provisions. Each of these contentions, however, is meritless and cannot support affirmance.

**1.** The City failed to meet its burden to produce rebuttal evidence to overcome AIRW's prima facie case that the permit maintains existing uses of the receiving waters. Tex. Gov't Code § 2003.047(i-1), (i-2). The City not only failed to introduce any evidence that effluent from the Facility will not maintain or protect existing uses, *see* 1.AR.59 at 24 ("The City did not present evidence disputing the accuracy of the ALU, DO determinations, or effluent limits or how such determinations and limits are not protective of existing uses and wildlife."), but it completely failed to identify any applicable requirement that the permit would violate. With no such evidence, the City resorted to a hodgepodge of arguments that the Commission lacked

36

sufficient information to make a reasonable conclusion about water quality and existing uses. But each of those arguments was meritless because none were supported by any evidence that identified any information that was both necessary to the Commission's review and missing from the record.

**2.** The City separately failed to meet its burden to produce rebuttal evidence to overcome AIRW's prima facie case that the permit adequately protects the health of nearby residents. Multiple witnesses testified that the Facility's treated effluent will be disinfected to satisfy "criteria established in the [Texas Surface Water Quality Standards] for the protection of human health and for primary contact recreational uses," defined as "[a]ctivities considered to have significant risks of ingestion of the water." 2.AR.78 at 23. Put in simple terms, the highly treated effluent from the Facility is not harmful to humans, even if they ingest it as part of recreational activities. The City cited no evidence to the contrary and offered no witness that was even qualified to provide contrary testimony.

**3.** The City failed to rebut AIRW's prima facie case that the permit complies with both Tier 1 and Tier 2 of Texas's antidegradation policy.

Tier 1 of the antidegradation policy states that "[e]xisting uses and water quality sufficient to protect those uses must be maintained." 30 Tex. Admin. Code § 307.5(b)(1). There is testimony that the Commission's staff applied this standard and found that existing water quality uses will not be impaired. 2.AR.127 at 12. And the City provided no evidence to the contrary. The City instead argued there was a lack of meaningful review and that the

37

Commission did not consider uses like livestock watering. But there is no evidentiary support for this. The back-and-forth emails that the City tries to cast as demonstrating lack of meaningful review in fact demonstrate that the Commission's staff were highly engaged in getting the analysis right. *See* 2.AR.172 at 1; 4.AR.181 at 691-92. And the City's arguments about livestock are complete red herrings considering that the effluent is not harmful to humans.

Tier 2 degradation analysis applies to "waters that exceed fishable/swimmable quality," and asks whether the water level quality is degraded "by more than a de minimis extent, but not to the extent that an existing use is impaired." 30 Tex. Admin. Code § 307.5(b)(2). The City argued that the Commission failed to apply this "de minimis" standard and instead applied a "no significant degradation" standard. *See* 2.AR.127 at 8. But a "no significant degradation" conclusion is the same as a conclusion that any degradation is "de minimis." They are two sides of the same coin: a degradation in water quality is "de minimis" when it is not significant. *See Andrade v. Venable*, 372 S.W.3d 134, 138 (Tex. 2012) ("[T]he expenditure cannot be *de minimis*—it must be significant."); *De minimis*, Black's *Law Dictionary* (12th ed. 2024) (defining de minimis as "so insignificant that a court may overlook it in deciding an issue or case"). At the very least, the Commission's conclusion that staff applied the correct standard when drafting the permit was reasonable given testimony that staff applied the standard set forth in 30 Texas Administrative Code § 307.5(b)(2).

38

**4.** The City also failed to rebut AIRW's prima facie case that the permit contains sufficient operational requirements to ensure protection of water quality. The City argued that the permit requires too infrequent sampling and does not require so-called "bonus" features to retain wastewater onsite in the event of a disruption in treatment. These arguments fail, however, because, as witnesses explained, sampling frequency is set consistent with the Commission's established rules, *see* 2.AR.124 at 10, and no site-specific characteristics require any "bonus" features, 2.AR.87 at 10. The Commission reasonably relied on that evidence to conclude that the Permit is sufficiently protective without the City's extra measures exceeding the applicable legal requirements.

## C. Substantial evidence supports the Commission's other determinations.

Finally, substantial evidence supports the Commission's determination regarding nuisance odors and compliance history.

The City argued below that the permit violates requirements related to nuisance odors. Not so. By rule, there simply needs to be a 150-foot buffer area between the treatment units producing nuisance odors and the nearest property line. 30 Tex. Admin. Code § 309.13(e). And the evidence from the hearing unambiguously demonstrates that there was ample buffer zone area. *See* 2.AR.74 at 70; 2.AR.89.

The City separately argued that the Commission was required to place additional conditions in the permit to account for the fact that AIRW and its

affiliates do not have a compliance history with the Commission. But the Commission's rules do not require this punitive approach for first-time applicants, nor for their affiliates who likewise lack an operational history. *See* 30 Tex. Admin. Code § 60.1; 2.AR.78 at 21; 2.AR.124 at 13.

## PRAYER

The Court should reverse the judgment below and render judgment for the Commission, AIRW, and the other intervening defendants.

Dated: May 21, 2025

Respectfully submitted.

/s/ *Andrew B. Davis*

Helen S. Gilbert
Texas Bar No. 00786263
hgilbert@bartonbensonjones.com
BARTON BENSON JONES, PLLC
7000 N. MoPac Expwy, Suite 200
Austin, TX 78731

Edmond McCarthy
Texas Bar No. 13367200
Ed@ermlawfirm.com
MCCARTHY & MCCARTHY, LLP
1122 Colorado St., Suite 2399
Austin, TX 78701

Andrew B. Davis
Texas Bar. No. 24082898
andrew@lkcfirm.com
William T. Thompson
Texas Bar. No. 24088531
will@lkcfirm.com
Todd Disher
Texas Bar. No. 24081854
todd@lkcfirm.com
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701

*Counsel for Intervenor-Defendants AIRW 2017-7, L.P., 600 Westinghouse Investments, LLC, and 800 Westinghouse Investments, LLC*

41

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2024, I electronically filed the foregoing with the Clerk of the Court using the eFileTexas.gov electronic filing system, which will send notification of such filing to the email addresses denoted on Service Contacts List.

/s/ *Andrew B. Davis*

Andrew B. Davis

## CERTIFICATE OF COMPLIANCE

Microsoft Word reports that this brief contains 9,669 words, excluding exempted text.

/s/ *Andrew B. Davis*

Andrew B. Davis

# In the Court of Appeals
# for the Fifteenth Judicial District
# Austin, Texas

———

AIRW 2017-7, L.P. ET AL,

*Appellants,*

*v.*

CITY OF GEORGETOWN, TEXAS,

*Appellee.*

———

**Appendix**

———

|  | TAB |
|---|---|
| District Court Judgment (CR 730) | 1 |
| TCEQ Final Order (1.AR.66) | 2 |
| Statutory Provisions | 3 |
| • Tex. Water Code § 13.244 | |
| • Tex. Water Code § 26.003 | |
| • Tex. Water Code § 26.027 | |
| • Tex. Water Code § 26.0282 | |
| • Tex. Gov't Code § 2001.174 | |
| • Tex. Gov't Code § 2003.047 | |
| City of Georgetown Provisions: | 4 |
| • City of Georgetown Home Rule Charter § 5.01 | |
| • Georgetown Unified Dev. Code § 13.05 | |

TCEQ Regulations and Guidance...................................................................................5

- Regionalization Guidance Webpage (2.AR.98)
- 16 Tex. Admin. Code § 24.225(c)
- 30 Tex. Admin. Code § 60.1
- 30 Tex. Admin. Code § 305.64
- 30 Tex. Admin. Code § 307.5(b)
- 30 Tex. Admin. Code § 309.13(e)

# Tab 1

District Court Judgment (CR 730)

CAUSE NO. D-1-GN-23-001004

| | | |
|---|---|---|
| **CITY OF GEORGETOWN, TEXAS** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | |
| | § | **TRAVIS COUNTY, TEXAS** |
| **TEXAS COMMISSION ON** | § | |
| **ENVIRONMENTAL QUALITY,** | § | |
| | § | |
| **Defendant.** | § | **261ST JUDICIAL DISTRICT** |

### FINAL JUDGMENT REVERSING ORDER OF
### TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

This case is an appeal of a final agency order relating to the issuance by the Texas Commission on Environmental Quality ("TCEQ") to Intervenor AIRW 2017-7, L.P. ("AIRW") of a new Texas Pollutant Discharge Elimination System permit (the "Permit") to discharge up to 200,000 gallons per day of treated domestic wastewater from a proposed wastewater treatment facility within the extraterritorial jurisdiction of the plaintiff, City of Georgetown ("City" or "Plaintiff"). On October 31, 2024, this Court held a hearing on the merits of this cause. Having considered the Texas Administrative Procedure Act, pleadings, administrative record, briefing, and argument of counsel, the Court finds that the TCEQ's order under review in this case should be and is hereby **REVERSED AND REMANDED** to Defendant for further proceedings for the following reasons:

1. Defendant erred by determining that the Permit complies with Texas's regionalization policy.

2. Because Intervenor AIRW failed to seek a waiver from Plaintiff's city council, there is no way to know whether the city council would be willing to waive the annexation requirement. It is unreasonable to assume that City staff—who are bound by the city council—speak for the city council, which is not bound and has both the power to waive requirements and the ability to act under political

considerations. This means that Defendant should not have determined both that (1) Plaintiff denied Intervenor AIRW service; and (2) connection to Plaintiff's system would cost Intervenor AIRW $20 million.

IT IS ORDERED, ADJUDGED, AND DECREED that TCEQ's order is **REVERSED AND REMANDED TO THE TCEQ FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS ORDER**.

This Judgment is final, disposes of all parties and claims, and is appealable.

~~SIGNED this __ of November, 2024.~~

Date: December 2, 2024

JUDGE PRESIDING
LAURIE EISERLOH
455th District Court

AGREED AS TO FORM:

William A. Faulk III
SPENCER FANE, LLP
cfaulk@spencerfane.com
**Counsel for Plaintiff, City of Georgetown**

Sara J. Ferris
Erin K. Snody
OFFICE OF THE ATTORNEY GENERAL
sara.ferris@oag.texas.gov
erin.snody@oag.texas.gov
**Counsel for Defendant Texas Commission on Environmental Quality**

Andrew B. Davis
LEH0TSKY KELLER COHN LLP
andrew@lkcfirm.com
Helen Gilbert
BARTON BENSON JONESPLLC
hgilbert@bartonbensonjones.com
Edmond McCarthy
MCCARTHY & MCCARTHY, LLP
ed@ermlawfirm.com
**Counsel for Intervenors**
**AIRW 2017-7, L.P., 600 Westinghouse Investments, LLC,**
**and 800 Westinghouse Investments, LLC**

John J. Carlton
THE CARLTON LAW FIRM, PLLC
john@carltonlawaustin.com
**Counsel for Intervenor Jonah Water Special Utility District**

3

# Tab 2

TCEQ Final Order (1.AR.66)

# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY



**AN ORDER** GRANTING THE APPLICATION BY AIR-W 2017-7 L.P. FOR TPDES PERMIT NO. WQ0015878001 IN WILLIAMSON COUNTY, TEXAS; SOAH DOCKET NO. 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; TCEQ DOCKET NO. 2021-1214-MWD

On November 16, 2022, the Texas Commission on Environmental Quality (TCEQ or Commission) considered the application of AIR-W 2017-7 L.P. (AIRW) for a new Texas Pollutant Discharge Elimination System (TPDES) Permit No. WQ0015878001 in Williamson County, Texas. A Proposal for Decision (PFD) was presented by Andrew Lutostanski and Katerina DeAngelo, Administrative Law Judges (ALJs) with the State Office of Administrative Hearings (SOAH), who conducted an evidentiary hearing concerning the application on May 23-25, 2022, in Austin, Texas via Zoom videoconferencing. After considering the PFD, the Commission makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### Application

1. AIRW filed its application (Application) for a new TPDES permit with TCEQ on April 6, 2020.

2. The Application requested authorization to discharge treated domestic wastewater from a proposed plant site, the Rockride Lane Water Resource Reclamation Facility (Facility), to be located approximately 500 feet southeast of the intersection of Rockride Lane (County Road 110) and Westinghouse Road (County Road 111), in Williamson County, Texas 78626. AIRW proposes to build the Facility to serve the Mansions of Georgetown III development, an 880-house subdivision.

1

3.     The treated effluent will be discharged via pipe, thence through a culvert, thence to an unnamed tributary, thence to Mankins Branch, thence to the San Gabriel/North Fork San Gabriel River in Segment No. 1248 of the Brazos River Basin. The unclassified receiving water uses are limited aquatic life use for the unnamed tributary and Mankins Branch (intermittent with perennial pools), and high aquatic life use for Mankins Branch (perennial). The designated uses for Segment No. 1248 are primary contact recreation, public water supply, aquifer protection, and high aquatic life use.

4.     The Executive Director (ED) declared the Application administratively complete on June 19, 2020, and technically complete on October 26, 2020.

5.     The ED completed the technical review of the Application, prepared a draft permit (Draft Permit) and made it available for public review and comment.

6.     AIRW currently owns the site at which the proposed Facility will be located.

7.     AIRW, through its affiliate, entered into Non-Standard Service Agreements (NSSAs) with Jonah Water Special Utility District (Jonah) on April 20, 2022, for the provision of retail wastewater services to the development.

8.     Under the NSSAs, Jonah will own and operate the Facility once the TPDES permit is issued and transferred to it under 30 Texas Administrative Code section 305.64.

**The Draft Permit**

9.     The Draft Permit would authorize a discharge of treated domestic wastewater at a daily average flow not to exceed 200,000 gallons per day (or 0.20 million gallons per day (MGD)).

10.    The Facility will have treatment units including aeration basins, a final clarifier, a cloth effluent filter, chemical injection for phosphorus removal, aerated sludge holding and thickening tank, and a chlorine contact chamber. The Facility has not been constructed.

11.    The unclassified receiving water uses are limited aquatic life use for the unnamed tributary and Mankins Branch (intermittent with perennial pools), and high aquatic life use for Mankins Branch (perennial). The designated uses for Segment No. 1248 are primary contact recreation, public water supply, aquifer protection, and high aquatic life use.

12. The effluent limitations in the Draft Permit, based on a 30 day average, include: 7 milligram per liter (mg/L) Five-Day Carbonaceous Biochemical Oxygen Demand; 10 mg/L Total Suspended Solids; 2 mg/L Ammonia Nitrogen; 0.5 mg/L Total Phosphorus; a minimum dissolved oxygen (DO) of 4.0 mg/L, pH in the range of 6.0 to 9.0, and Escherichia coli (E. coli) not to exceed 126 colony forming units/most probable number per 100 milliliter.

13. The effluent shall contain a chlorine residual of at least 1.0 mg/L and shall not exceed a chlorine residual of 4.0 mg/L after a detention of at least 20 minutes based on peak flow.

## Notice and Jurisdiction

14. The Notice of Receipt of the Application and Intent to Obtain Water Quality Permit was published on June 28, 2020, in the *Williamson County Sun* in English and, on June 25, 2020, in *El Mundo Newspaper* in Spanish.

15. The Combined Notice of Receipt and Intent to Obtain a Water Quality Permit and Notice of Application and Preliminary Decision was published on December 13, 2020, in the *Williamson County Sun* in English and, on December 17, 2020, in *El Mundo Newspaper* in Spanish.

16. The comment period for the Application closed on January 19, 2021.

17. TCEQ's Office of the Chief Clerk received timely comments from various individuals and the City of Georgetown (the City). The City also timely filed a request for a Contested Case Hearing based upon issues raised during the public comment period.

18. The ED filed his Response to Public Comments on August 6, 2021.

19. On November 3, 2021, the Commission considered the hearing request at its open meeting and, on November 9, 2021, issued an Interim Order, directing that the following eight issues be referred to SOAH, denying all issues not referred, and setting the maximum duration of the hearing at 180 days from the date of the preliminary hearing until the date the PFD is issued by SOAH:

   A) Issue A: Whether the Draft Permit is protective of water quality and the existing uses of the receiving waters in accordance with applicable Texas Surface Water Quality

3

Standards (TSQWS), including protection of aquatic and terrestrial wildlife;

B) Issue B: Whether the Draft Permit is consistent with the state's regionalization policy and demonstration of need for the volume requested in the application for a new discharge permit pursuant to Texas Water Code section 26.0282;

C) Issue C: Whether the Draft Permit is protective of the health of the nearby residents;

D) Issue D: Whether the Draft Permit complies with applicable requirements regarding nuisance odors;

E) Issue E: Whether the Application is substantially complete and accurate;

F) Issue F: Whether the Draft Permit complies with the TCEQ's antidegradation policy and procedures;

G) Issue G: Whether the Draft Permit should be altered or denied based on the AIRW's compliance history; and

H) Issue H: Whether the Draft Permit contains sufficient provisions to ensure protection of water quality, including necessary operational requirements.

20. On January 16, 2022, notice of the preliminary hearing was published in English in the *Williamson County Sun* and, on January 13, 2022, in Spanish in *El Mundo Newspaper*. The notice included the time, date, and place of the hearing, as well as the matters asserted, in accordance with the applicable statutes and rules.

**Proceedings at SOAH**

21. On February 24, 2022, a preliminary hearing was convened in this case via videoconference by SOAH ALJs Andrew Lutostanski and Ross Henderson. Attorney Helen Gilbert appeared for AIRW; attorney Patricia Carls appeared for the City; attorney Bobby Salehi appeared for the ED; attorney Jennifer Jamison appeared for the Office of Public Interest Counsel (OPIC); Jim Webb appeared for himself; and John Carlton appeared for Jonah.

4

22. Mr. Webb and Jonah sought party status at the preliminary hearing, and the ALJs granted those requests. Mr. Webb submitted his withdrawal from the proceeding on May 17, 2022.

23. Jurisdiction was noted by the ALJs and the Administrative Record, and AIRW's exhibits AIRW Exhibit 1-7 were admitted.

24. A second preliminary hearing was held via videoconference by SOAH ALJs Lutostanski and Katerina DeAngelo on May 12, 2022. All parties appeared through their respective representatives and the ALJs ruled on all timely-filed motions and objections.

25. On May 23-25, 2022, ALJs Lutostanski and DeAngelo convened the hearing on the merits via videoconference and all parties appeared through their respective representatives. The record closed on June 24, 2022, after the parties filed post-hearing briefs.

**Protection of Water Quality and Existing Uses, Including Aquatic and Terrestrial Wildlife**

26. The prima facie demonstration that the Draft Permit is protective of water quality and the existing uses of the receiving waters in accordance with applicable Texas Surface Water Quality Standards (TSWQS), including protection of aquatic and terrestrial wildlife, was not rebutted.

27. TSWQS apply to surface water in the state and are set by the Commission at levels designed to be protective of public health, aquatic resources, terrestrial life, and other environmental and economic resources. The applicable water quality standards are the TSWQS in 30 Texas Administrative Code Chapter 307.

28. The TSWQS consist of general standards, narrative standards, surface water segment-specific numeric standards, numeric standards for toxic substances, and antidegradation review.

29. The TSWQS establish specific uses for each classified water body in the state and also provide numeric criteria for each classified stream.

30. The provisions of the Draft Permit are protective of water quality and are in accordance with the TSWQS.

31. The Draft Permit is protective of water quality and existing uses of the receiving water.

5

32.   The Draft Permit is protective of aquatic and terrestrial wildlife.

**Regionalization**

33.   To effectuate its policy of encouraging regionalization of wastewater services, TCEQ requires an applicant to provide certain information to allow TCEQ to conduct a regionalization analysis.

34.   No part of the Facility or development is within the City's corporate limits.

35.   The proposed Facility and its discharge are within the City's extraterritorial jurisdiction.

36.   Properties in the City's extraterritorial jurisdiction that desire wastewater services from the City must first submit a petition for voluntary annexation.

37.   The ordinance requiring annexation for wastewater services may be waived by the City Council.

38.   As part of its Application, AIRW provided email correspondence to and from nearby providers regarding whether they would provide sewer service.

39.   AIRW's written communications with nearby providers were sufficient, and AIRW was not required to submit certified letters because the emails provide similar tracking and traceability.

40.   AIRW explored securing wastewater services from the City, and the City placed conditions on providing service, including: the Facility site would have to be annexed into the City and comply with the City's land use restrictions.

41.   There was no indication that the City was willing to waive the annexation and land use requirements.

42.   AIRW received a conditional offer for sewer service from the City. The City denied AIRW's request for service unless AIRW agreed to annexation and land use restrictions.

43. The ED requested from AIRW a cost analysis of expenditures that includes the cost of connecting to the CCN facilities versus the cost of the proposed facility or expansion.

44. Constructing a new plant will cost approximately $300,000 more than connecting to the City's system.

45. Because of the higher property tax rate inside the City than outside it in the unincorporated area and the City's condition of annexation to connect to its system, connecting carries with it an approximately $20 million cost due to diminution in property value.

46. Costs weigh in favor of granting AIRW's application.

47. The evidence fails to show that easements and the delay inherent to acquiring them are impediments to connecting to the City's system.

48. Even if easements were needed, the evidence fails to show that AIRW tried and failed to secure them.

49. There is no regional provider designated for the area where the Facility is proposed to be located.

50. The proposed Facility and its discharge are not within the sewer CCN of any retail public utility.

51. The proposed Facility and its discharge are partially within Jonah's district boundaries and wholly within Jonah's water CCN area.

52. The City did not request Jonah's consent to provide wastewater service to the Facility, and Jonah has not given consent for the City to operate within its boundaries.

53. DELETED

54. DELETED

**Nearby Residents**

55. The prima facie demonstration that the Draft Permit is protective of the health of nearby residents was not rebutted.

56. The Draft Permit contains adequate permit limits and monitoring requirements to protect the health of nearby residents.

57. The monitoring and sampling requirements in the Draft Permit comply with the Commission rules.

58. The Draft Permit contains appropriate effluent limits.

59. The Draft Permit is protective of human health, including those of nearby residents.

**Nuisance Odors**

60. AIRW will control nuisance odors by owning the 150-foot buffer zone from the wastewater treatment plant units to the property line.

61. The evidence failed to show that the discharge will go into any body of water that crosses or abuts any park, playground, or schoolyard within one mile of the point of discharge.

**Completeness and Accuracy of Application**

62. The prima facie demonstration that the Application is substantially complete and accurate was not rebutted.

63. The Application went through both an administrative and a technical review.

64. The Application included all required information and was substantially complete and accurate.

### Antidegradation

65. The prima facie demonstration that the Draft Permit complies with TCEQ's antidegradation policy and procedures was not rebutted.

66. The ED performed a Tier 1 and Tier 2 antidegradation review of the receiving waters in accordance with 30 Texas Administrative Code section 307.5.

67. The narrative and numeric criteria to protect existing uses will be maintained throughout the receiving waters; therefore, existing water quality uses will be maintained and protected.

68. The existing water quality uses of the receiving waters of the unnamed tributary of unnamed tributary, Mankins Branch, the San Gabriel/North Fork San Gabriel River in Segment No. 1248 of the Brazos River Basin will not be impaired by the Draft Permit as long as AIRW complies with the Draft Permit, which will satisfy the antidegradation Tier 1 requirements.

69. The Draft Permit will not cause significant degradation of water quality in the receiving waters of the unnamed tributary, Mankins Branch, the San Gabriel/North Fork San Gabriel River in Segment No. 1248 of the Brazos River Basin as long as AIRW complies with the Draft Permit, which will satisfy the antidegradation Tier 2 requirements.

70. The Draft Permit complies with TCEQ's antidegradation policy and procedures.

### Compliance History

71. AIRW's compliance status is unclassified.

72. No evidence was presented that indicated that AIRW's compliance history should alter or result in permit denial.

73. AIRW's compliance history of unclassified does not serve as a basis for alteration or denial of the Draft Permit.

## Operational Requirements

74. The prima facie demonstration that the Draft Permit contains sufficient provisions to ensure protection of water quality, including necessary operational requirements, was not rebutted.

75. The operational requirements in the Draft Permit are sufficient to ensure protection of water quality.

## Transcription Costs

76. Reporting and transcription of the hearing on the merits was warranted because the hearing lasted for three days.

77. All parties fully participated in the hearing by presenting witnesses and cross-examining witnesses; however, Jonah's participation in the hearing was minor and disproportionate to the City and AIRW.

78. Both the City and AIRW participated roughly equally in the hearing and cited to the transcript in their closing arguments; therefore, both sides benefitted from having a transcript.

79. There was no evidence that any party subject to allocation of costs is financially unable to pay a share of the costs.

80. The total cost for recording and transcribing the preliminary hearing and the hearing on the merits was $8,848.75.

81. AIRW and the City should each pay one-half of the transcription costs.

## II. CONCLUSIONS OF LAW

1. TCEQ has jurisdiction over this matter. Tex. Water Code, chs. 5, 26.

2. SOAH has jurisdiction to conduct a hearing and to prepare a PFD in contested cases referred by the Commission under Texas Government Code section 2003.047.

10

3. Notice was provided in accordance with Texas Water Code sections 5.114 and 26.028; Texas Government Code sections 2001.051 and 2001.052; and 30 Texas Administrative Code sections 39.405 and 39.551.

4. The Application is subject to the requirements in Senate Bill 709, effective September 1, 2015. Tex. Gov't Code § 2003.047(i-1)-(i-3).

5. AIRW's filing of the Administrative Record established a prima facie case that: (1) the Draft Permit meets all state and federal legal and technical requirements; and (2) a permit, if issued consistent with the Draft Permit, would protect human health and safety, the environment, and physical property. Tex. Gov't Code § 2003.047(i-1); 30 Tex. Admin. Code § 80.17.

6. AIRW retains the burden of proof on the issues regarding the sufficiency of the Application and compliance with the necessary statutory and regulatory requirements. 30 Tex. Admin. Code § 80.17(a).

7. The City did not rebut the prima facie demonstration by demonstrating that one or more provisions in the Draft Permit violate a specifically applicable state or federal requirement that relates to a matter referred by TCEQ. Tex. Gov't Code § 2003.047(i-2); 30 Tex. Admin. Code § 80.117(c).

8. The Draft Permit is protective of water quality and the existing uses of the receiving waters in accordance with applicable TSWQS, including protection of aquatic and terrestrial wildlife.

9. The Draft Permit is protective of the health of residents near the proposed Facility and discharge route.

10. The Application demonstrates compliance with TCEQ's regionalization policy. Tex. Water Code §§ 26.003, 26.081(a)-(b), (d); 26.0282.

11. The Application demonstrates a need for the Draft Permit. Tex. Water Code § 26.0282.

12. The Draft Permit contains sufficient provisions to prevent nuisance odors. 30 Tex. Admin. Code §§ 217.38, 309.13(e).

13. The Application is substantially complete and accurate.

14. The Draft Permit complies with TCEQ's antidegradation policy. 30 Texas Admin. Code §§ 307.5, 307.6(b)(4).

15. AIRW's compliance history does not raise issues regarding AIRW's ability to comply with the material terms of the Draft Permit or that would warrant altering the terms of the Draft Permit.

16. The Draft Permit contains sufficient provisions, including necessary operational requirements, to ensure protection of water quality.

17. No transcript costs may be assessed against the ED or OPIC because TCEQ's rules prohibit the assessment of any cost to a statutory party who is precluded by law from appealing any ruling, decision, or other act of the Commission. 30 Tex. Admin. Code § 80.23(d)(2).

18. Factors to be considered in assessing transcript costs include: the party who requested the transcript; the financial ability of the party to pay the costs; the extent to which the party participated in the hearing; the relative benefits to the various parties of having a transcript; the budgetary constraints of a state or federal administrative agency participating in the proceeding; and any other factor which is relevant to a just and reasonable assessment of the costs. 30 Tex. Admin. Code § 80.23(d)(1).

19. Considering the factors in 30 Texas Administrative Code section 80.23(d)(1), a reasonable assessment of hearing transcript costs against parties to the contested case proceeding is: one-half to AIRW and one-half to the City.

## III. EXPLAINATION OF CHANGES

1. The Commission determined to adopt the Administrative Law Judges' proposed Order with changes.

2. The Commission determined to amend the second sentence in Finding of Fact #3 based on the Executive Director's Exceptions and agreed to by the Administrative Law Judges to read: "The unclassified receiving water uses are limited aquatic life use for the unnamed tributary and Mankins Branch (intermittent with perennial pools), and high aquatic life use for Mankins Branch (perennial)."

3. The Commission determined to amend Finding of Fact #51 based on Jonah's Exceptions and agreed to by the Administrative Law Judges to read: "The proposed Facility and its discharge are partially within Jonah's district boundaries and wholly within Jonah's water CCN area."

4. The Commission determined to delete Findings of Fact #53 and #54 as unnecessary to the Commission's regionalization policy consideration in this case.

**NOW, THEREFORE, BE IT ORDERED BY THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY, IN ACCORDANCE WITH THESE FINDINGS OF FACT AND CONCLUSIONS OF LAW, THAT:**

1. AIRW's Application for Texas Pollutant Discharge Elimination System Permit No. WQ0015878001 is granted as set forth in the Draft Permit.

2. AIRW and the City must each pay one-half of the transcription costs.

3. The Commission adopts the ED's Response to Public Comment in accordance with 30 Texas Administrative Code section 50.117.

4. All other motions, requests for entry of specific Findings of Fact or Conclusions of Law, and any other requests for general or specific relief, if not expressly granted herein, are hereby denied.

5. The effective date of this Order is the date the Order is final, as provided by Texas Government Code section 2001.144 and 30 Texas Administrative Code section 80.273.

6. TCEQ's Chief Clerk shall forward a copy of this Order to all parties.

7. If any provision, sentence, clause, or phrase of this Order is for any reason held to be invalid, the invalidity of any provision shall not affect the validity of the remaining portions of this Order.

ISSUED: November 28, 2022  TEXAS COMMISSION ON
ENVIRONMENTAL QUALITY


Jon Niermann, Chairman

13



TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
P.O. Box 13087
Austin, Texas 78711-3087

<u>PERMIT TO DISCHARGE WASTES</u>
under provisions of
Section 402 of the Clean Water Act
and Chapter 26 of the Texas Water Code

AIRW 2017-7, L.P.

whose mailing address is

2505 North State Highway 360, Suite 800
Grand Prairie, Texas 75050

is authorized to treat and discharge wastes from the Rockride Lane Water Resource Reclamation Facility, SIC Code 4952

located approximately 500 feet southeast of the intersection of Rockride Lane (County Road 110) and Westinghouse Road (County Road 111), in Williamson County, Texas 78626

via pipe, thence through a culvert, thence to an unnamed tributary, thence to Mankins Branch, thence the San Gabriel/North Fork San Gabriel River in Segment No. 1248 of the Brazos River Basin

only according to effluent limitations, monitoring requirements, and other conditions set forth in this permit, as well as the rules of the Texas Commission on Environmental Quality (TCEQ), the laws of the State of Texas, and other orders of the TCEQ. The issuance of this permit does not grant to the permittee the right to use private or public property for conveyance of wastewater along the discharge route described in this permit. This includes, but is not limited to, property belonging to any individual, partnership, corporation, or other entity. Neither does this permit authorize any invasion of personal rights nor any violation of federal, state, or local laws or regulations. It is the responsibility of the permittee to acquire property rights as may be necessary to use the discharge route.

This permit shall expire at midnight, **five years from the date of issuance**.

ISSUED DATE: November 28, 2022

_____
For the Commission

EFFLUENT LIMITATIONS AND MONITORING REQUIREMENTS

1. During the period beginning upon the date of issuance and lasting through the date of expiration, the permittee is authorized to discharge subject to the following effluent limitations:

The daily average flow of effluent shall not exceed 0.20 million gallons per day (MGD), nor shall the average discharge during any two-hour period (2-hour peak) exceed 556 gallons per minute.

| Effluent Characteristic | Discharge Limitations | | | | Min. Self-Monitoring Requirements | |
|---|---|---|---|---|---|---|
| | Daily Avg | 7-day Avg | Daily Max | Single Grab | Report Daily Avg. & Max. Single Grab | |
| | mg/l (lbs/day) | mg/l | mg/l | mg/l | Measurement Frequency | Sample Type |
| Flow, MGD | Report | N/A | Report | N/A | Continuous | Totalizing Meter |
| Carbonaceous Biochemical Oxygen Demand (5-day) | 7 (12) | 12 | 22 | 32 | One/week | Grab |
| Total Suspended Solids | 10 (17) | 15 | 25 | 35 | One/week | Grab |
| Ammonia Nitrogen | 2 (3.3) | 5 | 10 | 15 | One/week | Grab |
| Total Phosphorus | 0.5 (0.8) | 1 | 2 | 3 | One/week | Grab |
| E. coli, CFU or MPN* per 100 ml | 126 | N/A | N/A | 399 | One/month | Grab |

*CFU or MPN* - colony-forming units or most probable number

2. The effluent shall contain a chlorine residual of at least 1.0 mg/l and shall not exceed a chlorine residual of 4.0 mg/l after a detention time of at least 20 minutes (based on peak flow), and shall be monitored five times per week by grab sample. An equivalent method of disinfection may be substituted only with prior approval of the Executive Director.

3. The pH shall not be less than 6.0 standard units nor greater than 9.0 standard units and shall be monitored once per month by grab sample.

4. There shall be no discharge of floating solids or visible foam in other than trace amounts and no discharge of visible oil.

5. Effluent monitoring samples shall be taken at the following location(s): Following the final treatment unit.

6. The effluent shall contain a minimum dissolved oxygen of 4.0 mg/l and shall be monitored once per week by grab sample.

## DEFINITIONS AND STANDARD PERMIT CONDITIONS

As required by Title 30 Texas Administrative Code (TAC) Chapter 305, certain regulations appear as standard conditions in waste discharge permits. 30 TAC § 305.121 - 305.129 (relating to Permit Characteristics and Conditions) as promulgated under the Texas Water Code (TWC) §§ 5.103 and 5.105, and the Texas Health and Safety Code (THSC) §§ 361.017 and 361.024(a), establish the characteristics and standards for waste discharge permits, including sewage sludge, and those sections of 40 Code of Federal Regulations (CFR) Part 122 adopted by reference by the Commission. The following text includes these conditions and incorporates them into this permit. All definitions in TWC § 26.001 and 30 TAC Chapter 305 shall apply to this permit and are incorporated by reference. Some specific definitions of words or phrases used in this permit are as follows:

1. Flow Measurements

   a. Annual average flow - the arithmetic average of all daily flow determinations taken within the preceding 12 consecutive calendar months. The annual average flow determination shall consist of daily flow volume determinations made by a totalizing meter, charted on a chart recorder and limited to major domestic wastewater discharge facilities with one million gallons per day or greater permitted flow.

   b. Daily average flow - the arithmetic average of all determinations of the daily flow within a period of one calendar month. The daily average flow determination shall consist of determinations made on at least four separate days. If instantaneous measurements are used to determine the daily flow, the determination shall be the arithmetic average of all instantaneous measurements taken during that month. Daily average flow determination for intermittent discharges shall consist of a minimum of three flow determinations on days of discharge.

   c. Daily maximum flow - the highest total flow for any 24-hour period in a calendar month.

   d. Instantaneous flow – the measured flow during the minimum time required to interpret the flow measuring device.

   e. 2-hour peak flow (domestic wastewater treatment plants) - the maximum flow sustained for a two-hour period during the period of daily discharge. The average of multiple measurements of instantaneous maximum flow within a two-hour period may be used to calculate the 2-hour peak flow.

   f. Maximum 2-hour peak flow (domestic wastewater treatment plants) - the highest 2-hour peak flow for any 24-hour period in a calendar month.

2. Concentration Measurements

   a. Daily average concentration - the arithmetic average of all effluent samples, composite or grab as required by this permit, within a period of one calendar month, consisting of at least four separate representative measurements.

      i. For domestic wastewater treatment plants - When four samples are not available in a calendar month, the arithmetic average (weighted by flow) of all values in the previous four consecutive month period consisting of at least four measurements shall be utilized as the daily average concentration.

ii. For all other wastewater treatment plants - When four samples are not available in a calendar month, the arithmetic average (weighted by flow) of all values taken during the month shall be utilized as the daily average concentration.

b. 7-day average concentration - the arithmetic average of all effluent samples, composite or grab as required by this permit, within a period of one calendar week, Sunday through Saturday.

c. Daily maximum concentration - the maximum concentration measured on a single day, by the sample type specified in the permit, within a period of one calendar month.

d. Daily discharge - the discharge of a pollutant measured during a calendar day or any 24-hour period that reasonably represents the calendar day for purposes of sampling. For pollutants with limitations expressed in terms of mass, the daily discharge is calculated as the total mass of the pollutant discharged over the sampling day. For pollutants with limitations expressed in other units of measurement, the daily discharge is calculated as the average measurement of the pollutant over the sampling day.

The daily discharge determination of concentration made using a composite sample shall be the concentration of the composite sample. When grab samples are used, the daily discharge determination of concentration shall be the arithmetic average (weighted by flow value) of all samples collected during that day.

e. Bacteria concentration (*E. coli* or Enterococci) - Colony Forming Units (CFU) or Most Probable Number (MPN) of bacteria per 100 milliliters effluent. The daily average bacteria concentration is a geometric mean of the values for the effluent samples collected in a calendar month. The geometric mean shall be determined by calculating the nth root of the product of all measurements made in a calendar month, where n equals the number of measurements made; or, computed as the antilogarithm of the arithmetic mean of the logarithms of all measurements made in a calendar month. For any measurement of bacteria equaling zero, a substituted value of one shall be made for input into either computation method. If specified, the 7-day average for bacteria is the geometric mean of the values for all effluent samples collected during a calendar week.

f. Daily average loading (lbs/day) - the arithmetic average of all daily discharge loading calculations during a period of one calendar month. These calculations must be made for each day of the month that a parameter is analyzed. The daily discharge, in terms of mass (lbs/day), is calculated as (Flow, MGD x Concentration, mg/l x 8.34).

g. Daily maximum loading (lbs/day) - the highest daily discharge, in terms of mass (lbs/day), within a period of one calendar month.

3. Sample Type

a. Composite sample - For domestic wastewater, a composite sample is a sample made up of a minimum of three effluent portions collected in a continuous 24-hour period or during the period of daily discharge if less than 24 hours, and combined in volumes proportional to flow, and collected at the intervals required by 30 TAC § 319.9 (a). For industrial wastewater, a composite sample is a sample made up of a minimum of three effluent portions collected in a continuous 24-hour period or during the period of daily discharge if less than 24 hours, and combined in volumes proportional to flow, and collected at the intervals required by 30 TAC § 319.9 (b).

b.  Grab sample - an individual sample collected in less than 15 minutes.

4.  Treatment Facility (facility) - wastewater facilities used in the conveyance, storage, treatment, recycling, reclamation and/or disposal of domestic sewage, industrial wastes, agricultural wastes, recreational wastes, or other wastes including sludge handling or disposal facilities under the jurisdiction of the Commission.

5.  The term "sewage sludge" is defined as solid, semi-solid, or liquid residue generated during the treatment of domestic sewage in 30 TAC Chapter 312. This includes the solids that have not been classified as hazardous waste separated from wastewater by unit processes.

6.  Bypass - the intentional diversion of a waste stream from any portion of a treatment facility.

**MONITORING AND REPORTING REQUIREMENTS**

1.  Self-Reporting

    Monitoring results shall be provided at the intervals specified in the permit. Unless otherwise specified in this permit or otherwise ordered by the Commission, the permittee shall conduct effluent sampling and reporting in accordance with 30 TAC §§ 319.4 - 319.12. Unless otherwise specified, effluent monitoring data shall be submitted each month, to the Compliance Monitoring Team of the Enforcement Division (MC 224), by the 20th day of the following month for each discharge which is described by this permit whether or not a discharge is made for that month. Monitoring results must be submitted online using the NetDMR reporting system available through the TCEQ website unless the permittee requests and obtains an electronic reporting waiver. Monitoring results must be signed and certified as required by Monitoring and Reporting Requirements No. 10.

    As provided by state law, the permittee is subject to administrative, civil and criminal penalties, as applicable, for negligently or knowingly violating the Clean Water Act (CWA); TWC §§ 26, 27, and 28; and THSC § 361, including but not limited to knowingly making any false statement, representation, or certification on any report, record, or other document submitted or required to be maintained under this permit, including monitoring reports or reports of compliance or noncompliance, or falsifying, tampering with or knowingly rendering inaccurate any monitoring device or method required by this permit or violating any other requirement imposed by state or federal regulations.

2.  Test Procedures

    a.  Unless otherwise specified in this permit, test procedures for the analysis of pollutants shall comply with procedures specified in 30 TAC §§ 319.11 - 319.12. Measurements, tests, and calculations shall be accurately accomplished in a representative manner.

    b.  All laboratory tests submitted to demonstrate compliance with this permit must meet the requirements of 30 TAC § 25, Environmental Testing Laboratory Accreditation and Certification.

3.  Records of Results

    a.  Monitoring samples and measurements shall be taken at times and in a manner so as to be representative of the monitored activity.

    b.  Except for records of monitoring information required by this permit related to the permittee's sewage sludge use and disposal activities, which shall be retained for a period

of at least five years (or longer as required by 40 CFR Part 503), monitoring and reporting records, including strip charts and records of calibration and maintenance, copies of all records required by this permit, records of all data used to complete the application for this permit, and the certification required by 40 CFR § 264.73(b)(9) shall be retained at the facility site, or shall be readily available for review by a TCEQ representative for a period of three years from the date of the record or sample, measurement, report, application or certification. This period shall be extended at the request of the Executive Director.

c. Records of monitoring activities shall include the following:

i. date, time and place of sample or measurement;

ii. identity of individual who collected the sample or made the measurement.

iii. date and time of analysis;

iv. identity of the individual and laboratory who performed the analysis;

v. the technique or method of analysis; and

vi. the results of the analysis or measurement and quality assurance/quality control records.

The period during which records are required to be kept shall be automatically extended to the date of the final disposition of any administrative or judicial enforcement action that may be instituted against the permittee.

4. Additional Monitoring by Permittee

If the permittee monitors any pollutant at the location(s) designated herein more frequently than required by this permit using approved analytical methods as specified above, all results of such monitoring shall be included in the calculation and reporting of the values submitted on the approved self-report form. Increased frequency of sampling shall be indicated on the self-report form.

5. Calibration of Instruments

All automatic flow measuring or recording devices and all totalizing meters for measuring flows shall be accurately calibrated by a trained person at plant start-up and as often thereafter as necessary to ensure accuracy, but not less often than annually unless authorized by the Executive Director for a longer period. Such person shall verify in writing that the device is operating properly and giving accurate results. Copies of the verification shall be retained at the facility site and/or shall be readily available for review by a TCEQ representative for a period of three years.

6. Compliance Schedule Reports

Reports of compliance or noncompliance with, or any progress reports on, interim and final requirements contained in any compliance schedule of the permit shall be submitted no later than 14 days following each schedule date to the Regional Office and the Compliance Monitoring Team of the Enforcement Division (MC 224).

7. Noncompliance Notification

    a.  In accordance with 30 TAC § 305.125(9) any noncompliance which may endanger human health or safety, or the environment shall be reported by the permittee to the TCEQ. Except as allowed by 30 TAC § 305.132, report of such information shall be provided orally or by facsimile transmission (FAX) to the Regional Office within 24 hours of becoming aware of the noncompliance. A written submission of such information shall also be provided by the permittee to the Regional Office and the Compliance Monitoring Team of the Enforcement Division (MC 224) within five working days of becoming aware of the noncompliance. For Publicly Owned Treatment Works (POTWs), effective December 21, 2023, the permittee must submit the written report for unauthorized discharges and unanticipated bypasses that exceed any effluent limit in the permit using the online electronic reporting system available through the TCEQ website unless the permittee requests and obtains an electronic reporting waiver. The written submission shall contain a description of the noncompliance and its cause; the potential danger to human health or safety, or the environment; the period of noncompliance, including exact dates and times; if the noncompliance has not been corrected, the time it is expected to continue; and steps taken or planned to reduce, eliminate, and prevent recurrence of the noncompliance, and to mitigate its adverse effects.

    b.  The following violations shall be reported under Monitoring and Reporting Requirement 7.a.:

        i.  Unauthorized discharges as defined in Permit Condition 2(g).

        ii.  Any unanticipated bypass that exceeds any effluent limitation in the permit.

        iii.  Violation of a permitted maximum daily discharge limitation for pollutants listed specifically in the Other Requirements section of an Industrial TPDES permit.

    c.  In addition to the above, any effluent violation which deviates from the permitted effluent limitation by more than 40% shall be reported by the permittee in writing to the Regional Office and the Compliance Monitoring Team of the Enforcement Division (MC 224) within 5 working days of becoming aware of the noncompliance.

    d.  Any noncompliance other than that specified in this section, or any required information not submitted or submitted incorrectly, shall be reported to the Compliance Monitoring Team of the Enforcement Division (MC 224) as promptly as possible. For effluent limitation violations, noncompliances shall be reported on the approved self-report form.

8. In accordance with the procedures described in 30 TAC §§ 35.301 - 35.303 (relating to Water Quality Emergency and Temporary Orders) if the permittee knows in advance of the need for a bypass, it shall submit prior notice by applying for such authorization.

9. Changes in Discharges of Toxic Substances

All existing manufacturing, commercial, mining, and silvicultural permittees shall notify the Regional Office, orally or by facsimile transmission within 24 hours, and both the Regional Office and the Compliance Monitoring Team of the Enforcement Division (MC 224) in writing within five (5) working days, after becoming aware of or having reason to believe:

a. That any activity has occurred or will occur which would result in the discharge, on a routine or frequent basis, of any toxic pollutant listed at 40 CFR Part 122, Appendix D, Tables II and III (excluding Total Phenols) which is not limited in the permit, if that discharge will exceed the highest of the following "notification levels":

    i. One hundred micrograms per liter (100 µg/L);

    ii. Two hundred micrograms per liter (200 µg/L) for acrolein and acrylonitrile; five hundred micrograms per liter (500 µg/L) for 2,4-dinitrophenol and for 2-methyl-4,6-dinitrophenol; and one milligram per liter (1 mg/L) for antimony;

    iii. Five (5) times the maximum concentration value reported for that pollutant in the permit application; or

    iv. The level established by the TCEQ.

b. That any activity has occurred or will occur which would result in any discharge, on a nonroutine or infrequent basis, of a toxic pollutant which is not limited in the permit, if that discharge will exceed the highest of the following "notification levels":

    i. Five hundred micrograms per liter (500 µg/L);

    ii. One milligram per liter (1 mg/L) for antimony;

    iii. Ten (10) times the maximum concentration value reported for that pollutant in the permit application; or

    iv. The level established by the TCEQ.

10. Signatories to Reports

    All reports and other information requested by the Executive Director shall be signed by the person and in the manner required by 30 TAC § 305.128 (relating to Signatories to Reports).

11. All POTWs must provide adequate notice to the Executive Director of the following:

    a. Any new introduction of pollutants into the POTW from an indirect discharger which would be subject to CWA § 301 or § 306 if it were directly discharging those pollutants;

    b. Any substantial change in the volume or character of pollutants being introduced into that POTW by a source introducing pollutants into the POTW at the time of issuance of the permit; and

    c. For the purpose of this paragraph, adequate notice shall include information on:

        i. The quality and quantity of effluent introduced into the POTW; and

        ii. Any anticipated impact of the change on the quantity or quality of effluent to be discharged from the POTW.

**PERMIT CONDITIONS**

1. General

    a. When the permittee becomes aware that it failed to submit any relevant facts in a permit application, or submitted incorrect information in an application or in any report to the Executive Director, it shall promptly submit such facts or information.

    b. This permit is granted on the basis of the information supplied and representations made by the permittee during action on an application, and relying upon the accuracy and completeness of that information and those representations. After notice and opportunity for a hearing, this permit may be modified, suspended, or revoked, in whole or in part, in accordance with 30 TAC Chapter 305, Subchapter D, during its term for good cause including, but not limited to, the following:

        i. Violation of any terms or conditions of this permit;

        ii. Obtaining this permit by misrepresentation or failure to disclose fully all relevant facts; or

        iii. A change in any condition that requires either a temporary or permanent reduction or elimination of the authorized discharge.

    c. The permittee shall furnish to the Executive Director, upon request and within a reasonable time, any information to determine whether cause exists for amending, revoking, suspending or terminating the permit. The permittee shall also furnish to the Executive Director, upon request, copies of records required to be kept by the permit.

2. Compliance

    a. Acceptance of the permit by the person to whom it is issued constitutes acknowledgment and agreement that such person will comply with all the terms and conditions embodied in the permit, and the rules and other orders of the Commission.

    b. The permittee has a duty to comply with all conditions of the permit. Failure to comply with any permit condition constitutes a violation of the permit and the Texas Water Code or the Texas Health and Safety Code, and is grounds for enforcement action, for permit amendment, revocation, or suspension, or for denial of a permit renewal application or an application for a permit for another facility.

    c. It shall not be a defense for a permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of the permit.

    d. The permittee shall take all reasonable steps to minimize or prevent any discharge or sludge use or disposal or other permit violation that has a reasonable likelihood of adversely affecting human health or the environment.

    e. Authorization from the Commission is required before beginning any change in the permitted facility or activity that may result in noncompliance with any permit requirements.

    f. A permit may be amended, suspended and reissued, or revoked for cause in accordance

with 30 TAC §§ 305.62 and 305.66 and TWC§ 7.302. The filing of a request by the permittee for a permit amendment, suspension and reissuance, or termination, or a notification of planned changes or anticipated noncompliance, does not stay any permit condition.

g.  There shall be no unauthorized discharge of wastewater or any other waste. For the purpose of this permit, an unauthorized discharge is considered to be any discharge of wastewater into or adjacent to water in the state at any location not permitted as an outfall or otherwise defined in the Other Requirements section of this permit.

h.  In accordance with 30 TAC § 305.535(a), the permittee may allow any bypass to occur from a TPDES permitted facility which does not cause permitted effluent limitations to be exceeded or an unauthorized discharge to occur, but only if the bypass is also for essential maintenance to assure efficient operation.

i.  The permittee is subject to administrative, civil, and criminal penalties, as applicable, under TWC §§ 7.051 - 7.075 (relating to Administrative Penalties), 7.101 - 7.111 (relating to Civil Penalties), and 7.141 - 7.202 (relating to Criminal Offenses and Penalties) for violations including, but not limited to, negligently or knowingly violating the federal CWA §§ 301, 302, 306, 307, 308, 318, or 405, or any condition or limitation implementing any sections in a permit issued under the CWA § 402, or any requirement imposed in a pretreatment program approved under the CWA §§ 402 (a)(3) or 402 (b)(8).

3.  Inspections and Entry

    a.  Inspection and entry shall be allowed as prescribed in the TWC Chapters 26, 27, and 28, and THSC § 361.

    b.  The members of the Commission and employees and agents of the Commission are entitled to enter any public or private property at any reasonable time for the purpose of inspecting and investigating conditions relating to the quality of water in the state or the compliance with any rule, regulation, permit or other order of the Commission. Members, employees, or agents of the Commission and Commission contractors are entitled to enter public or private property at any reasonable time to investigate or monitor or, if the responsible party is not responsive or there is an immediate danger to public health or the environment, to remove or remediate a condition related to the quality of water in the state. Members, employees, Commission contractors, or agents acting under this authority who enter private property shall observe the establishment's rules and regulations concerning safety, internal security, and fire protection, and if the property has management in residence, shall notify management or the person then in charge of his presence and shall exhibit proper credentials. If any member, employee, Commission contractor, or agent is refused the right to enter in or on public or private property under this authority, the Executive Director may invoke the remedies authorized in TWC § 7.002. The statement above, that Commission entry shall occur in accordance with an establishment's rules and regulations concerning safety, internal security, and fire protection, is not grounds for denial or restriction of entry to any part of the facility, but merely describes the Commission's duty to observe appropriate rules and regulations during an inspection.

4.  Permit Amendment and/or Renewal

a.  The permittee shall give notice to the Executive Director as soon as possible of any planned physical alterations or additions to the permitted facility if such alterations or additions would require a permit amendment or result in a violation of permit requirements. Notice shall also be required under this paragraph when:

    i.   The alteration or addition to a permitted facility may meet one of the criteria for determining whether a facility is a new source in accordance with 30 TAC § 305.534 (relating to New Sources and New Dischargers); or

    ii.  The alteration or addition could significantly change the nature or increase the quantity of pollutants discharged. This notification applies to pollutants that are subject neither to effluent limitations in the permit, nor to notification requirements in Monitoring and Reporting Requirements No. 9; or

    iii. The alteration or addition results in a significant change in the permittee's sludge use or disposal practices, and such alteration, addition, or change may justify the application of permit conditions that are different from or absent in the existing permit, including notification of additional use or disposal sites not reported during the permit application process or not reported pursuant to an approved land application plan.

b.  Prior to any facility modifications, additions, or expansions that will increase the plant capacity beyond the permitted flow, the permittee must apply for and obtain proper authorization from the Commission before commencing construction.

c.  The permittee must apply for an amendment or renewal at least 180 days prior to expiration of the existing permit in order to continue a permitted activity after the expiration date of the permit. If an application is submitted prior to the expiration date of the permit, the existing permit shall remain in effect until the application is approved, denied, or returned. If the application is returned or denied, authorization to continue such activity shall terminate upon the effective date of the action. If an application is not submitted prior to the expiration date of the permit, the permit shall expire and authorization to continue such activity shall terminate.

d.  Prior to accepting or generating wastes which are not described in the permit application or which would result in a significant change in the quantity or quality of the existing discharge, the permittee must report the proposed changes to the Commission. The permittee must apply for a permit amendment reflecting any necessary changes in permit conditions, including effluent limitations for pollutants not identified and limited by this permit.

e.  In accordance with the TWC § 26.029(b), after a public hearing, notice of which shall be given to the permittee, the Commission may require the permittee, from time to time, for good cause, in accordance with applicable laws, to conform to new or additional conditions.

f.  If any toxic effluent standard or prohibition (including any schedule of compliance specified in such effluent standard or prohibition) is promulgated under CWA § 307(a) for a toxic pollutant which is present in the discharge and that standard or prohibition is more stringent than any limitation on the pollutant in this permit, this permit shall be modified or revoked and reissued to conform to the toxic effluent standard or prohibition. The permittee shall comply with effluent standards or prohibitions established under CWA § 307(a) for toxic pollutants within the time provided in the

regulations that established those standards or prohibitions, even if the permit has not yet been modified to incorporate the requirement.

5.  Permit Transfer

    a.  Prior to any transfer of this permit, Commission approval must be obtained. The Commission shall be notified in writing of any change in control or ownership of facilities authorized by this permit. Such notification should be sent to the Applications Review and Processing Team (MC 148) of the Water Quality Division.

    b.  A permit may be transferred only according to the provisions of 30 TAC § 305.64 (relating to Transfer of Permits) and 30 TAC § 50.133 (relating to Executive Director Action on Application or WQMP update).

6.  Relationship to Hazardous Waste Activities

    This permit does not authorize any activity of hazardous waste storage, processing, or disposal that requires a permit or other authorization pursuant to the Texas Health and Safety Code.

7.  Relationship to Water Rights

    Disposal of treated effluent by any means other than discharge directly to water in the state must be specifically authorized in this permit and may require a permit pursuant to TWC Chapter 11.

8.  Property Rights

    A permit does not convey any property rights of any sort, or any exclusive privilege.

9.  Permit Enforceability

    The conditions of this permit are severable, and if any provision of this permit, or the application of any provision of this permit to any circumstances, is held invalid, the application of such provision to other circumstances, and the remainder of this permit, shall not be affected thereby.

10. Relationship to Permit Application

    The application pursuant to which the permit has been issued is incorporated herein; provided, however, that in the event of a conflict between the provisions of this permit and the application, the provisions of the permit shall control.

11. Notice of Bankruptcy

    a.  Each permittee shall notify the Executive Director, in writing, immediately following the filing of a voluntary or involuntary petition for bankruptcy under any chapter of Title 11 (Bankruptcy) of the United States Code (11 USC) by or against:

        i.   the permittee;

        ii.  an entity (as that term is defined in 11 USC, § 101(14)) controlling the permittee or listing the permit or permittee as property of the estate; or

        iii. an affiliate (as that term is defined in 11 USC, § 101(2)) of the permittee.

b. This notification must indicate:

   i. the name of the permittee;

   ii. the permit number(s);

   iii. the bankruptcy court in which the petition for bankruptcy was filed; and

   iv. the date of filing of the petition.

## OPERATIONAL REQUIREMENTS

1. The permittee shall at all times ensure that the facility and all of its systems of collection, treatment, and disposal are properly operated and maintained. This includes, but is not limited to, the regular, periodic examination of wastewater solids within the treatment plant by the operator in order to maintain an appropriate quantity and quality of solids inventory as described in the various operator training manuals and according to accepted industry standards for process control. Process control, maintenance, and operations records shall be retained at the facility site, or shall be readily available for review by a TCEQ representative, for a period of three years.

2. Upon request by the Executive Director, the permittee shall take appropriate samples and provide proper analysis in order to demonstrate compliance with Commission rules. Unless otherwise specified in this permit or otherwise ordered by the Commission, the permittee shall comply with all applicable provisions of 30 TAC Chapter 312 concerning sewage sludge use and disposal and 30 TAC §§ 319.21 - 319.29 concerning the discharge of certain hazardous metals.

3. Domestic wastewater treatment facilities shall comply with the following provisions:

   a. The permittee shall notify the Municipal Permits Team, Wastewater Permitting Section (MC 148) of the Water Quality Division, in writing, of any facility expansion at least 90 days prior to conducting such activity.

   b. The permittee shall submit a closure plan for review and approval to the Municipal Permits Team, Wastewater Permitting Section (MC 148) of the Water Quality Division, for any closure activity at least 90 days prior to conducting such activity. Closure is the act of permanently taking a waste management unit or treatment facility out of service and includes the permanent removal from service of any pit, tank, pond, lagoon, surface impoundment and/or other treatment unit regulated by this permit.

4. The permittee is responsible for installing prior to plant start-up, and subsequently maintaining, adequate safeguards to prevent the discharge of untreated or inadequately treated wastes during electrical power failures by means of alternate power sources, standby generators, and/or retention of inadequately treated wastewater.

5. Unless otherwise specified, the permittee shall provide a readily accessible sampling point and, where applicable, an effluent flow measuring device or other acceptable means by which effluent flow may be determined.

6.  The permittee shall remit an annual water quality fee to the Commission as required by 30 TAC Chapter 21. Failure to pay the fee may result in revocation of this permit under TWC § 7.302(b)(6).

7.  Documentation

    For all written notifications to the Commission required of the permittee by this permit, the permittee shall keep and make available a copy of each such notification under the same conditions as self-monitoring data are required to be kept and made available. Except for information required for TPDES permit applications, effluent data, including effluent data in permits, draft permits and permit applications, and other information specified as not confidential in 30 TAC §§ 1.5(d), any information submitted pursuant to this permit may be claimed as confidential by the submitter. Any such claim must be asserted in the manner prescribed in the application form or by stamping the words confidential business information on each page containing such information. If no claim is made at the time of submission, information may be made available to the public without further notice. If the Commission or Executive Director agrees with the designation of confidentiality, the TCEQ will not provide the information for public inspection unless required by the Texas Attorney General or a court pursuant to an open records request. If the Executive Director does not agree with the designation of confidentiality, the person submitting the information will be notified.

8.  Facilities that generate domestic wastewater shall comply with the following provisions; domestic wastewater treatment facilities at permitted industrial sites are excluded.

    a.  Whenever flow measurements for any domestic sewage treatment facility reach 75% of the permitted daily average or annual average flow for three consecutive months, the permittee must initiate engineering and financial planning for expansion and/or upgrading of the domestic wastewater treatment and/or collection facilities. Whenever the flow reaches 90% of the permitted daily average or annual average flow for three consecutive months, the permittee shall obtain necessary authorization from the Commission to commence construction of the necessary additional treatment and/or collection facilities. In the case of a domestic wastewater treatment facility which reaches 75% of the permitted daily average or annual average flow for three consecutive months, and the planned population to be served or the quantity of waste produced is not expected to exceed the design limitations of the treatment facility, the permittee shall submit an engineering report supporting this claim to the Executive Director of the Commission.

        If in the judgment of the Executive Director the population to be served will not cause permit noncompliance, then the requirement of this section may be waived. To be effective, any waiver must be in writing and signed by the Director of the Enforcement Division (MC 219) of the Commission, and such waiver of these requirements will be reviewed upon expiration of the existing permit; however, any such waiver shall not be interpreted as condoning or excusing any violation of any permit parameter.

    b.  The plans and specifications for domestic sewage collection and treatment works associated with any domestic permit must be approved by the Commission and failure to secure approval before commencing construction of such works or making a discharge is a violation of this permit and each day is an additional violation until approval has been secured.

c.  Permits for domestic wastewater treatment plants are granted subject to the policy of the Commission to encourage the development of area-wide waste collection, treatment, and disposal systems. The Commission reserves the right to amend any domestic wastewater permit in accordance with applicable procedural requirements to require the system covered by this permit to be integrated into an area-wide system, should such be developed; to require the delivery of the wastes authorized to be collected in, treated by or discharged from said system, to such area-wide system; or to amend this permit in any other particular to effectuate the Commission's policy. Such amendments may be made when the changes required are advisable for water quality control purposes and are feasible on the basis of waste treatment technology, engineering, financial, and related considerations existing at the time the changes are required, exclusive of the loss of investment in or revenues from any then existing or proposed waste collection, treatment or disposal system.

9.  Domestic wastewater treatment plants shall be operated and maintained by sewage plant operators holding a valid certificate of competency at the required level as defined in 30 TAC Chapter 30.

10. For Publicly Owned Treatment Works (POTWs), the 30-day average (or monthly average) percent removal for BOD and TSS shall not be less than 85%, unless otherwise authorized by this permit.

11. Facilities that generate industrial solid waste as defined in 30 TAC § 335.1 shall comply with these provisions:

a.  Any solid waste, as defined in 30 TAC § 335.1 (including but not limited to such wastes as garbage, refuse, sludge from a waste treatment, water supply treatment plant or air pollution control facility, discarded materials, discarded materials to be recycled, whether the waste is solid, liquid, or semisolid), generated by the permittee during the management and treatment of wastewater, must be managed in accordance with all applicable provisions of 30 TAC Chapter 335, relating to Industrial Solid Waste Management.

b.  Industrial wastewater that is being collected, accumulated, stored, or processed before discharge through any final discharge outfall, specified by this permit, is considered to be industrial solid waste until the wastewater passes through the actual point source discharge and must be managed in accordance with all applicable provisions of 30 TAC Chapter 335.

c.  The permittee shall provide written notification, pursuant to the requirements of 30 TAC § 335.8(b)(1), to the Corrective Action Section (MC 127) of the Remediation Division informing the Commission of any closure activity involving an Industrial Solid Waste Management Unit, at least 90 days prior to conducting such an activity.

d.  Construction of any industrial solid waste management unit requires the prior written notification of the proposed activity to the Registration and Reporting Section (MC 129) of the Permitting and Registration Support Division. No person shall dispose of industrial solid waste, including sludge or other solids from wastewater treatment processes, prior to fulfilling the deed recordation requirements of 30 TAC § 335.5.

e. The term "industrial solid waste management unit" means a landfill, surface impoundment, waste-pile, industrial furnace, incinerator, cement kiln, injection well, container, drum, salt dome waste containment cavern, or any other structure vessel, appurtenance, or other improvement on land used to manage industrial solid waste.

f. The permittee shall keep management records for all sludge (or other waste) removed from any wastewater treatment process. These records shall fulfill all applicable requirements of 30 TAC § 335 and must include the following, as it pertains to wastewater treatment and discharge:

    i. Volume of waste and date(s) generated from treatment process;
    ii. Volume of waste disposed of on-site or shipped off-site;
    iii. Date(s) of disposal;
    iv. Identity of hauler or transporter;
    v. Location of disposal site; and
    vi. Method of final disposal.

The above records shall be maintained on a monthly basis. The records shall be retained at the facility site, or shall be readily available for review by authorized representatives of the TCEQ for at least five years.

12. For industrial facilities to which the requirements of 30 TAC § 335 do not apply, sludge and solid wastes, including tank cleaning and contaminated solids for disposal, shall be disposed of in accordance with THSC § 361.

TCEQ Revision 08/2008

**SLUDGE PROVISIONS**

The permittee is authorized to dispose of sludge only at a Texas Commission on Environmental Quality (TCEQ) authorized land application site, co-disposal landfill, wastewater treatment facility, or facility that further processes sludge. **The disposal of sludge by land application on property owned, leased or under the direct control of the permittee is a violation of the permit unless the site is authorized with the TCEQ. This provision does not authorize Distribution and Marketing of Class A or Class AB Sewage Sludge. This provision does not authorize the permittee to land apply sludge on property owned, leased or under the direct control of the permittee.**

**SECTION I.        REQUIREMENTS APPLYING TO ALL SEWAGE SLUDGE LAND APPLICATION**

**A. General Requirements**

1.  The permittee shall handle and dispose of sewage sludge in accordance with 30 TAC § 312 and all other applicable state and federal regulations in a manner that protects public health and the environment from any reasonably anticipated adverse effects due to any toxic pollutants that may be present in the sludge.

2.  In all cases, if the person (permit holder) who prepares the sewage sludge supplies the sewage sludge to another person for land application use or to the owner or lease holder of the land, the permit holder shall provide necessary information to the parties who receive the sludge to assure compliance with these regulations.

**B. Testing Requirements**

1.  Sewage sludge shall be tested once during the term of this permit in accordance with the method specified in both 40 CFR Part 261, Appendix II and 40 CFR Part 268, Appendix I [Toxicity Characteristic Leaching Procedure (TCLP)] or other method that receives the prior approval of the TCEQ for the contaminants listed in 40 CFR Part 261.24, Table 1. Sewage sludge failing this test shall be managed according to RCRA standards for generators of hazardous waste, and the waste's disposition must be in accordance with all applicable requirements for hazardous waste processing, storage, or disposal. Following failure of any TCLP test, the management or disposal of sewage sludge at a facility other than an authorized hazardous waste processing, storage, or disposal facility shall be prohibited until such time as the permittee can demonstrate the sewage sludge no longer exhibits the hazardous waste toxicity characteristics (as demonstrated by the results of the TCLP tests). A written report shall be provided to both the TCEQ Registration and Reporting Section (MC 129) of the Permitting and Registration Support Division and the Regional Director (MC Region 11) within seven (7) days after failing the TCLP Test.

The report shall contain test results, certification that unauthorized waste management has stopped, and a summary of alternative disposal plans that comply with RCRA standards for the management of hazardous waste. The report shall be addressed to: Director, Permitting and Registration Support Division (MC 129), Texas Commission on Environmental Quality, P.O. Box 13087, Austin, Texas 78711-3087. In addition, the permittee shall prepare an annual report on the results of all sludge toxicity testing. This annual report shall be submitted to the TCEQ Regional Office (MC Region 11) and the Compliance Monitoring Team (MC 224) of the Enforcement Division by September 30th of each year. The permittee must submit this annual report using the online electronic reporting system available through the TCEQ website unless the permittee requests and obtains an electronic reporting waiver.

2. Sewage sludge shall not be applied to the land if the concentration of the pollutants exceeds the pollutant concentration criteria in Table 1. The frequency of testing for pollutants in Table 1 is found in Section I.C. of this permit.

TABLE 1

| Pollutant | Ceiling Concentration (Milligrams per kilogram)* |
|---|---|
| Arsenic | 75 |
| Cadmium | 85 |
| Chromium | 3000 |
| Copper | 4300 |
| Lead | 840 |
| Mercury | 57 |
| Molybdenum | 75 |
| Nickel | 420 |
| PCBs | 49 |
| Selenium | 100 |
| Zinc | 7500 |

* Dry weight basis

3. Pathogen Control

All sewage sludge that is applied to agricultural land, forest, a public contact site, or a reclamation site must be treated by one of the following methods to ensure that the sludge meets either the Class A, Class AB or Class B pathogen requirements.

a. For sewage sludge to be classified as Class A with respect to pathogens, the density of fecal coliform in the sewage sludge must be less than 1,000 most probable number (MPN) per gram of total solids (dry weight basis), or the density of Salmonella sp. bacteria in the sewage sludge must be less than three MPN per four grams of total solids (dry weight basis) at the time the sewage sludge is used or disposed. In addition, one of the alternatives listed below must be met:

Alternative 1 - The temperature of the sewage sludge that is used or disposed shall be maintained at or above a specific value for a period of time. See 30 TAC § 312.82(a)(2)(A) for specific information;

Alternative 5 (PFRP) - Sewage sludge that is used or disposed of must be treated in one of the Processes to Further Reduce Pathogens (PFRP) described in 40 CFR Part 503, Appendix B. PFRP include composting, heat drying, heat treatment, and thermophilic aerobic digestion; or

Alternative 6 (PFRP Equivalent) - Sewage sludge that is used or disposed of must be treated in a process that has been approved by the U. S. Environmental Protection Agency as being equivalent to those in Alternative 5.

b.  For sewage sludge to be classified as Class AB with respect to pathogens, the density of fecal coliform in the sewage sludge must be less than 1,000 MPN per gram of total solids (dry weight basis), or the density of *Salmonella* sp. bacteria in the sewage sludge be less than three MPN per four grams of total solids (dry weight basis) at the time the sewage sludge is used or disposed. In addition, one of the alternatives listed below must be met:

Alternative 2 - The pH of the sewage sludge that is used or disposed shall be raised to above 12 std. units and shall remain above 12 std. units for 72 hours.

The temperature of the sewage sludge shall be above 52° Celsius for 12 hours or longer during the period that the pH of the sewage sludge is above 12 std. units.

At the end of the 72-hour period during which the pH of the sewage sludge is above 12 std. units, the sewage sludge shall be air dried to achieve a percent solids in the sewage sludge greater than 50%; or

Alternative 3 - The sewage sludge shall be analyzed for enteric viruses prior to pathogen treatment. The limit for enteric viruses is less than one Plaque-forming Unit per four grams of total solids (dry weight basis) either before or following pathogen treatment. See 30 TAC § 312.82(a)(2)(C)(i-iii) for specific information. The sewage sludge shall be analyzed for viable helminth ova prior to pathogen treatment. The limit for viable helminth ova is less than one per four grams of total solids (dry weight basis) either before or following pathogen treatment. See 30 TAC § 312.82(a)(2)(C)(iv-vi) for specific information; or

Alternative 4 - The density of enteric viruses in the sewage sludge shall be less than one Plaque-forming Unit per four grams of total solids (dry weight basis) at the time the sewage sludge is used or disposed. The density of viable helminth ova in the sewage sludge shall be less than one per four grams of total solids (dry weight basis) at the time the sewage sludge is used or disposed.

c.  Sewage sludge that meets the requirements of Class AB sewage sludge may be classified a Class A sewage sludge if a variance request is submitted in writing that is supported by substantial documentation demonstrating equivalent methods for reducing odors and written approval is granted by the executive director. The executive director may deny the variance request or revoke that approved variance if it is determined that the variance may potentially endanger human health or the environment, or create nuisance odor conditions.

d.  Three alternatives are available to demonstrate compliance with Class B criteria for sewage sludge.

Alternative 1

i.  A minimum of seven random samples of the sewage sludge shall be collected within 48 hours of the time the sewage sludge is used or disposed of during each monitoring episode for the sewage sludge.

ii.  The geometric mean of the density of fecal coliform in the samples collected shall be less than either 2,000,000 MPN per gram of total solids (dry weight basis) or 2,000,000 Colony Forming Units per gram of total solids (dry weight basis).

Alternative 2 - Sewage sludge that is used or disposed of shall be treated in one of the Processes to Significantly Reduce Pathogens (PSRP) described in 40 CFR Part 503, Appendix B, so long as all of the following requirements are met by the generator of the sewage sludge.

i.  Prior to use or disposal, all the sewage sludge must have been generated from a single location, except as provided in paragraph v. below;

ii.  An independent Texas Licensed Professional Engineer must make a certification to the generator of a sewage sludge that the wastewater treatment facility generating the sewage sludge is designed to achieve one of the PSRP at the permitted design loading of the facility. The certification need only be repeated if the design loading of the facility is increased. The certification shall include a statement indicating the design meets all the applicable standards specified in Appendix B of 40 CFR Part 503;

iii.  Prior to any off-site transportation or on-site use or disposal of any sewage sludge generated at a wastewater treatment facility, the chief certified operator of the wastewater treatment facility or other responsible official who manages the processes to significantly reduce pathogens at the wastewater treatment facility for the permittee, shall certify that the sewage sludge underwent at least the minimum operational requirements necessary in order to meet one of the PSRP. The acceptable processes and the minimum operational and record keeping requirements shall be in accordance with established U.S. Environmental Protection Agency final guidance;

iv.  All certification records and operational records describing how the requirements of this paragraph were met shall be kept by the generator for a minimum of three years and be available for inspection by commission staff for review; and

v.  If the sewage sludge is generated from a mixture of sources, resulting from a person who prepares sewage sludge from more than one wastewater treatment facility, the resulting derived product shall meet one of the PSRP, and shall meet the certification, operation, and record keeping requirements of this paragraph.

Alternative 3 - Sewage sludge shall be treated in an equivalent process that has been approved by the U.S. Environmental Protection Agency, so long as all of the following requirements are met by the generator of the sewage sludge.

i.  Prior to use or disposal, all the sewage sludge must have been generated from a single location, except as provided in paragraph v. below;

ii. Prior to any off-site transportation or on-site use or disposal of any sewage sludge generated at a wastewater treatment facility, the chief certified operator of the wastewater treatment facility or other responsible official who manages the processes to significantly reduce pathogens at the wastewater treatment facility for the permittee, shall certify that the sewage sludge underwent at least the minimum operational requirements necessary in order to meet one of the PSRP. The acceptable processes and the minimum operational and record keeping requirements shall be in accordance with established U.S. Environmental Protection Agency final guidance;

iii. All certification records and operational records describing how the requirements of this paragraph were met shall be kept by the generator for a minimum of three years and be available for inspection by commission staff for review;

iv. The Executive Director will accept from the U.S. Environmental Protection Agency a finding of equivalency to the defined PSRP; and

v. If the sewage sludge is generated from a mixture of sources resulting from a person who prepares sewage sludge from more than one wastewater treatment facility, the resulting derived product shall meet one of the Processes to Significantly Reduce Pathogens, and shall meet the certification, operation, and record keeping requirements of this paragraph.

In addition to the Alternatives 1 – 3, the following site restrictions must be met if Class B sludge is land applied:

i. Food crops with harvested parts that touch the sewage sludge/soil mixture and are totally above the land surface shall not be harvested for 14 months after application of sewage sludge.

ii. Food crops with harvested parts below the surface of the land shall not be harvested for 20 months after application of sewage sludge when the sewage sludge remains on the land surface for 4 months or longer prior to incorporation into the soil.

iii. Food crops with harvested parts below the surface of the land shall not be harvested for 38 months after application of sewage sludge when the sewage sludge remains on the land surface for less than 4 months prior to incorporation into the soil.

iv. Food crops, feed crops, and fiber crops shall not be harvested for 30 days after application of sewage sludge.

v. Animals shall not be allowed to graze on the land for 30 days after application of sewage sludge.

vi. Turf grown on land where sewage sludge is applied shall not be harvested for 1 year after application of the sewage sludge when the harvested turf is placed on either land with a high potential for public exposure or a lawn.

vii. Public access to land with a high potential for public exposure shall be restricted for 1 year after application of sewage sludge.

viii. Public access to land with a low potential for public exposure shall be restricted for 30 days after application of sewage sludge.

ix.  Land application of sludge shall be in accordance with the buffer zone requirements found in 30 TAC § 312.44.

4. Vector Attraction Reduction Requirements

All bulk sewage sludge that is applied to agricultural land, forest, a public contact site, or a reclamation site shall be treated by one of the following Alternatives 1 through 10 for vector attraction reduction.

Alternative 1 -   The mass of volatile solids in the sewage sludge shall be reduced by a minimum of 38%.

Alternative 2 -   If Alternative 1 cannot be met for an anaerobically digested sludge, demonstration can be made by digesting a portion of the previously digested sludge anaerobically in the laboratory in a bench-scale unit for 40 additional days at a temperature between 30° and 37° Celsius. Volatile solids must be reduced by less than 17% to demonstrate compliance.

Alternative 3 -   If Alternative 1 cannot be met for an aerobically digested sludge, demonstration can be made by digesting a portion of the previously digested sludge with percent solids of two percent or less aerobically in the laboratory in a bench-scale unit for 30 additional days at 20° Celsius. Volatile solids must be reduced by less than 15% to demonstrate compliance.

Alternative 4 -   The specific oxygen uptake rate (SOUR) for sewage sludge treated in an aerobic process shall be equal to or less than 1.5 milligrams of oxygen per hour per gram of total solids (dry weight basis) at a temperature of 20° Celsius.

Alternative 5 -   Sewage sludge shall be treated in an aerobic process for 14 days or longer. During that time, the temperature of the sewage sludge shall be higher than 40° Celsius and the average temperature of the sewage sludge shall be higher than 45° Celsius.

Alternative 6 -   The pH of sewage sludge shall be raised to 12 or higher by alkali addition and, without the addition of more alkali shall remain at 12 or higher for two hours and then remain at a pH of 11.5 or higher for an additional 22 hours at the time the sewage sludge is prepared for sale or given away in a bag or other container.

Alternative 7 -   The percent solids of sewage sludge that does not contain unstabilized solids generated in a primary wastewater treatment process shall be equal to or greater than 75% based on the moisture content and total solids prior to mixing with other materials. Unstabilized solids are defined as organic materials in sewage sludge that have not been treated in either an aerobic or anaerobic treatment process.

Alternative 8 -   The percent solids of sewage sludge that contains unstabilized solids generated in a primary wastewater treatment process shall be equal to or greater than 90% based on the moisture content and total solids prior to mixing with other materials at the time the sludge is used. Unstabilized solids are defined as organic materials in sewage sludge that have not been treated in either an aerobic or anaerobic treatment process.

Alternative 9 -   i.   Sewage sludge shall be injected below the surface of the land.

                ii.  No significant amount of the sewage sludge shall be present on the land surface within one hour after the sewage sludge is injected.

                iii. When sewage sludge that is injected below the surface of the land is Class A or Class AB with respect to pathogens, the sewage sludge shall be injected below the land surface within eight hours after being discharged from the pathogen treatment process.

Alternative 10-   i.   Sewage sludge applied to the land surface or placed on a surface disposal site shall be incorporated into the soil within six hours after application to or placement on the land.

                ii.  When sewage sludge that is incorporated into the soil is Class A or Class AB with respect to pathogens, the sewage sludge shall be applied to or placed on the land within eight hours after being discharged from the pathogen treatment process.

## C. Monitoring Requirements

Toxicity Characteristic Leaching Procedure (TCLP) Test     - once during the term of this permit

PCBs     - once during the term of this permit

All metal constituents and fecal coliform or *Salmonella* sp. bacteria shall be monitored at the appropriate frequency shown below, pursuant to 30 TAC § 312.46(a)(1):

| Amount of sewage sludge (*) metric tons per 365-day period | Monitoring Frequency |
|---|---|
| 0 to less than 290 | Once/Year |
| 290 to less than 1,500 | Once/Quarter |
| 1,500 to less than 15,000 | Once/Two Months |
| 15,000 or greater | Once/Month |

(*) *The amount of bulk sewage sludge applied to the land (dry wt. basis).*

Representative samples of sewage sludge shall be collected and analyzed in accordance with the methods referenced in 30 TAC § 312.7

Identify each of the analytic methods used by the facility to analyze enteric viruses, fecal coliforms, helminth ova, *Salmonella* sp., and other regulated parameters.

Identify in the following categories (as applicable) the sewage sludge treatment process or processes at the facility: preliminary operations (e.g., sludge grinding and degritting), thickening (concentration), stabilization, anaerobic digestion, aerobic digestion, composting, conditioning, disinfection (e.g., beta ray irradiation, gamma ray irradiation, pasteurization), dewatering (e.g., centrifugation, sludge drying beds, sludge lagoons), heat drying, thermal reduction, and methane or biogas capture and recovery.

Identify the nature of material generated by the facility (such as a biosolid for beneficial use or land-farming, or sewage sludge for disposal at a monofill) and whether the material is ultimately conveyed off-site in bulk or in bags.

**SECTION II.     REQUIREMENTS SPECIFIC TO BULK SEWAGE SLUDGE FOR APPLICATION TO THE LAND MEETING CLASS A, CLASS AB or B PATHOGEN REDUCTION AND THE CUMULATIVE LOADING RATES IN TABLE 2, OR CLASS B PATHOGEN REDUCTION AND THE POLLUTANT CONCENTRATIONS IN TABLE 3**

For those permittees meeting Class A, Class AB or B pathogen reduction requirements and that meet the cumulative loading rates in Table 2 below, or the Class B pathogen reduction requirements and contain concentrations of pollutants below listed in Table 3, the following conditions apply:

**A.  Pollutant Limits**

Table 2

| Pollutant | Cumulative Pollutant Loading Rate (pounds per acre)* |
|---|---|
| Arsenic | 36 |
| Cadmium | 35 |
| Chromium | 2677 |
| Copper | 1339 |
| Lead | 268 |
| Mercury | 15 |
| Molybdenum | Report Only |
| Nickel | 375 |
| Selenium | 89 |
| Zinc | 2500 |

Table 3

| Pollutant | Monthly Average Concentration (milligrams per kilogram)* |
|---|---|
| Arsenic | 41 |
| Cadmium | 39 |
| Chromium | 1200 |
| Copper | 1500 |
| Lead | 300 |
| Mercury | 17 |
| Molybdenum | Report Only |
| Nickel | 420 |
| Selenium | 36 |
| Zinc | 2800 |

*Dry weight basis

**B.  Pathogen Control**

All bulk sewage sludge that is applied to agricultural land, forest, a public contact site, a reclamation site, shall be treated by either Class A, Class AB or Class B pathogen reduction requirements as defined above in Section I.B.3.

### C. Management Practices

1.  Bulk sewage sludge shall not be applied to agricultural land, forest, a public contact site, or a reclamation site that is flooded, frozen, or snow-covered so that the bulk sewage sludge enters a wetland or other waters in the State.

2.  Bulk sewage sludge not meeting Class A requirements shall be land applied in a manner which complies with Applicability in accordance with 30 TAC §312.41 and the Management Requirements in accordance with 30 TAC § 312.44.

3.  Bulk sewage sludge shall be applied at or below the agronomic rate of the cover crop.

4.  An information sheet shall be provided to the person who receives bulk sewage sludge sold or given away. The information sheet shall contain the following information:

    a.  The name and address of the person who prepared the sewage sludge that is sold or given away in a bag or other container for application to the land.

    b.  A statement that application of the sewage sludge to the land is prohibited except in accordance with the instruction on the label or information sheet.

    c.  The annual whole sludge application rate for the sewage sludge application rate for the sewage sludge that does not cause any of the cumulative pollutant loading rates in Table 2 above to be exceeded, unless the pollutant concentrations in Table 3 found in Section II above are met.

### D. Notification Requirements

1.  If bulk sewage sludge is applied to land in a State other than Texas, written notice shall be provided prior to the initial land application to the permitting authority for the State in which the bulk sewage sludge is proposed to be applied. The notice shall include:

    a.  The location, by street address, and specific latitude and longitude, of each land application site.

    b.  The approximate time period bulk sewage sludge will be applied to the site.

    c.  The name, address, telephone number, and National Pollutant Discharge Elimination System permit number (if appropriate) for the person who will apply the bulk sewage sludge.

2.  The permittee shall give 180 days prior notice to the Executive Director in care of the Wastewater Permitting Section (MC 148) of the Water Quality Division of any change planned in the sewage sludge disposal practice.

### E. Record Keeping Requirements

The sludge documents will be retained at the facility site and/or shall be readily available for review by a TCEQ representative. The person who prepares bulk sewage sludge or a sewage sludge material shall develop the following information and shall retain the information at

the facility site and/or shall be readily available for review by a TCEQ representative for a period of <u>five years</u>. If the permittee supplies the sludge to another person who land applies the sludge, the permittee shall notify the land applier of the requirements for record keeping found in 30 TAC § 312.47 for persons who land apply.

1. The concentration (mg/kg) in the sludge of each pollutant listed in Table 3 above and the applicable pollutant concentration criteria (mg/kg), <u>or</u> the applicable cumulative pollutant loading rate and the applicable cumulative pollutant loading rate limit (lbs/ac) listed in Table 2 above.

2. A description of how the pathogen reduction requirements are met (including site restrictions for Class AB and Class B sludge, if applicable).

3. A description of how the vector attraction reduction requirements are met.

4. A description of how the management practices listed above in Section II.C are being met.

5. The following certification statement:

   "I certify, under penalty of law, that the applicable pathogen requirements in 30 TAC § 312.82(a) or (b) and the vector attraction reduction requirements in 30 TAC § 312.83(b) have been met for each site on which bulk sewage sludge is applied. This determination has been made under my direction and supervision in accordance with the system designed to ensure that qualified personnel properly gather and evaluate the information used to determine that the management practices have been met. I am aware that there are significant penalties for false certification including fine and imprisonment."

6. The recommended agronomic loading rate from the references listed in Section II.C.3. above, as well as the actual agronomic loading rate shall be retained. The person who applies bulk sewage sludge or a sewage sludge material shall develop the following information and shall retain the information at the facility site and/or shall be readily available for review by a TCEQ representative <u>indefinitely</u>. If the permittee supplies the sludge to another person who land applies the sludge, the permittee shall notify the land applier of the requirements for record keeping found in 30 TAC § 312.47 for persons who land apply:

   a. A certification statement that all applicable requirements (specifically listed) have been met, and that the permittee understands that there are significant penalties for false certification including fine and imprisonment. See 30 TAC § 312.47(a)(4)(A)(ii) or 30 TAC § 312.47(a)(5)(A)(ii), as applicable, and to the permittee's specific sludge treatment activities.

   b. The location, by street address, and specific latitude and longitude, of each site on which sludge is applied.

   c. The number of acres in each site on which bulk sludge is applied.

   d. The date and time sludge is applied to each site.

  e. The cumulative amount of each pollutant in pounds/acre listed in Table 2 applied to each site.

  f. The total amount of sludge applied to each site in dry tons.

The above records shall be maintained on-site on a monthly basis and shall be made available to the Texas Commission on Environmental Quality upon request.

## F. Reporting Requirements

The permittee shall report annually to the TCEQ Regional Office (MC Region 11) and Compliance Monitoring Team (MC 224) of the Enforcement Division, by September 30th of each year the following information. The permittee must submit this annual report using the online electronic reporting system available through the TCEQ website unless the permittee requests and obtains an electronic reporting waiver.

1. Identify in the following categories (as applicable) the sewage sludge treatment process or processes at the facility: preliminary operations (e.g., sludge grinding and degritting), thickening (concentration), stabilization, anaerobic digestion, aerobic digestion, composting, conditioning, disinfection (e.g., beta ray irradiation, gamma ray irradiation, pasteurization), dewatering (e.g., centrifugation, sludge drying beds, sludge lagoons), heat drying, thermal reduction, and methane or biogas capture and recovery.

2. Identify the nature of material generated by the facility (such as a biosolid for beneficial use or land-farming, or sewage sludge for disposal at a monofill) and whether the material is ultimately conveyed off-site in bulk or in bags.

3. Results of tests performed for pollutants found in either Table 2 or 3 as appropriate for the permittee's land application practices.

4. The frequency of monitoring listed in Section I.C. that applies to the permittee.

5. Toxicity Characteristic Leaching Procedure (TCLP) results.

6. PCB concentration in sludge in mg/kg.

7. Identity of hauler(s) and TCEQ transporter number.

8. Date(s) of transport.

9. Texas Commission on Environmental Quality registration number, if applicable.

10. Amount of sludge disposal dry weight (lbs/acre) at each disposal site.

11. The concentration (mg/kg) in the sludge of each pollutant listed in Table 1 (defined as a monthly average) as well as the applicable pollutant concentration criteria (mg/kg) listed in Table 3 above, or the applicable pollutant loading rate limit (lbs/acre) listed in Table 2 above if it exceeds 90% of the limit.

12. Level of pathogen reduction achieved (Class A, Class AB or Class B).

13. Alternative used as listed in Section I.B.3.(a. or b.). Alternatives describe how the pathogen reduction requirements are met. If Class B sludge, include information on how site restrictions were met.

14. Identify each of the analytic methods used by the facility to analyze enteric viruses, fecal coliforms, helminth ova, *Salmonella* sp., and other regulated parameters.

15. Vector attraction reduction alternative used as listed in Section I.B.4.

16. Amount of sludge transported in dry tons/year.

17. The certification statement listed in either 30 TAC § 312.47(a)(4)(A)(ii) or 30 TAC § 312.47(a)(5)(A)(ii) as applicable to the permittee's sludge treatment activities, shall be attached to the annual reporting form.

18. When the amount of any pollutant applied to the land exceeds 90% of the cumulative pollutant loading rate for that pollutant, as described in Table 2, the permittee shall report the following information as an attachment to the annual reporting form.

    a. The location, by street address, and specific latitude and longitude.

    b. The number of acres in each site on which bulk sewage sludge is applied.

    c. The date and time bulk sewage sludge is applied to each site.

    d. The cumulative amount of each pollutant (i.e., pounds/acre) listed in Table 2 in the bulk sewage sludge applied to each site.

    e. The amount of sewage sludge (i.e., dry tons) applied to each site.

The above records shall be maintained on a monthly basis and shall be made available to the Texas Commission on Environmental Quality upon request.

**SECTION III.**      **REQUIREMENTS APPLYING TO ALL SEWAGE SLUDGE DISPOSED IN A MUNICIPAL SOLID WASTE LANDFILL**

A.  The permittee shall handle and dispose of sewage sludge in accordance with 30 TAC § 330 and all other applicable state and federal regulations to protect public health and the environment from any reasonably anticipated adverse effects due to any toxic pollutants that may be present. The permittee shall ensure that the sewage sludge meets the requirements in 30 TAC § 330 concerning the quality of the sludge disposed in a municipal solid waste landfill.

B.  If the permittee generates sewage sludge and supplies that sewage sludge to the owner or operator of a municipal solid waste landfill (MSWLF) for disposal, the permittee shall provide to the owner or operator of the MSWLF appropriate information needed to be in compliance with the provisions of this permit.

C.  The permittee shall give 180 days prior notice to the Executive Director in care of the Wastewater Permitting Section (MC 148) of the Water Quality Division of any change planned in the sewage sludge disposal practice.

D.  Sewage sludge shall be tested once during the term of this permit in accordance with the method specified in both 40 CFR Part 261, Appendix II and 40 CFR Part 268, Appendix I (Toxicity Characteristic Leaching Procedure) or other method, which receives the prior approval of the TCEQ for contaminants listed in Table 1 of 40 CFR § 261.24. Sewage sludge failing this test shall be managed according to RCRA standards for generators of hazardous waste, and the waste's disposition must be in accordance with all applicable requirements for hazardous waste processing, storage, or disposal.

Following failure of any TCLP test, the management or disposal of sewage sludge at a facility other than an authorized hazardous waste processing, storage, or disposal facility shall be prohibited until such time as the permittee can demonstrate the sewage sludge no longer exhibits the hazardous waste toxicity characteristics (as demonstrated by the results of the TCLP tests). A written report shall be provided to both the TCEQ Registration and Reporting Section (MC 129) of the Permitting and Registration Support Division and the Regional Director (MC Region 11) of the appropriate TCEQ field office within 7 days after failing the TCLP Test.

The report shall contain test results, certification that unauthorized waste management has stopped, and a summary of alternative disposal plans that comply with RCRA standards for the management of hazardous waste. The report shall be addressed to: Director, Permitting and Registration Support Division (MC 129), Texas Commission on Environmental Quality, P. O. Box 13087, Austin, Texas 78711-3087. In addition, the permittee shall prepare an annual report on the results of all sludge toxicity testing. This annual report shall be submitted to the TCEQ Regional Office (MC Region 11) and the Compliance Monitoring Team (MC 224) of the Enforcement Division by September 30 of each year.

E.  Sewage sludge shall be tested as needed, in accordance with the requirements of 30 TAC Chapter 330.

F.  Record Keeping Requirements

    The permittee shall develop the following information and shall retain the information for five years.

1. The description (including procedures followed and the results) of all liquid Paint Filter Tests performed.

2. The description (including procedures followed and results) of all TCLP tests performed.

The above records shall be maintained on-site on a monthly basis and shall be made available to the Texas Commission on Environmental Quality upon request.

G. Reporting Requirements

The permittee shall report annually to the TCEQ Regional Office (MC Region 11) and Compliance Monitoring Team (MC 224) of the Enforcement Division by September 30th of each year the following information. The permittee must submit this annual report using the online electronic reporting system available through the TCEQ website unless the permittee requests and obtains an electronic reporting waiver.

1. Identify in the following categories (as applicable) the sewage sludge treatment process or processes at the facility: preliminary operations (e.g., sludge grinding and degritting), thickening (concentration), stabilization, anaerobic digestion, aerobic digestion, composting, conditioning, disinfection (e.g., beta ray irradiation, gamma ray irradiation, pasteurization), dewatering (e.g., centrifugation, sludge drying beds, sludge lagoons), heat drying, thermal reduction, and methane or biogas capture and recovery.

2. Toxicity Characteristic Leaching Procedure (TCLP) results.

3. Annual sludge production in dry tons/year.

4. Amount of sludge disposed in a municipal solid waste landfill in dry tons/year.

5. Amount of sludge transported interstate in dry tons/year.

6. A certification that the sewage sludge meets the requirements of 30 TAC § 330 concerning the quality of the sludge disposed in a municipal solid waste landfill.

7. Identity of hauler(s) and transporter registration number.

8. Owner of disposal site(s).

9. Location of disposal site(s).

10. Date(s) of disposal.

The above records shall be maintained on-site on a monthly basis and shall be made available to the Texas Commission on Environmental Quality upon request.

**SECTION IV.    REQUIREMENTS APPLYING TO SLUDGE TRANSPORTED TO ANOTHER FACILITY FOR FURTHER PROCESSING**

These provisions apply to sludge that is transported to another wastewater treatment facility or facility that further processes sludge. These provisions are intended to allow transport of sludge to facilities that have been authorized to accept sludge. These provisions do not limit the ability of the receiving facility to determine whether to accept the sludge, nor do they limit the ability of the receiving facility to request additional testing or documentation.

**A.  General Requirements**

1.  The permittee shall handle and dispose of sewage sludge in accordance with 30 TAC Chapter 312 and all other applicable state and federal regulations in a manner that protects public health and the environment from any reasonably anticipated adverse effects due to any toxic pollutants that may be present in the sludge.

2.  Sludge may only be transported using a registered transporter or using an approved pipeline.

**B.  Record Keeping Requirements**

1.  For sludge transported by an approved pipeline, the permittee must maintain records of the following:

    a.    the amount of sludge transported;

    b.    the date of transport;

    c.    the name and TCEQ permit number of the receiving facility or facilities;

    d.    the location of the receiving facility or facilities;

    e.    the name and TCEQ permit number of the facility that generated the waste; and

    f.    copy of the written agreement between the permittee and the receiving facility to accept sludge.

2.  For sludge transported by a registered transporter, the permittee must maintain records of the completed trip tickets in accordance with 30 TAC § 312.145(a)(1)-(7) and amount of sludge transported.

3.  The above records shall be maintained on-site on a monthly basis and shall be made available to the TCEQ upon request. These records shall be retained for at least five years.

## C. Reporting Requirements

The permittee shall report the following information annually to the TCEQ Regional Office (MC Region 11) and Compliance Monitoring Team (MC 224) of the Enforcement Division, by September 30th of each year. The permittee must submit this annual report using the online electronic reporting system available through the TCEQ website unless the permittee requests and obtains an electronic reporting waiver.

1.  Identify in the following categories (as applicable) the sewage sludge treatment process or processes at the facility: preliminary operations (e.g., sludge grinding and degritting), thickening (concentration), stabilization, anaerobic digestion, aerobic digestion, composting, conditioning, disinfection (e.g., beta ray irradiation, gamma ray irradiation, pasteurization), dewatering (e.g., centrifugation, sludge drying beds, sludge lagoons), heat drying, thermal reduction, and methane or biogas capture and recovery.

2.  the annual sludge production;

3.  the amount of sludge transported;

4.  the owner of each receiving facility;

5.  the location of each receiving facility; and

6.  the date(s) of disposal at each receiving facility.

TCEQ Revision 10/2019

**OTHER REQUIREMENTS**

1. The permittee shall employ or contract with one or more licensed wastewater treatment facility operators or wastewater system operations companies holding a valid license or registration according to the requirements of 30 TAC Chapter 30, Occupational Licenses and Registrations, and in particular 30 TAC Chapter 30, Subchapter J, Wastewater Operators and Operations Companies.

   This Category C facility must be operated by a chief operator or an operator holding a Class C license or higher. The facility must be operated a minimum of five days per week by the licensed chief operator or an operator holding the required level of license or higher. The licensed chief operator or operator holding the required level of license or higher must be available by telephone or pager seven days per week. Where shift operation of the wastewater treatment facility is necessary, each shift that does not have the on-site supervision of the licensed chief operator must be supervised by an operator in charge who is licensed not less than one level below the category for the facility.

2. The facility is not located in the Coastal Management Program boundary.

3. The permittee shall comply with the requirements of 30 TAC § 309.13(a) through (d). In addition, by ownership of the required buffer zone area, the permittee shall comply with the requirements of 30 TAC § 309.13(e).

4. The permittee shall provide facilities for the protection of its wastewater treatment facility from a 100-year flood.

5. In accordance with 30 TAC § 319.9, a permittee that has at least twelve months of uninterrupted compliance with its bacteria limit may notify the commission in writing of its compliance and request a less frequent measurement schedule. To request a less frequent schedule, the permittee shall submit a written request to the TCEQ Wastewater Permitting Section (MC 148) for each phase that includes a different monitoring frequency. The request must contain all of the reported bacteria values (Daily Avg. and Daily Max/Single Grab) for the twelve consecutive months immediately prior to the request. If the Executive Director finds that a less frequent measurement schedule is protective of human health and the environment, the permittee may be given a less frequent measurement schedule. For this permit, 1/month may be reduced to 1/quarter. **A violation of any bacteria limit by a facility that has been granted a less frequent measurement schedule will require the permittee to return to the standard frequency schedule and submit written notice to the TCEQ Wastewater Permitting Section (MC 148).** The permittee may not apply for another reduction in measurement frequency for at least 24 months from the date of the last violation. The Executive Director may establish a more frequent measurement schedule if necessary to protect human health or the environment.

6. Prior to construction of the treatment facility, the permittee shall submit to the TCEQ Wastewater Permitting Section (MC 148) a summary transmittal letter in accordance with the requirements in 30 TAC § 217.6(d). If requested by the Wastewater Permitting Section, the permittee shall submit plans and specifications and a final engineering design report which comply with 30 TAC Chapter 217, Design Criteria for Domestic Wastewater Systems. The permittee shall clearly show how the treatment system will meet the permitted effluent limitations required on Page 2 of this permit. A copy of the summary transmittal letter shall be available at the plant site for inspection by authorized representatives of the TCEQ.

7. Reporting requirements according to 30 TAC §§ 319.1-319.11 and any additional effluent reporting requirements contained in this permit are suspended from the effective date of the permit until plant startup or discharge from the facility described by this permit, whichever occurs first. The permittee shall provide written notice to the TCEQ Regional Office (MC Region 11) and the Applications Review

and Processing Team (MC 148) of the Water Quality Division at least forty-five (45) days prior to plant startup or anticipated discharge, whichever occurs first, on Notification of Completion Form 20007.

# Tab 3

Statutory Provisions

Vernon's Texas Statutes and Codes Annotated
    Water Code (Refs & Annos)
        Title 2. Water Administration (Refs & Annos)
            Subtitle B. Water Rights
                Chapter 13. Water Rates and Services (Refs & Annos)
                    Subchapter G. Certificates of Convenience and Necessity

V.T.C.A., Water Code § 13.244

§ 13.244. Application; Maps and Other Information; Evidence and Consent

Currentness

(a) Except as provided by Section 13.258, to obtain a certificate of public convenience and necessity or an amendment to a certificate, a public utility or water supply or sewer service corporation shall submit to the utility commission an application for a certificate or for an amendment as provided by this section.

(b) Each public utility and water supply or sewer service corporation shall file with the utility commission a map or maps showing all its facilities and illustrating separately facilities for production, transmission, and distribution of its services, and each certificated retail public utility shall file with the utility commission a map or maps showing any facilities, customers, or area currently being served outside its certificated areas.

(c) Each applicant for a certificate or for an amendment shall file with the utility commission evidence required by the utility commission to show that the applicant has received the required consent, franchise, or permit of the proper municipality or other public authority.

(d) An application for a certificate of public convenience and necessity or for an amendment to a certificate must contain:

   (1) a description of the proposed service area by:

      (A) a metes and bounds survey certified by a licensed state land surveyor or a registered professional land surveyor;

      (B) the Texas State Plane Coordinate System;

      (C) verifiable landmarks, including a road, creek, or railroad line; or

      (D) if a recorded plat of the area exists, lot and block number;

   (2) a description of any requests for service in the proposed service area;

(3) a capital improvements plan, including a budget and estimated timeline for construction of all facilities necessary to provide full service to the entire proposed service area;

(4) a description of the sources of funding for all facilities;

(5) to the extent known, a description of current and projected land uses, including densities;

(6) a current financial statement of the applicant;

(7) according to the tax roll of the central appraisal district for each county in which the proposed service area is located, a list of the owners of each tract of land that is:

    (A) at least 50 acres; and

    (B) wholly or partially located within the proposed service area; and

(8) any other item required by the utility commission.

(e) The executive director of the utility commission, at the discretion of the executive director of the utility commission or on the request of the certificate holder, may make a correction to a certificate of public convenience and necessity, without observing formal amendment procedures, by reissuing the certificate or issuing an endorsement to the certificate. The executive director of the utility commission shall notify the certificate holder that the correction has been made and ensure that the reissued certificate or endorsement is recorded in the commission's records. The executive director of the utility commission may make a correction under this subsection only:

(1) to correct a clerical or typographical error;

(2) to change the name of an incorporated certificate holder on a certificate if:

    (A) an amendment to the certificate holder's articles of incorporation or certificate of formation, as applicable, is filed with the secretary of state that only changes the name of the certificate holder; and

    (B) the certificate holder provides verification from the secretary of state to the utility commission that the amendment only changed the name of the certificate holder;

(3) to correct a mapping error in a certificate to reflect the metes and bounds of the certificated area; or

(4) to correct another similar nonsubstantive error or matter if authorized by the utility commission by rule.

(f) The executive director of the utility commission may not make a correction under Subsection (e)(3) unless the certificate holder:

(1) submits to the executive director of the utility commission a written agreement between the certificate holder and any other retail water or sewer service provider whose service area is directly affected by the correction; and

(2) provides notice of the correction to any water or sewer service customers whose retail service is directly affected by the correction.

**Credits**

Added by Acts 1985, 69th Leg., ch. 795, § 3.005, eff. Sept. 1, 1985. Amended by Acts 1989, 71st Leg., ch. 567, § 23, eff. Sept. 1, 1989; Acts 1995, 74th Leg., ch. 76, § 11.286, eff. Sept. 1, 1995; Acts 2005, 79th Leg., ch. 1145, § 4, eff. Sept. 1, 2005; Acts 2013, 83rd Leg., ch. 170 (H.B. 1600), § 2.44, eff. Sept. 1, 2013; Acts 2013, 83rd Leg., ch. 171 (S.B. 567), § 44, eff. Sept. 1, 2013; Acts 2017, 85th Leg., ch. 948 (S.B. 1842), § 2, eff. Sept. 1, 2017; Acts 2023, 88th Leg., ch. 1083 (S.B. 893), § 1, eff. June 18, 2023.

V. T. C. A., Water Code § 13.244, TX WATER § 13.244

Current through legislation effective May 15, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
Water Code (Refs & Annos)
Title 2. Water Administration (Refs & Annos)
Subtitle D. Water Quality Control
Chapter 26. Water Quality Control (Refs & Annos)
Subchapter A. Administrative Provisions (Refs & Annos)

V.T.C.A., Water Code § 26.003

§ 26.003. Policy of This Subchapter

Currentness

It is the policy of this state and the purpose of this subchapter to maintain the quality of water in the state consistent with the public health and enjoyment, the propagation and protection of terrestrial and aquatic life, and the operation of existing industries, taking into consideration the economic development of the state; to encourage and promote the development and use of regional and areawide waste collection, treatment, and disposal systems to serve the waste disposal needs of the citizens of the state; and to require the use of all reasonable methods to implement this policy.

**Credits**

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 2001, 77th Leg., ch. 965, § 1.26, eff. Sept. 1, 2001.

V. T. C. A., Water Code § 26.003, TX WATER § 26.003
Current through legislation effective May 15, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Water Code (Refs & Annos)
      Title 2. Water Administration (Refs & Annos)
        Subtitle D. Water Quality Control
          Chapter 26. Water Quality Control (Refs & Annos)
            Subchapter B. General Powers and Duties

V.T.C.A., Water Code § 26.027

§ 26.027. Commission May Issue Permits

Currentness

(a) The commission may issue permits and amendments to permits for the discharge of waste or pollutants into or adjacent to water in the state. No permit shall be issued authorizing the discharge of any radiological, chemical, or biological warfare agent or high-level radioactive waste. The commission may refuse to issue a permit when the commission finds that issuance of the permit would violate the provisions of any state or federal law or rule or regulation promulgated thereunder, or when the commission finds that issuance of the permit would interfere with the purpose of this chapter.

(b) A person desiring to obtain a permit or to amend a permit shall submit an application to the commission containing all information reasonably required by the commission. The commission shall, at minimum, require an applicant who is an individual to provide:

  (1) the individual's full legal name and date of birth;

  (2) the street address of the individual's place of residence;

  (3) the identifying number from the individual's driver's license or personal identification certificate issued by the state or country in which the individual resides;

  (4) the individual's sex; and

  (5) any assumed business or professional name of the individual filed under Chapter 71, Business & Commerce Code.

(c) A person may not commence construction of a treatment facility until the commission has issued a permit to authorize the discharge of waste from the facility, except with the approval of the commission.

(d) The commission may not require under this chapter any permit for the placing of dredged or fill materials into or adjacent to water in the state for the purpose of constructing, modifying, or maintaining facilities or structures, but this does not change or limit any authority the commission may have with respect to the control of water quality. The commission may adopt rules and regulations to govern and control the discharge of dredged or fill materials consistent with the purpose of this chapter.

**Credits**

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1985, 69th Leg., ch. 795, § 1.074, eff. Sept. 1, 1985; Acts 1993, 73rd Leg., ch. 152, § 2, eff. Sept. 1, 1993; Acts 2007, 80th Leg., ch. 885, § 2.40, eff. April 1, 2009.

V. T. C. A., Water Code § 26.027, TX WATER § 26.027

Current through legislation effective May 15, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Water Code (Refs & Annos)
        Title 2. Water Administration (Refs & Annos)
            Subtitle D. Water Quality Control
                Chapter 26. Water Quality Control (Refs & Annos)
                    Subchapter B. General Powers and Duties

V.T.C.A., Water Code § 26.0282

§ 26.0282. Consideration of Need and Regional Treatment Options

Currentness

In considering the issuance, amendment, or renewal of a permit to discharge waste, the commission may deny or alter the terms and conditions of the proposed permit, amendment, or renewal based on consideration of need, including the expected volume and quality of the influent and the availability of existing or proposed areawide or regional waste collection, treatment, and disposal systems not designated as such by commission order pursuant to provisions of this subchapter. This section is expressly directed to the control and treatment of conventional pollutants normally found in domestic wastewater.

**Credits**

Added by Acts 1989, 71st Leg., ch. 757, § 1, eff. Sept. 1, 1989.

V. T. C. A., Water Code § 26.0282, TX WATER § 26.0282
Current through legislation effective May 15, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title. 10. General Government (Refs & Annos)
      Subtitle A. Administrative Procedure and Practice
        Chapter 2001. Administrative Procedure (Refs & Annos)
          Subchapter G. Contested Cases: Judicial Review (Refs & Annos)

V.T.C.A., Government Code § 2001.174

§ 2001.174. Review Under Substantial Evidence Rule or Undefined Scope of Review

Currentness

If the law authorizes review of a decision in a contested case under the substantial evidence rule or if the law does not define the scope of judicial review, a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:

(1) may affirm the agency decision in whole or in part; and

(2) shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(A) in violation of a constitutional or statutory provision;

(B) in excess of the agency's statutory authority;

(C) made through unlawful procedure;

(D) affected by other error of law;

(E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

**Credits**
Added by Acts 1993, 73rd Leg., ch. 268, § 1, eff. Sept. 1, 1993.

V. T. C. A., Government Code § 2001.174, TX GOVT § 2001.174

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. 1

Current through legislation effective May 15, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title. 10. General Government (Refs & Annos)
      Subtitle A. Administrative Procedure and Practice
        Chapter 2003. State Office of Administrative Hearings
          Subchapter C. Staff and Administration

V.T.C.A., Government Code § 2003.047

§ 2003.047. Hearings for Texas Commission on Environmental Quality

Currentness

(a) The office shall perform contested case hearings for the Texas Commission on Environmental Quality.

(b) The office shall conduct hearings relating to contested cases before the commission, other than a hearing conducted by one or more commissioners. The commission by rule may delegate to the office the responsibility to hear any other matter before the commission if consistent with the responsibilities of the office.

(c) The office may contract with qualified individuals to serve as temporary administrative law judges as necessary.

(d) To be eligible to preside at a hearing on behalf of the commission, an administrative law judge, regardless of temporary or permanent status, must be licensed to practice law in this state and have the expertise necessary to conduct hearings regarding technical or other specialized subjects that may come before the commission.

(e) In referring a matter for hearing, the commission shall provide to the administrative law judge a list of disputed issues. The commission shall specify the date by which the administrative law judge is expected to complete the proceeding and provide a proposal for decision to the commission. The administrative law judge may extend the proceeding if the administrative law judge determines that failure to grant an extension would deprive a party of due process or another constitutional right. The administrative law judge shall establish a docket control order designed to complete the proceeding by the date specified by the commission.

(e-1) This subsection applies only to a matter referred under Section 5.556, Water Code. Each issue referred by the commission must have been raised by an affected person in a comment submitted by that affected person in response to a permit application in a timely manner. The list of issues submitted under Subsection (e) must:

(1) be detailed and complete; and

(2) contain either:

(A) only factual questions; or

(B) mixed questions of fact and law.

(e-2) For a matter referred under Section 5.556 or 5.557, Water Code, the administrative law judge must complete the proceeding and provide a proposal for decision to the commission not later than the earlier of:

(1) the 180th day after the date of the preliminary hearing; or

(2) the date specified by the commission.

(e-3) The deadline specified by Subsection (e-2) or (e-6), as applicable, may be extended:

(1) by agreement of the parties with the approval of the administrative law judge; or

(2) by the administrative law judge if the judge determines that failure to extend the deadline would unduly deprive a party of due process or another constitutional right.

(e-4) For the purposes of Subsection (e-3)(2), a political subdivision has the same constitutional rights as an individual.

(e-5) This subsection applies only to a matter referred under Section 5.557, Water Code. The administrative law judge may not hold a preliminary hearing until after the executive director has issued a response to public comments under Section 5.555, Water Code.

(e-6) For a matter pertaining to an application described by Section 11.122(b-1), Water Code, the administrative law judge must complete the proceeding and provide a proposal for decision to the commission not later than the 270th day after the date the matter was referred to the office.

(f) Except as otherwise provided by this subsection, the scope of the hearing is limited to the issues referred by the commission. On the request of a party, the administrative law judge may consider an issue that was not referred by the commission if the administrative law judge determines that:

(1) the issue is material;

(2) the issue is supported by evidence; and

(3) there are good reasons for the failure to supply available information regarding the issue during the public comment period.

(g) The scope of permissible discovery is limited to:

(1) any matter reasonably calculated to lead to the discovery of admissible evidence regarding any issue referred to the administrative law judge by the commission or that the administrative law judge has agreed to consider; and

(2) the production of documents:

(A) reviewed or relied on in preparing application materials or selecting the site of the proposed facility; or

(B) relating to the ownership of the applicant or the owner or operator of the facility or proposed facility.

(h) The commission by rule shall:

(1) provide for subpoenas and commissions for depositions; and

(2) require that discovery be conducted in accordance with the Texas Rules of Civil Procedure, except that the commission by rule shall determine the level of discovery under Rule 190, Texas Rules of Civil Procedure, [1] appropriate for each type of case considered by the commission, taking into account the nature and complexity of the case.

(i) The office and the commission jointly shall adopt rules providing for certification to the commission of an issue that involves an ultimate finding of compliance with or satisfaction of a statutory standard the determination of which is committed to the discretion or judgment of the commission by law. The rules must address, at a minimum, the issues that are appropriate for certification and the procedure to be used in certifying the issue. Each agency shall publish the jointly adopted rules.

(i-1) In a contested case regarding a permit application referred under Section 5.556 or 5.557, Water Code, the filing with the office of the application, the draft permit prepared by the executive director of the commission, the preliminary decision issued by the executive director, and other sufficient supporting documentation in the administrative record of the permit application establishes a prima facie demonstration that:

(1) the draft permit meets all state and federal legal and technical requirements; and

(2) a permit, if issued consistent with the draft permit, would protect human health and safety, the environment, and physical property.

(i-2) A party may rebut a demonstration under Subsection (i-1) by presenting evidence that:

(1) relates to a matter referred under Section 5.557, Water Code, or an issue included in a list submitted under Subsection (e) in connection with a matter referred under Section 5.556, Water Code; and

(2) demonstrates that one or more provisions in the draft permit violate a specifically applicable state or federal requirement.

(i-3) If in accordance with Subsection (i-2) a party rebuts a presumption established under Subsection (i-1), the applicant and the executive director may present additional evidence to support the draft permit.

(j) An administrative law judge hearing a case on behalf of the commission, on the judge's own motion or on motion of a party and after notice and an opportunity for a hearing, may impose appropriate sanctions as provided by Subsection (k) against a party or its representative for:

    (1) filing a motion or pleading that is groundless and brought:

        (A) in bad faith;

        (B) for the purpose of harassment; or

        (C) for any other improper purpose, such as to cause unnecessary delay or needless increase in the cost of the proceeding;

    (2) abuse of the discovery process in seeking, making, or resisting discovery; or

    (3) failure to obey an order of the administrative law judge or the commission.

(k) A sanction imposed under Subsection (j) may include, as appropriate and justified, issuance of an order:

    (1) disallowing further discovery of any kind or of a particular kind by the offending party;

    (2) charging all or any part of the expenses of discovery against the offending party or its representatives;

    (3) holding that designated facts be considered admitted for purposes of the proceeding;

    (4) refusing to allow the offending party to support or oppose a designated claim or defense or prohibiting the party from introducing designated matters in evidence;

    (5) disallowing in whole or in part requests for relief by the offending party and excluding evidence in support of those requests; and

    (6) striking pleadings or testimony, or both, in whole or in part.

(l) After hearing evidence and receiving legal argument, an administrative law judge shall make findings of fact, conclusions of law, and any ultimate findings required by statute, all of which shall be separately stated. The administrative law judge shall

make a proposal for decision to the commission and shall serve the proposal for decision on all parties. An opportunity shall be given to each party to file exceptions to the proposal for decision and briefs related to the issues addressed in the proposal for decision. The commission shall consider and act on the proposal for decision.

(m) Except as provided in Section 361.0832, Health and Safety Code, the commission shall consider the proposal for decision prepared by the administrative law judge, the exceptions of the parties, and the briefs and argument of the parties. The commission may amend the proposal for decision, including any finding of fact, but any such amendment thereto and order shall be based solely on the record made before the administrative law judge. Any such amendment by the commission shall be accompanied by an explanation of the basis of the amendment. The commission may also refer the matter back to the administrative law judge to reconsider any findings and conclusions set forth in the proposal for decision or take additional evidence or to make additional findings of fact or conclusions of law. The commission shall serve a copy of the commission's order, including its finding of facts and conclusions of law, on each party.

(n) The provisions of Chapter 2001 shall apply to contested case hearings for the commission to the extent not inconsistent with this section.

(o) An administrative law judge hearing a case on behalf of the commission may not, without the agreement of all parties, issue an order referring the case to an alternative dispute resolution procedure if the commission has already conducted an unsuccessful alternative dispute resolution procedure. If the commission has not already conducted an alternative dispute resolution procedure, the administrative law judge shall consider the commission's recommendation in determining whether to issue an order referring the case to the procedure.

**Credits**
Added by Acts 1995, 74th Leg., ch. 106, § 1, eff. Sept. 1, 1995. Amended by Acts 1997, 75th Leg., ch. 934, § 5, eff. Sept. 1, 1997; Acts 1999, 76th Leg., ch. 1350, § 6, eff. Sept. 1, 1999; Acts 2015, 84th Leg., ch. 116 (S.B. 709), § 1, eff. Sept. 1, 2015; Acts 2015, 84th Leg., ch. 228 (H.B. 2154), §§ 6, 7, eff. Sept. 1, 2015; Acts 2017, 85th Leg., ch. 429 (S.B. 1430), § 2, eff. Sept. 1, 2017; Acts 2017, 85th Leg., ch. 1097 (H.B. 3735), § 6, eff. Sept. 1, 2017.

---

**Footnotes**

1        Vernon's Ann.Rules Civ.Proc., rule 190.1 et seq.

V. T. C. A., Government Code § 2003.047, TX GOVT § 2003.047
Current through legislation effective May 15, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 4

City of Georgetown Provisions

Sec. 5.01. - The City Manager.

The Council shall appoint a City Manager who shall be the chief administrative and executive officer of the City. The City Manager shall be chosen by the Council solely on the basis of executive and administrative training, experience and ability, and need not, when appointed, be a resident of the City of Georgetown; however during the tenure of office, the City Manager shall reside within the City.

The City Manager shall not be appointed for a definite term, but may be removed at the will and pleasure of the Council by the vote of a majority of all Councilmembers qualified and serving. The action of the Council in removing the City Manager shall be final, it being the intention of this Charter to vest all authority and fix all responsibility for such removal in the Council. The City Manager shall receive such compensation as may be fixed by the Council.

No member of the Council shall, during the time for which the councilmember is elected or for two (2) years thereafter, be chosen as City Manager.

SECTION 13.05. - PUBLIC WASTEWATER STANDARDS

All development, where desired or required, shall be served with an approved public wastewater system, including but not limited to, wastewater lines, manholes, force mains, and lift stations, consistent with the Comprehensive Plan. Properties in the ETJ that desire or require wastewater service from the City of Georgetown shall first submit a petition for voluntary annexation, in accordance with Section 3.25 of this Code. All improvements shall be designed and constructed according to the City's Construction Manual.

A. Where an approved public wastewater collection main or outfall line is less than one-half mile from the property boundary, connection to the public wastewater system shall be required and a public wastewater collection system shall be installed throughout the development.

B. Extension of wastewater utilities shall conform to the City's adopted Utility Extension and Improvement Policy, as amended.

C. The developer shall be responsible for the cost of extension and connection to the existing wastewater collection system.

D. The wastewater gravity main pipe size for wastewater improvements shall be a minimum diameter of eight inches.

E. The design and construction of all wastewater systems shall comply with regulations covering extension of public sanitary wastewater systems adopted by the Texas Commission on Environmental Quality.

F. All wastewater systems shall be designed and constructed to operate on a gravity flow basis. In extraordinary circumstances and with the approval of the Development Engineer, lots one acre and greater may design a low-pressure, vacuum, or gravity flow system to minimize the need for lift stations.

G. Where an approved wastewater collection main or outfall line is more than one-half mile away from the property boundary, on-site septic system(s) may be utilized; however, if the City's Capital Improvement Plan has scheduled the extension of a wastewater collection main or outfall line to be completed to a location point within one-half mile away from the property boundary within five years from the date of the Preliminary Plat submittal, connection to the public wastewater system is required. In such instance, the subdivider shall be required to install a public wastewater collection system and shall bear the cost of connecting to such existing wastewater collection system. A subdivider may request an exception or alternative to this requirement, which shall be considered by the Development Engineer or their designee. An appeal of the decision made by the Development Engineer in this regard shall be heard by the City Council.

H.  Improvements required through the Water Services Master Plan shall be designed and installed in accordance with Section 13.08 of this Code.

(Ord. No. 2017-15, § 2, 2-28-2017)

# Tab 5

TCEQ Regulations and Guidance

 **TEXAS COMMISSION ON ENVIRONMENTAL QUALITY**

(https://www.tceq.texas.gov)

Home (https://www.tceq.texas.gov) / Permits, Registrations, and Reporting (https://www.tceq.texas.gov/permitting) /
Wastewater Treatment (https://www.tceq.texas.gov/permitting/wastewater) / TCEQ Regionalization Policy for Wastewater
Treatment

# TCEQ Regionalization Policy for Wastewater Treatment

**Information for applicants and the public about the requirements associated with regionalization and TCEQ's role in reviewing domestic wastewater permit applications.**

---

**On this page:**

- **What is wastewater regionalization?**
- **When does TCEQ assess for wastewater regionalization?**
- **How has TCEQ decided on wastewater regionalization in the past?**
- **What do I need to provide as an applicant, for TCEQ to assess the need and availability of regionalization during the wastewater permitting process?**
- **How can the public participate in the wastewater permitting process?**

---

## What is wastewater regionalization?

Regionalization is the administrative or physical combination of two or more community wastewater systems for improved planning operation or management.

Texas Water Code (TWC) Section 26.081 provides Texas' regionalization policy for wastewater treatment. It states that TCEQ is to implement a policy to "encourage and promote the development and use of regional and area-wide waste collection, treatment, and disposal systems to serve the waste disposal needs of the citizens of the state and to prevent pollution and maintain and enhance the quality of the water in the state".

In furtherance of that policy TWC Section 26.0282 authorizes TCEQ, when considering issuing a permit to discharge waste, to deny or alter the terms and conditions of a proposed permit based on need and the availability of existing or proposed area-wide or regional waste collection, treatment, and disposal systems.

 **Back to top**

## When does TCEQ assess for wastewater regionalization?

TCEQ will assess for the need and availability of regionalization for wastewater during the permitting process. The presence of a wastewater treatment facility or wastewater collection system within three miles of a proposed new wastewater treatment facility or the expansion of an existing facility is <u>not</u> an automatic basis to deny an application or to compel an applicant to connect to an existing facility.

TCEQ may approve new, renewal, and major amendment applications for discharges of wastewater in any of the following situations where:

- There is no wastewater treatment facility or collection system within three miles of the proposed facility.

**AIRW-EXH. 28**
AIRW000382

- The applicant requested service from wastewater treatment facilities within the 3 miles, and the request was denied.
- The applicant can successfully demonstrate that an exception to regionalization should be granted based on costs, affordable rates, and/or other relevant factors.
- The applicant has obtained a Certificate of Convenience and Necessity (CCN) for the service area of the proposed new facility or the proposed expansion of the existing facility.

🔺 **Back to top**

## How has TCEQ decided on wastewater regionalization in the past?

TCEQ has not denied any wastewater permit actions based solely on regionalization, and the agency supports new applicants and existing facilities productively working together to provide quality and cost-effective service. The following concerns related to regionalization were raised during previous wastewater permit actions and subsequent legal proceedings:

- lack of timely and cost-efficient wastewater services within the surrounding area
- lack of detailed cost analysis and comparison
- lack of thorough communication with existing facilities within a three-mile radius
- discharges within the Cibolo Creek Watershed per Title 30 , Texas Administrative Code (30 TAC), Section 351.65

TCEQ has previously included agreed language between the applicant and protestants in the "Other Requirements" section of the proposed permit that contains requirements about future coordination if the existing wastewater provider is able to provide service to proposed area.

🔺 **Back to top**

## What do I need to provide as an applicant, for TCEQ to assess the need and availability of regionalization during the wastewater permitting process?

TCEQ requires that you include justification of permit need in all wastewater permit applications for new facilities and all applications to amend an existing permit. Section 1.1 of the Domestic Technical Report for wastewater permit applications also requires the following information:

1. Determine whether or not there are any permitted domestic wastewater treatment facilities or collection systems within a three-mile radius of the proposed facility.
    - Tools to use:
        - **Wastewater Outfall Map Viewer**⤢ **(https://tceq.maps.arcgis.com/apps/webappviewer/index.html? id=d47b9419f42c49dea592203aeda99da1)**
        - **PUC CCN Map Viewer** ⤢ **(https://www.puc.texas.gov/industry/water/utilities/map.aspx)**
2. Contact any existing permitted domestic wastewater treatment facilities within a three-mile radius to inquire if they currently have the capacity to accept or are willing to expand to accept the volume of wastewater proposed.
    - If an existing facility does have the capacity to accept the proposed wastewater, submit an analysis of expenditures required to connect to the existing facility or collection system versus the cost of constructing and operating the proposed new facility or expansion.
3. Provide copies of all correspondence with the owners and/or operators of any existing permitted domestic wastewater treatment facilities and collection systems within a three-mile radius of the proposed facility.

🔺 **Back to top**

**AIRW-EXH. 28**

AIRW000383

## How can the public participate in the wastewater permitting process?

- **Environmental Permitting: Participating in the Process (/agency/decisions/participation/permitting-participation)**
- **Permits for Municipal Wastewater Treatment Plants: Learning More (/agency/decisions/participation/permitting-participation/municipal-wastewater)**

▲ **Back to top**

**AIRW-EXH. 28**

AIRW000384

Texas Administrative Code
Title 16. Economic Regulation
Part 2. Public Utility Commission of Texas
Chapter 24. Substantive Rules Applicable to Water and Sewer Service Providers
Subchapter H. Certificates of Convenience and Necessity

16 TAC § 24.225

§ 24.225. Certificate of Convenience and Necessity Required

Currentness

(a) Unless otherwise specified, a utility or a water supply or sewer service corporation may not in any way provide retail water or sewer utility service directly or indirectly to the public without first having obtained from the commission a certificate of convenience and necessity (CCN). Except as otherwise provided by this subchapter, a retail public utility may not provide, make available, or extend retail water or sewer utility service to any area to which retail water or sewer utility service is being lawfully provided by another retail public utility without first obtaining a CCN that includes the area in which the consuming facility is located.

(b) A district may not provide services within the certificated service area of a retail public utility or within the boundaries of another district without the retail public utility's or district's consent, unless the district has a CCN to provide retail water or sewer utility service to that area.

(c) Except as otherwise provided by this subchapter, a retail public utility may not provide retail water or sewer utility service within the boundaries of a district that provides the same type of retail water or sewer utility service without the district's consent, unless the retail public utility has a CCN to provide retail water or sewer utility service to that area.

(d) A person that is not a retail public utility, a utility, or a water supply or sewer service corporation that is operating under provisions in accordance with TWC §13.242(c) may not construct facilities to provide retail water or sewer utility service to more than one service connection that is not on the property owned by the person and that is within the certificated service area of a retail public utility without first obtaining written consent from the retail public utility.

(e) A supplier of wholesale water or sewer service may not require a purchaser to obtain a CCN if the purchaser is not otherwise required by this chapter to obtain a CCN.

**Credits**
**Source:** The provisions of this §24.225 adopted to be effective October 17, 2018, 43 TexReg 6826.

Current through 50 Tex.Reg. No. 802, dated February 7, 2025, as effective on or before February 14, 2025. Some sections may be more current. See credits for details.

16 TAC § 24.225, 16 TX ADC § 24.225

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Texas Administrative Code
  Title 30. Environmental Quality
    Part 1. Texas Commission on Environmental Quality
      Chapter 60. Compliance History

30 TAC § 60.1

§ 60.1. Compliance History

Currentness

(a) Applicability. The provisions of this chapter are applicable to all persons subject to the requirements of Texas Water Code (TWC), Chapters 26, 27, and 32 and Texas Health and Safety Code (THSC), Chapters 361, 375, 382, and 401.

(1) Specifically, the agency will utilize compliance history when making decisions regarding:

(A) the issuance, renewal, amendment, modification, denial, suspension, or revocation of a permit;

(B) enforcement;

(C) the use of announced investigations; and

(D) participation in innovative programs.

(2) For purposes of this chapter, the term "permit" means licenses, certificates, registrations, approvals, permits by rule, standard permits, or other forms of authorization.

(3) With respect to authorizations, this chapter only applies to forms of authorization, including temporary authorizations, that require some level of notification to the agency, and which, after receipt by the agency, requires the agency to make a substantive review of and approval or disapproval of the authorization required in the notification or submittal. For the purposes of this rule, "substantive review of and approval or disapproval" means action by the agency to determine, prior to issuance of the requested authorization, and based on the notification or other submittal, whether the person making the notification has satisfied statutory or regulatory criteria that are prerequisites to issuance of such authorization. The term "substantive review or response" does not include confirmation of receipt of a submittal.

(4) Regardless of the applicability of paragraphs (2) and (3) of this subsection, this chapter does not apply to certain permit actions such as:

(A) voluntary permit revocations;

(B) minor amendments and nonsubstantive corrections to permits;

(C) Texas pollutant discharge elimination system and underground injection control minor permit modifications;

(D) Class 1 solid waste modifications, except for changes in ownership;

(E) municipal solid waste Class I modifications, except for temporary authorizations and municipal solid waste Class I modifications requiring public notice;

(F) permit alterations;

(G) administrative revisions; and

(H) air quality new source review permit amendments which meet the criteria of §39.402(a)(3)(A)-(C) and (5)(A)-(C) of this title (relating to Applicability to Air Quality Permits and Permit Amendments) and minor permit revisions under Chapter 122 of this title (relating to Federal Operating Permits Program).

(5) Further, this chapter does not apply to occupational licensing programs under the jurisdiction of the commission.

(6) Not later than September 1, 2012, the executive director shall develop compliance histories with the components specified in this chapter. Prior to September 1, 2012, the executive director shall continue in effect the standards and use of compliance history for any action (permitting, enforcement, or otherwise) that were in effect before September 1, 2012.

(7) Beginning September 1, 2012, this chapter shall apply to the use of compliance history in agency decisions relating to:

(A) applications submitted on or after this date for the issuance, amendment, modification, or renewal of permits;

(B) inspections and flexible permitting;

(C) a proceeding that is initiated or an action that is brought on or after this date for the suspension or revocation of a permit or the imposition of a penalty in a matter under the jurisdiction of the commission; and

(D) applications submitted on or after this date for other forms of authorization, or participation in an innovative program, except for flexible permitting.

(8) If a motion to overturn is filed under §50.139 of this title (relating to Motion to Overturn Executive Director's Decision) with respect to any of the actions listed in paragraph (4) of this subsection, and is set for commission agenda, a compliance

history shall be prepared by the executive director and filed with the Office of the Chief Clerk no later than six days before the Motion is considered on the commission agenda.

(b) Compliance period. The compliance history period includes the five years prior to the date the permit application is received by the executive director; the five-year period preceding the date of initiating an enforcement action with an initial enforcement settlement offer or the filing date of an Executive Director's Preliminary Report, whichever occurs first; for purposes of determining whether an announced investigation is appropriate, the five-year period preceding an investigation; or the five years prior to the date the application for participation in an innovative program is received by the executive director. The compliance history period may be extended beyond the date the application for the permit or participation in an innovative program is received by the executive director, up through completion of review of the application. Except as used in §60.2(f) of this title (relating to Classification) for determination of repeat violator, notices of violation may only be used as a component of compliance history for a period not to exceed one year from the date of issuance.

(c) Components. The compliance history shall include multimedia compliance-related information about a person, specific to the site which is under review, as well as other sites which are owned or operated by the same person. The components are:

(1) any final enforcement orders, court judgments, and criminal convictions of this state relating to compliance with applicable legal requirements under the jurisdiction of the commission. "Applicable legal requirement" means an environmental law, regulation, permit, order, consent decree, or other requirement;

(2) regardless of any other provision of the TWC, orders developed under TWC, §7.070 and approved by the commission on or after February 1, 2002;

(3) to the extent readily available to the executive director, final enforcement orders, court judgments, consent decrees, and criminal convictions relating to violations of environmental rules of the United States Environmental Protection Agency;

(4) chronic excessive emissions events. For purposes of this chapter, the term "emissions event" is the same as defined in THSC, §382.0215(a);

(5) any information required by law or any compliance-related requirement necessary to maintain federal program authorization;

(6) the dates of investigations;

(7) all written notices of violation for a period not to exceed one year from the date of issuance of each notice of violation, including written notification of a violation from a regulated person, issued on or after September 1, 1999, except for those administratively determined to be without merit;

(8) the date of letters notifying the executive director of an intended audit conducted and any violations disclosed and having received immunity under the Texas Environmental, Health, and Safety Audit Privilege Act (Audit Act), 75th Legislature, 1997, TEX. REV. CIV. STAT. ANN. art. 4447cc (Vernon's);

(9) an environmental management system approved under Chapter 90 of this title (relating to Innovative Programs), if any, used for environmental compliance;

(10) any voluntary on-site compliance assessments conducted by the executive director under a special assistance program;

(11) participation in a voluntary pollution reduction program; and

(12) a description of early compliance with or offer of a product that meets future state or federal government environmental requirements.

(d) Change in ownership. In addition to the requirements in subsections (b) and (c) of this section, if ownership of the site changed during the five-year compliance period, a distinction of compliance history of the site under each owner during that five-year period shall be made. Specifically, for any part of the compliance period that involves a previous owner, the compliance history will include only the site under review. For the purposes of this rule, a change in operator shall be considered a change in ownership if the operator is a co-permittee.

**Credits**
**Source:** The provisions of this §60.1 adopted to be effective January 9, 2002, 27 TexReg 191; amended to be effective June 24, 2010, 35 TexReg 5277; amended to be effective July 19, 2012, 37 TexReg 5283; amended to be effective May 14, 2020, 45 TexReg 3082.

Current through 50 Tex.Reg. No. 802, dated February 7, 2025, as effective on or before February 14, 2025. Some sections may be more current. See credits for details.

30 TAC § 60.1, 30 TX ADC § 60.1

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Texas Administrative Code
  Title 30. Environmental Quality
    Part 1. Texas Commission on Environmental Quality
      Chapter 305. Consolidated Permits
        Subchapter D. Amendments, Renewals, Transfers, Corrections, Revocation, and Suspension of Permits

30 TAC § 305.64

§ 305.64. Transfer of Permits

Currentness

(a) A permit is issued in personam and may be transferred only upon approval of the commission. No transfer is required for a corporate name change, as long as the secretary of state can verify that a change in name alone has occurred. An attempted transfer is not effective for any purpose until actually approved by the commission.

(b) Except as provided otherwise in subsection (g) of this section, either the transferee or the permittee shall submit to the executive director an application for transfer at least 30 days before the proposed transfer date. The application shall contain the following:

(1) the name and address of the transferee;

(2) date of proposed transfer;

(3) if the permit requires financial responsibility, the method by which the proposed transferee intends to assume or provide financial responsibility, including proof of such financial responsibility to become effective when the transfer becomes effective;

(4) a fee of $100 to be applied toward the processing of the application, as provided in § 305.53(a) of this title (relating to Application Fee);

(5) a sworn statement that the application is made with the full knowledge and consent of the permittee if the transferee is filing the application; and

(6) any other information the executive director may reasonably require.

(c) If no agreement regarding transfer of permit responsibility and liability is provided, responsibility for compliance with the terms and conditions of the permit and liability for any violation associated therewith is assumed by the transferee, effective on the date of the approved transfer. This section is not intended to relieve a transferor of any liability.

(d) The executive director must be satisfied that proof of any required financial responsibility is sufficient before transmitting an application for transfer to the commission for further proceedings.

(e) If a person attempting to acquire a permit causes or allows operation of the facility before approval is given, such person shall be considered to be operating without a permit or other authorization.

(f) The commission may refuse to approve a transfer where conditions of a judicial decree, compliance agreement, or other enforcement order have not been entirely met. The commission shall also consider the prior compliance record of the transferee, if any.

(g) For permits involving hazardous waste under the Texas Solid Waste Disposal Act, Texas Health and Safety Code Annotated, Chapter 361 changes in the ownership or operational control of a facility may be made as Class 1 modifications with prior written approval of the executive director in accordance with §305.69 of this title (relating to Solid Waste Permit Modification at the Request of the Permittee). The new owner or operator must submit a revised permit application no later than 90 days prior to the scheduled change. A written agreement containing a specific date for transfer of permit responsibility between the current and new permittees must also be submitted to the executive director. When a transfer of ownership or operational control occurs, the old owner or operator shall comply with the requirements of Chapter 37, Subchapter P of this title (relating to Financial Assurance for Hazardous and Nonhazardous Industrial Solid Waste Facilities), until the new owner or operator has demonstrated compliance with the requirements of Chapter 37, Subchapter P of this title. The new owner or operator must demonstrate compliance with the requirements of Chapter 37, Subchapter P of this title within six months of the date of the change of ownership or operational control of the facility. Prior to the executive director issuing the permit modification transferring the permit, the new owner or operator must provide proof of financial assurance in compliance with Chapter 37, Subchapter P of this title. Upon demonstration to the executive director of compliance with Chapter 37 of this title (relating to Financial Assurance), the executive director shall notify the old owner or operator that he no longer needs to comply with Chapter 37, Subchapter P of this title as of the date of demonstration.

(h) The commission may transfer permits to an interim permittee pending an ultimate decision on a permit transfer if it finds one or more of the following:

(1) the permittee no longer owns the permitted facilities;

(2) the permittee is about to abandon or cease operation of the facilities;

(3) the permittee has abandoned or ceased operating the facilities; and

(4) there exists a need for the continued operation of the facility and the proposed interim permittee is capable of assuming responsibility for compliance with the permit.

(i) The commission may transfer a permit involuntarily after notice and an opportunity for hearing, for any of the following reasons:

(1) the permittee no longer owns or controls the permitted facilities;

(2) if the facilities have not been built, and the permittee no longer has sufficient property rights in the site of the proposed facilities;

(3) the permittee has failed or is failing to comply with the terms and conditions of the permit;

(4) the permitted facilities have been or are about to be abandoned;

(5) the permittee has violated commission rules or orders;

(6) the permittee has been or is operating the permitted facilities in a manner which creates an imminent and substantial endangerment to the public health or the environment;

(7) foreclosure, insolvency, bankruptcy, or similar proceedings have rendered the permittee unable to construct the permitted facilities or adequately perform its responsibilities in operating the facilities; or

(8) transfer of the permit would maintain the quality of water in the state consistent with the public health and enjoyment, the propagation and protection of terrestrial and aquatic life, and the operation of existing industries, taking into consideration the economic development of the state and/or would minimize the damage to the environment; and

(9) the transferee has demonstrated the willingness and ability to comply with the permit and all other applicable requirements.

(j) The commission may initiate proceedings in accordance with the Texas Water Code, Chapter 13, for the appointment of a receiver consistent with this section.

(k) For standard permits, changes in the ownership or operational control of a facility may be made as a Class 1 modification to the standard permit with prior approval from the executive director in accordance with § 305.69(k) of this title.

**Credits**
**Source:** The provisions of this §305.64 adopted to be effective June 19, 1986, 11 TexReg 2594; amended to be effective July 14, 1987, 12 TexReg 2102; amended to be effective July 19, 1989, 14 TexReg 3297; amended to be effective October 29, 1990, 15 TexReg 6015; amended to be effective March 21, 2000, 25 TexReg 2368; amended to be effective September 12, 2002, 27 TexReg 8560; amended to be effective October 29, 2009, 34 TexReg 7315; amended to be effective February 21, 2013, 38 TexReg 970; amended to be effective June 11, 2020, 45 TexReg 3773.

Current through 50 Tex.Reg. No. 802, dated February 7, 2025, as effective on or before February 14, 2025. Some sections may be more current. See credits for details.

30 TAC § 305.64, 30 TX ADC § 305.64

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Texas Administrative Code
  Title 30. Environmental Quality
    Part 1. Texas Commission on Environmental Quality
      Chapter 307. Texas Surface Water Quality Standards

30 TAC § 307.5

§ 307.5. Antidegradation

Currentness

(a) Application. The antidegradation policy and implementation procedures set forth in this section apply to actions regulated under state and federal authority that would increase pollution of the water in the state. Such actions include authorized wastewater discharges, total maximum daily loads (TMDLs), waste load evaluations, and any other miscellaneous actions, such as those related to man-induced nonpoint sources of pollution, that may impact the water in the state.

(b) Antidegradation policy. In accordance with the Texas Water Code, § 26.003, the following provisions establish the antidegradation policy of the commission.

(1) Tier 1. Existing uses and water quality sufficient to protect those existing uses must be maintained. Categories of existing uses are the same as for designated uses, as defined in § 307.7 of this title (relating to Site-Specific Uses and Criteria).

(2) Tier 2. No activities subject to regulatory action that would cause degradation of waters that exceed fishable/swimmable quality are allowed unless it can be shown to the commission's satisfaction that the lowering of water quality is necessary for important economic or social development. Degradation is defined as a lowering of water quality by more than a de minimis extent, but not to the extent that an existing use is impaired. Water quality sufficient to protect existing uses must be maintained. Fishable/swimmable waters are defined as waters that have quality sufficient to support propagation of indigenous fish, shellfish, terrestrial life, and recreation in and on the water.

(3) Tier 3. Outstanding national resource waters are defined as high quality waters within or adjacent to national parks and wildlife refuges, state parks, wild and scenic rivers designated by law, and other designated areas of exceptional recreational or ecological significance. The quality of outstanding national resource waters must be maintained and protected.

(4) Discharges that cause pollution that are authorized by the Texas Water Code, the Federal Clean Water Act, or other applicable laws must not lower water quality to the extent that the Texas Surface Water Quality Standards are not attained.

(5) Anyone discharging wastewater that would constitute a new source of pollution or an increased source of pollution from any industrial, public, or private project or development is required to provide a level of wastewater treatment consistent with the provisions of the Texas Water Code and the Clean Water Act (33 United States Code, §§ 1251 et seq.). As necessary, cost-effective and reasonable best management practices established through the Texas Water Quality Management Program are achieved for nonpoint sources of pollution.

(6) Application of antidegradation provisions does not preclude the commission from establishing modified thermal discharge limitations consistent with the Clean Water Act, § 316(a) (33 United States Code, § 1326).

(c) Antidegradation implementation procedures.

(1) Implementation for specific regulatory activities.

(A) For TPDES permits for wastewater, the process for the antidegradation review and public coordination is described in the standards implementation procedures.

(B) For federal permits relating to the discharge of fill or dredged material under Federal Clean Water Act, § 404, the antidegradation policy and public coordination is implemented through the evaluation of alternatives and mitigation under Federal Clean Water Act, § 404(b)(1). State review of alternatives, mitigation, and requirements to protect water quality may also be conducted for federal permits that are subject to state certification, as authorized by Federal Clean Water Act, § 401 and conducted in accordance with Chapter 279 of this title (relating to Water Quality Certification).

(C) Other state and federal permitted and regulated activities that increase pollution of water in the state are also subject to the provisions of the antidegradation policy as established in subsections (a) and (b) of this section.

(2) General provisions for implementing the antidegradation policy.

(A) Tier 1 reviews must ensure that water quality is sufficiently maintained so that existing uses are protected. All pollution that could cause an impairment of water quality is subject to Tier 1 reviews. If the existing uses and criteria of a potentially affected water body have not been previously determined, then the antidegradation review must include a preliminary determination of existing uses and criteria. Existing uses must be maintained and protected.

(B) Tier 2 reviews apply to all pollution that could cause degradation of water quality where water quality exceeds levels necessary to support propagation of fish, shellfish, terrestrial life, and recreation in and on the water (fishable/swimmable quality). Guidance for determining water bodies that exceed fishable/swimmable quality is contained in the standards implementation procedures. For dissolved oxygen, analyses of degradation under Tier 2 must utilize the same critical conditions as are used to protect instream criteria. For other parameters, appropriate conditions may vary. Conditions for determining degradation are commensurate with conditions for determining existing uses. The highest water quality sustained since November 28, 1975 (in accordance with EPA Standards Regulation 40 Code of Federal Regulations Part 131) defines baseline conditions for determinations of degradation.

(C) Tier 3 reviews apply to all pollution that could cause degradation of outstanding national resource waters. Outstanding national resource waters are those specifically designated in this chapter.

(D) When degradation of waters exceeding fishable/swimmable quality is anticipated, a statement that the antidegradation policy is pertinent to the permit action must be included in the public notice for the permit application or amendment. If no degradation is anticipated, the public notice must so state.

(E) Evidence can be introduced in public hearings, or through the public comment process, concerning the determination of existing uses and criteria; the assessment of degradation under Tier 1, Tier 2, and Tier 3; the social and economic justification for lowering water quality; requirements and conditions necessary to preclude degradation; and any other issues that bear upon the implementation of the antidegradation policy.

(F) Interested parties are given the opportunity to provide comments and additional information concerning the determination of existing uses, anticipated impacts of the discharge, baseline conditions, and the necessity of the discharge for important economic or social development if degradation of water quality is expected under Tier 2.

(G) The antidegradation policy and the general provisions for implementing the antidegradation policy apply to the determination of TMDLs and to waste load evaluations that allow an increase in loading. If the TMDL or waste load evaluation indicates that degradation of waters exceeding fishable/swimmable quality is expected, the public hearing notice must so state. Permits that are consistent with an approved TMDL or waste load evaluation under this antidegradation policy are not subjected to a separate antidegradation review for the specific parameters that are addressed by the TMDL or waste load evaluation.

**Credits**
**Source:** The provisions of this §307.5 adopted to be effective July 10, 1991, 16 TexReg 3400; amended to be effective July 13, 1995, 20 TexReg 4701; amended to be effective August 17, 2000, 25 TexReg 7722; amended to be effective July 22, 2010, 35 TexReg 6294.

Current through 50 Tex.Reg. No. 802, dated February 7, 2025, as effective on or before February 14, 2025. Some sections may be more current. See credits for details.

30 TAC § 307.5, 30 TX ADC § 307.5

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Texas Administrative Code
    Title 30. Environmental Quality
        Part 1. Texas Commission on Environmental Quality
            Chapter 309. Domestic Wastewater Effluent Limitation and Plant Siting
                Subchapter B. Location Standards

30 TAC § 309.13

§ 309.13. Unsuitable Site Characteristics

Currentness

(a) A wastewater treatment plant unit may not be located in the 100-year flood plain unless the plant unit is protected from inundation and damage that may occur during that flood event.

(b) A wastewater treatment plant unit may not be located in wetlands. (This prohibition is not applicable to constructed wetlands.)

(c) A wastewater treatment plant unit may not be located closer than 500 feet from a public water well as provided by §290.41(c)(1)(B) of this title (relating to Water Sources) nor 250 feet from a private water well. The following separation distances apply to any facility used for the storage, processing, or application of domestic wastewater. Exceptions to these requirements will be considered at the request of a permit applicant on a case-by-case basis, and alternative provisions will be established in a permit if the alternative condition provides adequate protection to potable water sources and supplies.

(1) A wastewater treatment plant unit, or land where irrigation using wastewater effluent occurs must be located a minimum horizontal distance of 150 feet from a private water well.

(2) A wastewater treatment plant unit, or land where irrigation using wastewater effluent occurs, must be located a minimum horizontal distance of 500 feet from an elevated or ground potable-water storage tank as provided by §290.43(b)(1) of this title (relating to Water Storage).

(3) A wastewater treatment plant unit, or land where irrigation using wastewater effluent occurs, must be located a minimum horizontal distance of 500 feet from a public water well site as provided by §290.41(c)(1)(C) of this title, spring, or other similar sources of public drinking water.

(4) A wet well or pump station at a wastewater treatment facility must be located a minimum horizontal distance of 300 feet from a public water well site, spring, or other similar sources of public drinking water as provided by §290.41(c)(1)(B) of this title.

(5) A wastewater treatment plant unit, or land where irrigation using wastewater effluent occurs, must be located a minimum horizontal distance of 500 feet from a surface water treatment plant as provided by §290.42(a)(2)(A) of this title (relating to Water Treatment).

(d) A wastewater treatment facility surface impoundment may not be located in areas overlying the recharge zones of major or minor aquifers, as defined by the Texas Water Development Board, unless the aquifer is separated from the base of the containment structure by a minimum of three feet of material with a hydraulic conductivity toward the aquifer not greater than $10^{-7}$ cm/sec or a thicker interval of more permeable material which provides equivalent or greater retardation of pollutant migration. A synthetic membrane liner may be substituted with a minimum of 40 mils thickness and an underground leak detection system with appropriate sampling points.

(e) One of the following alternatives must be met as a compliance requirement to abate and control a nuisance of odor prior to construction of a new wastewater treatment plant unit, or substantial change in the function or use of an existing wastewater treatment unit.

(1) Lagoons with zones of anaerobic activity (e.g., facultative lagoons, un-aerated equalization basins, etc.) may not be located closer than 500 feet to the nearest property line. All other wastewater treatment plant units may not be located closer than 150 feet to the nearest property line. Land used to treat primary effluent is considered a plant unit. Buffer zones for land used to dispose of treated effluent by irrigation shall be evaluated on a case-by-case basis. The permittee must hold legal title or have other sufficient property interest to a contiguous tract of land necessary to meet the distance requirements specified in this paragraph during the time effluent is disposed by irrigation.

(2) The applicant must submit a nuisance odor prevention request for approval by the executive director. A request for nuisance odor prevention must be in the form of an engineering report, prepared and sealed by a licensed Texas professional engineer in support of the request. At a minimum, the engineering report shall address existing climatological conditions such as wind velocity and atmospheric stability, surrounding land use which exists or which is anticipated in the future, wastewater characteristics in affected units pertaining to the area of the buffer zone, potential odor generating units, and proposed solutions to prevent nuisance conditions at the edge of the buffer zone and beyond. Proposed solutions shall be supported by actual test data or appropriate calculations. The request shall be submitted, prior to construction, either with a permit application and subject to review during the permitting process or submitted for executive director approval after the permitting process is completed.

(3) The permittee must submit sufficient evidence of legal restrictions prohibiting residential structures within the part of the buffer zone not owned by the applicant. Sufficient evidence of legal restriction may, among others, take the form of a suitable restrictive easement, right-of-way, covenant, deed restriction, deed recorded, or a private agreement provided as a certified copy of the original document. The request shall be submitted, prior to construction, either with a permit application and subject to review during the permitting process or submitted for executive director approval after the permitting process is completed.

(f) For a facility for which a permit application, other than a renewal application, is made after October 8, 1990, if the facility will not meet the buffer zone requirement by one of the alternatives described in subsection (e) of this section, the applicant shall include in the application for the discharge permit a request for a variance. A variance will be considered on a case-by-case basis and, if granted by the commission, shall be included as a condition in the permit. This variance may be granted by the commission, consistent with the policies set out in Texas Water Code, §26.003.

(g) Any approved alternative for achieving the requirements of this section must remain in effect as long as the wastewater treatment plant is permitted by the commission. To comply with this requirement, the permittee must carry out the nuisance

odor prevention plan at all times, shall ensure sufficient property ownership or interest and shall maintain easements prohibiting residential structures, as appropriate.

(h) For a permitted facility undergoing renewal of an existing permit with plans and specifications approved prior to March 1, 1990, for which no design change is requested, the facility will not be required to comply with the requirements of this section.

(i) Facilities for which plans and specifications have been approved prior to March 1, 1990, are not required to resubmit revised plans and specifications to meet changed requirements in this section in obtaining renewal of an existing permit.

**Credits**
**Source:** The provisions of this §309.13 adopted to be effective March 19, 1990, 15 TexReg 1160; amended to be effective October 8, 1990, 15 TexReg 5500; amended to be effective June 5, 1998, 23 TexReg 5723; amended to be effective January 9, 2020, 45 TexReg 370.

Current through 50 Tex.Reg. No. 802, dated February 7, 2025, as effective on or before February 14, 2025. Some sections may be more current. See credits for details.

30 TAC § 309.13, 30 TX ADC § 309.13

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Andrew Davis on behalf of Andrew Davis
Bar No. 24082898
andrew@lehotskykeller.com
Envelope ID: 101184423
Filing Code Description: Brief Requesting Oral Argument
Filing Description: AIRW Opening Brief and Appendix
Status as of 5/23/2025 7:05 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Patricia Carls | 3813425 | tcarls@tcarlslaw.com | 5/22/2025 5:10:45 PM | SENT |
| William Thompson | 24088531 | will@lkcfirm.com | 5/22/2025 5:10:45 PM | SENT |
| Edmond McCarthy | 13367200 | ed@ermlawfirm.com | 5/22/2025 5:10:45 PM | SENT |
| William Faulk | 24075674 | cfaulk@spencerfane.com | 5/22/2025 5:10:45 PM | SENT |
| John Carlton | 3817600 | john@carltonlawaustin.com | 5/22/2025 5:10:45 PM | SENT |
| Michael Parsons | 24079109 | michael@carltonlawaustin.com | 5/22/2025 5:10:45 PM | SENT |
| Carlota Hopinks-Baul | 24094039 | chbaul@spencerfane.com | 5/22/2025 5:10:45 PM | SENT |
| Helen Gilbert | 786263 | hgilbert@bartonbensonjones.com | 5/22/2025 5:10:45 PM | SENT |
| Kellie E.Billings-Ray | | Kellie.Billings-Ray@oag.texas.gov | 5/22/2025 5:10:45 PM | SENT |
| Sara Ferris | | sara.ferris@oag.texas.gov | 5/22/2025 5:10:45 PM | SENT |
| Colton Halter | | colton.halter@oag.texas.gov | 5/22/2025 5:10:45 PM | SENT |
| Erin  K.Snody | | Erin.Snody@oag.texas.gov | 5/22/2025 5:10:45 PM | ERROR |
| Maris Chambers | | MChambers@spencerfane.com | 5/22/2025 5:10:45 PM | SENT |
| Andrew Davis | | andrew@lkcfirm.com | 5/22/2025 5:10:45 PM | SENT |
| Todd Disher | | todd@lkcfirm.com | 5/22/2025 5:10:45 PM | SENT |
| John Carlton | | john@carltonlawfirm.com | 5/22/2025 5:10:45 PM | ERROR |
| Kelli Carlton | | kelli@carltonlawfirm.com | 5/22/2025 5:10:45 PM | ERROR |
| Erin Selvera | | erin@carltonlawfirm.com | 5/22/2025 5:10:45 PM | ERROR |
| Yahaira De Lara | | ydelara@bartonbensonjones.com | 5/22/2025 5:10:45 PM | SENT |
| Jennifer Jamison | | jennifer.jamison@tceq.texas.gov | 5/22/2025 5:10:45 PM | SENT |
| Bobby Salehi | | bobby.salehi@tceq.texas.gov | 5/22/2025 5:10:45 PM | ERROR |